## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANICE BEECHER and OMAR HAKKAOUI on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| VOLKSWAGEN GROUP OF AMERICA, INC., | |
| Defendant. | |

Plaintiffs Janice Beecher and Omar Hakkaoui (the "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against Defendant Volkswagen Group of America, Inc. ("Defendant" or "Volkswagen"). For their Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

### INTRODUCTION

1.    This consumer class action arises from a defect found in the 2021-2023 model year Volkswagen ID.4 (the "Class Vehicles"). The Class Vehicles currently

have a base MSRP of \$39,995 for the 2021 Volkswagen ID.4[1], a base MSRP of \$41,230 for the 2022 Volkswagen ID.4,[2] and a base MSRP of \$37,495 for the 2023 Volkswagen ID.4.[3]

2.    Defendant touted that the Class Vehicles are all-electric SUVs with safe technology. Defendant boasts that the Class Vehicles adopt technology "that help make it easier than ever to adopt the EV lifestyle"[4] and technology that is "safety-enhancing and intelligent."[5] Defendant proudly maintains that the Class Vehicles' technology can almost exclusively be controlled through voice or touch and that "there are very few actual buttons."[6]

3.    However, Defendant manufactured, marketed, and distributed the Class Vehicles without disclosing a key defect in material, workmanship, and/or design. Specifically, the Class Vehicles' overly touch sensitive capacitive steering wheels automatically engage Adaptive Cruise Control ("ACC") with a mere light brush of the hand over the steering wheel's haptic controls. This results in sudden and unintended acceleration while owners are driving the Class Vehicle. Plaintiffs have

---

[1] https://media.vw.com/en-us/press-kits/2021-id4-press-kit (last accessed March 19, 2025)

[2] https://media.vw.com/en-us/releases/1661 (last accessed March 19, 2025)

[3] https://media.vw.com/en-us/releases/1699 (last accessed March 19, 2025)

[4] https://www.vw.com/en/newsroom/everything-electric/vw-s-ev-history.html (last accessed March 19, 2025)

[5] https://www.vw.com/en/iq-drive/travel-assist.html (last accessed March 19, 2025)

[6] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)

been involved in fatal crashes because of the Defect, leaving them terrified and hesitant to drive their Class Vehicles.

4.    In addition to concealing the Defect, Defendant actively misrepresented the attributes and capabilities of the Class Vehicles by claiming, among other things, that the vehicles had been thoroughly tested, had no manufacturing shortcomings, and were equipped with robust technology that made the Class Vehicles safe to drive on a regular basis.

5.    Despite knowledge of the Defect from customer complaints, information sent from dealers, and its own internal records, Defendant has not offered its customers suitable repairs or replacements free of charge or offered to reimburse its customers. Instead, Defendant's investigations of Plaintiffs' complaints have continually led Defendant to conclude that the crashes with Class Vehicles were due to 'driver error' and had nothing to do with the Defect.

6.    Plaintiffs have suffered harm as a result of Defendant's decision not to disclose the Defect in the Class Vehicles. Plaintiffs purchased Class Vehicles which suffer from the Defect.

7.    On behalf of the class and subclasses they propose to represent, Plaintiffs seek an award of monetary damages, including the costs of inspecting and repairing the Class Vehicles, and appropriate injunctive and equitable relief,

including an order requiring Defendant to adequately disclose and repair the Defect in its Class Vehicles.

8.      It is well settled that a "plaintiff is 'the master of the complaint,' and therefore controls much about [his or] her suit." *Royal Canin U.S.A., Inc. v. Wullschleger*, 220 L.Ed.2d 289, 302 (U.S. 2025). As detailed herein, Plaintiffs' claims here focus on material omissions, not affirmative misrepresentations.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs.  This is a class action in which more than two-thirds of the proposed plaintiff class are citizens of states other than the Defendant.

10.      This Court has personal jurisdiction over Defendant Volkswagen Group of America, Inc. because it is incorporated in this district, conducts substantial business in this judicial district, and intentionally and purposefully placed the Class Vehicles into the stream of commerce within this district and throughout the United States.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391

because Defendant Volkswagen Group of America, Inc. is incorporated in this district, transacts business in this district and is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.

## PARTIES

12.    Plaintiff Janice Beecher is a citizen of New Britain, Connecticut who leased a Class Vehicle in Plainville, Connecticut in March 2024.

13.    Plaintiff Omar Hakkaoui is a citizen of Norfolk, Massachusetts who purchased a Class Vehicle in Watertown, Massachusetts in June 2022.

14.    Defendant Volkswagen Group of America, Inc., a subsidiary of Volkswagen AG, a public limited company in Germany, is a New Jersey Corporation with its principal place of business is located at 1950 Opportunity Way Suite 1500, Reston, VA 20190. Volkswagen Group of America, Inc. distributes Class Vehicles to consumers through the U.S. Volkswagen Group of America Chattanooga Operations, LLC, a wholly owned subsidiary of Volkswagen Group of America, Inc., located in Chattanooga, Tennessee.

15.    Defendant has designed, manufactured, imported, distributed, offered for sale, sold, and leased the Class Vehicles with the knowledge and intent to market, sell, and lease them in all fifty states.

16.    Defendant developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials related

to the ID.4 Vehicles with the intent that such documents should be purposefully distributed throughout all fifty states. Defendant is engaged in interstate commerce, selling vehicles through their network in every state of the United States.

## FACTUAL ALLEGATIONS



Image of the Volkswagen ID.4 Vehicle

17.    The ID.4 first rolled off the lines at the Chattanooga plant in Tennessee in 2021, and it was announced as Volkswagen's first EV to be built and sold in the United States in July 2022.[7]

18.    In 2022, Volkswagen sold 193,200 ID.4s, marking Volkswagen's highest selling EV of that year.[8]

---

[7] VW ID.4 sales see a record quarter, but giddyup already | Electrek (last accessed March 19, 2025)
[8] Volkswagen Commits To $131 Billion In EV And Digital Development By 2028 (forbes.com) (last accessed March 19, 2025)

19.     The ID.4 is Volkswagen's first all-electric SUV and the brand's first global EV.[9] It has been produced and sold in China, the United States, and Europe since its release.[10]

20.     Volkswagen promised that the ID.4 would demonstrate "the company's biggest strengths: the development of modern electric vehicles that bring together price, performance and sustainability for customers."[11]

21.     The ID.4 was launched through a campaign in 2021 under the recurring message of "Before it can change the world, it has to change yours." The goal of this campaign was to demonstrate the versatility of the ID.4 and how EV adoption can change the consumer's life at an individual level.[12] Kimberley Gardiner, senior vice president of Volkswagen brand marketing, stated that the purpose of the campaign was to show that the ID.4 is an "eSUV that meets everyday needs and is really fun to drive."[13]

---

[9]     https://www.media.vw.com/assets/documents/original/13020-2021ID4ReleaseFINAL.pdf p.1 (last accessed March 19, 2025)

[10]  https://www.volkswagen-newsroom.com/en/id4-5840 (last accessed March 19, 2025)

[11] *Id.*

[12] Volkswagen ID.4 EV campaign - Before it can change the world, it has to change yours - Volkswagen US Media Site (vw.com) (last accessed March 19, 2025)

[13] *See id.*

22.    A hallmark of the ID.4, according to Volkswagen, is the model's host of features and technology "that help make it easier than ever to adopt the EV lifestyle."[14]

23.    Volkswagen also touted that the high-tech interiors of the ID.4 "mirrors the futuristic look of the exterior."[15] The technology is designed to function almost exclusively through voice or touch and "there are very few actual buttons."[16] The ID.Cockpit display in front of the driver is operated with touch-sensitive controls on the multifunction capacitive steering wheel which provide haptic feedback.

24.    ID.4's steering wheels have controls for both driver assistance systems and the media system. The controls for driver assistance are on the left-hand side of the steering wheel while the controls for the media system are on the right-hand side of the steering wheel. Importantly, the conventional touch buttons on the steering wheel have been replaced by touch buttons on the multifunction steering wheel.[17]

---

[14] The long journey of EVs, from Elektro Bus to Volkswagen ID.4 EV and beyond (vw.com) (last accessed March 19, 2025)
[15] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[16] *Id.*
[17] MC-10189712-0001.pdf (nhtsa.gov)



Image of the ID.4 steering wheel and touch controls

25.     Volkswagen consistently maintained and advertised that the ID.4's technology is not only advanced but also paramount to consumers' safety.





26.     A key component of the ID.4's technology is the IQ.Drive, which is a "safety-enhancing and intelligent" technology.[18] Specifically, it is advertised as an advanced driver assistance technology and a smart infotainment system that uses voice and touch.[19] The IQ.Drive system uses front and rear radar, a front camera and multiple ultrasound sensors to collect information from the surrounding areas. This

---

[18] VW Travel Assist: How Does It Work? | Volkswagen (last accessed March 19, 2025)
[19] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)

system in turn enables Travel Assist; Front Assist; Active Side Assist; Rear Traffic Alert; Adaptive Cruise Control ("ACC"); Lane Assist; and Emergency Assist.[20]

27.    Travel Assist, a feature of the IQ.Drive system, is a semi-automated driving assistant that includes features of ACC and Lane Assist. This feature is meant to help drivers maintain a safe distance from other vehicles on the road and assist drivers in staying in the center of the lane.

28.    ACC, a standard feature on the ID.4, allows drivers to set the vehicle's speed and spacing between other vehicles in front of them using the multifunction steering wheel. ACC uses a forward-facing radar to maintain a set speed and distance from the vehicle in front of it. Pressing the accelerator can help override the ACC function while "[p]ressing the brakes always cancels the ACC function."[21]

---

[20] *Id.*

[21] *Id.*



Closeup image of ID.4 Driver Assistance touch controls on steering wheel

29. Front Assist, on the other hand, is designed to assist in warning drivers of potential frontal collisions with vehicles and pedestrians. Volkswagen advertised that it does so by engaging the automatic braking system to avoid or lessen the crash's impact.[22] This system warns the driver of potential imminent front-end collision situations both acoustically and visually through a warning symbol if the car is above 18mph. Additionally, an automatic jolt of the brakes can warn the driver

---

[22] Front Assist: To Warn You Of Potential Collisions | Volkswagen (vw.com) (last accessed March 19, 2025)

of the danger. In the event that the driver fails to brake, the Autonomous Emergency Braking system is activated to slow the vehicle. If the car is travelling below 18 mph and a potential frontal collision is detected, the Autonomous Emergency Braking is activated without a prior acoustic or visual warning. If the brake pedal is applied but the driver brakes too lightly, Braking Support is activated, which applies more pressure on the brakes for the driver.[23]

30.     Regardless of whether the car is travelling above or below 18mph, Volkswagen claims that the Emergency Braking system is activated through Front Assist. Per Volkswagen's advertisements, the only time activation of the Front Assist system may be limited is when the sensors are misaligned or damaged; the sensors are blocked by ice, mud, snow, dirt, mud or leaves; or if heavy cargo or trailers change the sensor angles.[24]



---

[23]  https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[24]  Front Assist: To Warn You of Potential Collisions | Volkswagen (vw.com)

31.    The ID.4s are equipped with an Event Data Recorder ("EDR"), sometimes referred to as the vehicle's 'black box.' EDRs can store data such as vehicle speed, brake application, and driver steering up to several seconds before a collision.[25] To retrieve information recorded on an EDR, owners are required to sign an EDR Authorization Form. The EDR report is usually accessed by engineers at Volkswagen to inspect ID.4s in the event of a collision.

32.    The 2021, 2022, 2023, and 2024 ID.4 models have the same features and specifications as noted above.

<u>The Defect</u>

33.    ID.4's technology, specifically its capacitive steering wheel and IQ.Drive system is defective.

34.    Since ID.4's release in 2021, consumers have repeatedly reported issues with the vehicle's touch-sensitive steering wheel controls.

35.    Specifically, the complaints have revolved around the steering wheel's cruise control buttons, which are capacitive rather than physical. This means that a light brush with one's fingers or touch of the hand with low pressure over the

---

[25]  https://www.explico.com/post/passenger-vehicle-event-data-recorders-what-are-they-and-how-are-they-useful#:~:text=Event%20Data%20Recorders%2C%20or%20EDRs,collision%20severity%20during%20a%20collision. (last accessed March 19, 2025)

controls on the wheel is enough to make the vehicle's system reengage to its last set speed on cruise control.[26]

36.    This has led to numerous incidents where drivers, often while parking, have inadvertently activated ACC, causing the vehicle to unexpectedly accelerate. This has resulted in severe injuries, property damage, and significant financial burdens for owners. The sudden, uncontrollable acceleration has not only terrified drivers but also led to costly repairs for accidents beyond their control. Moreover, the built-in safety mechanisms promised by Volkswagen, including the emergency braking system, have repeatedly failed to activate. On several occasions, where consumers have reported these incidents to Volkswagen, the company has avoided taking responsibility and blamed the accidents on 'driver error,' while falsely continuing to maintain that the car is safe to drive.

37.    The National Highway Traffic Safety Administration ("NHTSA") has received numerous related complaints involving ID.4's 2021-2023 models, which illustrate the significance of the defective haptic controls on the steering wheel. Below are examples of consumer complaints submitted to NHTSA regarding sudden acceleration issues with the Class Vehicles:

NHTSA ID Number: 11542693[27]
NHTSA Posting Date: November 19, 2021

---

[26]    https://www.canberratimes.com.au/story/8709196/volkswagen-owners-claim-steering-wheel-buttons-are-causing-crashes-report/ (last accessed March 19, 2025)
[27]    https://www.nhtsa.gov/?nhtsaId=11542693

Model: ID.4 2021

This car was marketed as an easy transition from gasoline powered engines, meaning its braking maneuvers should not have been largely different. However the 2021 electric did not come with auto hold which VW later determined should be added for brake safety reasons. In 2022 VW had a software upgrade and as of Sept. 2023 it has yet to be installed for me. However any update was already too late for me. In Nov. 2021 this scenario happened: I pulled up to my garage and realized the car was not aligned with the garage door so (after braking and bringing the car to a full stop) I chose "R" to proceed with the slight correction. I did not touch the accelerator but the car careened backwards down driveway and impaled itself on a large landscape rock (which stopped the descent). I just missed hitting a telephone pole and/or landing crosswise in the street at the bottom of my driveway. The incline was not steep but the backward momentum was great. I could have been severely injured but luckily only the car sustained heavy damage!

NHTSA ID Number: 11522547[28]
NHTSA Posting Date: May 15, 2023
Model: ID.4 2022

I have experienced within 3 months two incidents of unattended, out of control acceleration when pulling into a parking spot. First I drove into some bushes, at the second incident I drove over a sidewalk almost into a building. It was very scary. I found in the internet another person who has experienced the same thing. https://www.vwidtalk.com/threads/sudden-acceleration.6037/ I have not contacted the dealer yet. I cannot reproduce it. I am very sure I did not step on the accelerator.

NHTSA ID Number: 11541568[29]
NHTSA Posting Date: August 29, 2023
Model: ID.4 2021

---

[28] https://www.nhtsa.gov/?nhtsaId=11522547
[29] https://www.nhtsa.gov/?nhtsaId=11541568

16

The steering wheel controls on our 2021 Volkswagen ID.4 are haptic. That means that if you brush them with your fingers or hand with light pressure, they can activate. When leaving a neighborhood street, I turned the steering wheel approximately 180 degrees to pull out from a parking spot next to the curb. Upon releasing my grip a bit on the steering wheel (to let it rotate back to 'straight') my right thumb grazed the cruise control activation button (which is normally on the left side of the steering wheel). Since I had been using cruise control earlier in the drive, the cruise control resumed and the car accelerated without my providing any pedal input. Luckily I realized what had happened and pushed the brake pedal to cancel cruise control. The cruise control was set to 15 mph. I am thankful it was not set to something higher, like 65 mph. I don't know how fast the car would have accelerated in that case.

NHTSA ID Number: 11544772[30]
NHTSA Posting Date: September 13, 2023
Model: ID.4 2022

Two days ago I was pulling into a parking spot in a shopping center. The car suddenly accelerated forward and I hit a concrete parking block. This is the third time over the past 7 months that this has occurred, where the car suddenly accelerates when in a low speed. After the first time it happened, I called the dealership to ask if any other customers had this issue, but they said no. For them to run a diagnostic on it, they would have to recreate what had occurred. We all know that is impossible. So I ignored it, as it did not happen again until three months later. Then once again two days ago.

NHTSA ID Number: 11563099[31]
NHTSA Posting Date: January 2, 2024
Model: ID.4 2022

The car has now 3 times over the last year suddenly lurched forward while braking and pulling into a parking spot. The first time it went over a curb and into a yard. We thought it could be a mistake, but my wife, driving, has never had an accident in 40 years driving. Happened again,

---

[30] https://www.nhtsa.gov/?nhtsaId=11544772
[31] https://www.nhtsa.gov/?nhtsaId=11603099

and we thought maybe it had something to do with cruise control and hepatic sensitive buttons. But we keep that system off unless we are on the highway. This time it lurched forward but she managed to get it to stop just as it touched the parked car in front. No damage. Foot was on the brake as coming to a stop. This car should not be allowed on the road.

NHTSA ID Number: 11592927[32]
NHTSA Posting Date: April 21, 2024
Model: ID.4 2023

I was halfway into a parking stall. There was a cement sign post at the end of the stall and a truck facing me opposite. About six feet from the post the car accelerated and glanced off the post and hit the truck slightly. It happened very fast but I am 99% sure the car accelerated on its own. We did a search afterwards and found many reports of our model doing similar things.

NHTSA ID Number: 11593243[33]
NHTSA Posting Date: June 6, 2024
Model: ID.4 2022

Oct 9th 23 - My wife pulled into the office parking lot, and as she braked after parking the car. Post braking suddenly she realized the car was morning forward and it hit the car parked in front of her slot. The car being driven in the B mode , so it could recharge. The front bumper and grill were damaged incurring a loss of $ 6,972.76. Fortunately [this]did [n]ot cause a[n]y bodily injury to either me or other people in the parking lot. June 6th 24 - I pulled into the grocery store parking lot, and as i braked and parked the car, i noticed the very same phenomenon , after stopping suddenly i realize[d]    that the car went over the curb of the parking lot, hit the car parked next to me and then jumped to the otherside of the road and i had to steer into the next parking lot. Again causing severe damage to my car as well as the car parked next to me. Fortunately there was nobody walking in the parking lot, or no other

---

car that was entering the parking lot, for as the car jumped the curb it could lead to a very fatal accident.

NHTSA ID Number: 11603151[34]
NHTSA Posting Date: July 4, 2024
Model:                                    ID.4                                    2023

On 7/4/2024 at approximately 6pm, I disconnected my 2023 VW ID4 from an electrical charging station. I moved my vehicle 2 blocks away to an apartment building parking lot, which I had parked in previously. While pulling into the parking spot, I was coming to a complete stop, perhaps going 1-2 miles per hour and as I came to a stop, the car accelerated out of nowhere and crashed into a few small trees and a chain link fence for the neighbor's home. I had a passenger in the front passenger seat and neither of us could understand what had just happened. It made no sense and I have no idea what happened to cause the acceleration.

NHTSA ID Number: 11604974[35]
NHTSA Posting Date: July 9, 2024
Model: ID.4 2023

Was stationary in dense traffic, all waiting for a local bridge to open. We had been waiting for 10 or so minutes. Had braked and stopped close to car in front, car in Auto Hold. All of a sudden, my car accelerated quickly into stationary car in front, twice I believe, before I was able to brake and turn car off. I do not know why this happened or whether there were any warnings. Affected my car, car in front of me, and car in front of them. No one hurt, my car front rather damaged, perhaps $12,000+, car in front damaged front and rear. We were able to drive away, but my car not safe to drive. Is currently parked and waiting to be towed once collision shop space is available. I have not taken to dealer to test as is not safe to drive. No one has inspected in person yet.

---

[34] https://www.nhtsa.gov/?nhtsaId=11603151
[35] https://www.nhtsa.gov/?nhtsaId=11604974

NHTSA ID Number: 11604230[36]
NHTSA Posting Date: July 11, 2024
Model: ID.4 2023

Steering wheel has capacitive touch control for cruise controls and other options. While turning in corners or exiting from highways unknowingly capacitive controls are getting activated and it sets the speed to highway cruise speed limit or previous cruise speed, creating a panic situation. It is a safety issue and potentially crashes. I have avoided 10 different instances so far. It has to be recalled for this issue and fix has to be done for this.

NHTSA ID Number: 11603099[37]
NHTSA Posting Date: July 17, 2024
Model: ID.4 2023

The contact owns a 2023 Volkswagen ID.4. The contact stated while driving at 5 MPH, the service brake independently activated and steered in the opposite direction in which the vehicle was being steered. The vehicle independently accelerated and crashed into the rear of a parked vehicle. The parked vehicle was damaged to the rear of the vehicle. The contact's vehicle was damaged to the front center of the vehicle. The contact's adult daughter and adult friend were passengers in the vehicle when the failure occurred. The contact stated that no injuries were sustained. No Police report was filed. The contact stated that the driver of the parked vehicle confirmed that the contact did not have control of the vehicle when the failure occurred. The contact's vehicle was taken to the dealer, however the contact was requested to pay a diagnostic fee. The vehicle was not diagnosed or repaired by an independent mechanic or the dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 12,000.

NHTSA ID Number: 11605013[38]
NHTSA Posting Date: July 28, 2024

---

[36] https://www.nhtsa.gov/?nhtsaId=11604230
[37] https://www.nhtsa.gov/?nhtsaId=11603099
[38] https://www.nhtsa.gov/?nhtsaId=11605013

Model: ID.4 2022

Vehicle suffers from unintended and sudden acceleration when the "resume' capacitive touch button is accidentally brushed against. The vehicle is subject to injure or kill the vehicles occupants or others struck by the vehicle. Vehicle advised there is "no issue" with the vehicle but they did acknowledge the problem with the design of the steering wheel. The issue is intermittent and has occurred while driving at slow speeds in parking lots when the steering wheel is frequently turned more than 90 degrees and a body part can unintentionally touch the 'Resume" button.

NHTSA ID Number: 11605012[39]
NHTSA Posting Date: July 28, 2024
Model: ID.4 2021

Vehicle suffers from unintended and sudden acceleration when the "resume' capacitive touch button is accidentally brushed against. The vehicle is subject to injure or kill the vehicles occupants or others struck by the vehicle. Vehicle advised there is "no issue" with the vehicle but they did acknowledge the problem with the design of the steering wheel. The issue is intermittent and has occurred while driving at slow speeds in parking lots when the steering wheel is frequently turned more than 90 degrees and a body part can unintentionally touch the 'Resume" button.

NHTSA ID Number: 11625016[40]
NHTSA Posting Date: November 13, 2024
Model: ID.4 2022

Was coming to stopped traffic, suddenly car accelerated quickly and rear ended car in front, which then hit 2 cars in front. Event data recorder showed the acceleration; not sure what happened. Car has haptic button for adaptive cruise control and ? Engaged on resume button left side of steering wheel. VW says not a manufacturing defect. Fortunately no injuries - air bags did not deploy.

---

[39] https://www.nhtsa.gov/?nhtsaId=11605012
[40] https://www.nhtsa.gov/?nhtsaId=11625016

NHTSA ID Number: 11643685[41]
NHTSA Posting Date: February 19, 2025
Model: ID.4 2023

I was easing into a parking spot and braking when the car suddenly and uncontrollably accelerated, leveling a light pole in front of me and finally coming to a stop on top of the light pole base.

38.    Below are examples of consumer complaints submitted to NHTSA stating that the promised IQ.Drive safety features failed to activate in critical situations, leading to fatal crashes involving Class Vehicles. Several of these complaints describe instances where the emergency braking system failed to activate, or the Class Vehicle continued to accelerate despite the driver pressing the brakes. These incidents contradict Volkswagen's claim that "[p]ressing the brakes always cancels the ACC function."[42]:

NHTSA ID Number: 11446521[43]
NHTSA Posting Date: October 13, 2021
Model: ID.4 2021

In October, 11 weeks ago, while parallel parking, which I do everyday for work, I reversed back into an empty spot, toggled into Drive to straighten out my car and my car accelerated and hit the car parked in front of me. I kept stomping on the break pedal but it was stiff, I couldn't press it down at all. The break pedal was as if the car was turned off. Even though it has been 11 weeks ago, I will not drive the car because VW has not fixed the problem and I do not feel safe. The body repair

---

[41] https://www.nhtsa.gov/?nhtsaId=11643685
[42] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[43] https://www.nhtsa.gov/?nhtsaId=11446521

has been done. The car remains at the dealership where I bought it and is available for inspection. I could of hit many children because I was parking at an Elementary school when this unintended acceleration coupled with no brakes happened. It is VW's first ever ALL ELECTRIC car and the ID4's have NEVER had a software update. VW says, no technicians or trained mechanics, software would have to be done at dealer and could take all day, no software to download using Wi-Fi, may need bigger battery and no parts available. VW corporate fly out to inspect the car and run reports but they refuse to give me a copy and so does the dealership. VW is taking no responsibility and said the brake peddle was never applied, only the accelerator. I never put my foot on or near the accelerator because I was only inching forward to straighten my wheels out. When the car was put into drive it does not need any gas to move only a few inches forward. My insurance representative tried to run a report but he said there was no information at all on the recorder. He said I shouldn't have towed my car back to the dealer because information may have been erased. **There were no warnings or assist to stop the car.** This has not just happened to me but to many others as well. I can send documentation for that if you need. (emphasis added)

NHTSA ID Number: 11470359[44]
NHTSA Posting Date: June 21, 2022
Model: ID.4 2021

6/21/22 When I was pulling into a parking lot space, the car suddenly accelerated and the steering wheel turned uncontrollably, **I could not stop the car, the brakes didn't respond at all.** The car was driving by itself, I couldn't do anything to stop it, until I ran into two parked cars where it finally stopped; thank god no injuries. The car was undriveable, and was towed away, I'll have it inspected by the body shop and see if it can be repaired. This was a terrifying experience not being able to control the car, the car pretty much went went into run away mode. I hope this gets reported to VW and an investigate gets conducted to find the root cause it as this could happen again to anybody. (emphasis added)

---

[44] https://www.nhtsa.gov/?nhtsaId=11470359

NHTSA ID Number: 11576674[45]
NHTSA Posting Date: March 6, 2023
Model: ID.4 2023

As a civilian I appreciate this opportunity to express grievances, yet totally fighting way over my weight. Having now focused on the following: **The programming that does not release the adaptive speed control/stop & stop/go programming upon manual braking.** This failure clearly introduces the unexpected acceleration factor that was the initiating factor of my wife's accident. The character of Manufacturer Volkswagen/Audi of America, INC having repeatedly refused to allocate repair parts vs. maintain production of new vehicles. Cumulative more than 75,000 ID.4 were delivered in the U.S. in 2023, 11.5% share. My observations are based upon comparing the programming and reliability of the three tech vehicles we own: Mazda I-Loop, VW ID.4 and a Tesla X. The VW is a genuinely substantial vehicle of impressive physical characteristics hamstrung by a programming failure and management lack of character.

NHTSA ID Number: 11517068[46]
NHTSA Posting Date: April 6, 2023
Model: ID.4 2023

To Whom It May Concern RE: ID.4 VIN: [XXX] Unexpected acceleration The above vehicle was involved in an unwarranted accident fortunately only involving vehicles. In a parking lot at rolling speed while turning right into the parking space the vehicle charged ahead full throttle crossing a parking bumper, 8'-0" inch loose dirt, another parking pumper, and still full throttle into a Tesla Y in the opposing parking space. Many including the investigating State Trooper, the body shop working on the vehicle, and numerous internet similar accidents strongly suggested an unsafe condition vs. an unsafe action. **We drive a Mazda with the tech equipment, other Tesla's, etc. and all have the emergency braking benefit. They will not drive themselves into a wall, parked car etc. Additionally the air bags did not deploy** - wife's shoulder was bruised significantly.

---

[45] https://www.nhtsa.gov/?nhtsaId=11576674
[46] https://www.nhtsa.gov/?nhtsaId=11517068

Understandably, my wife no longer wishes to drive the vehicle which accounts for this letter to you. We would like to return the vehicle for a full refund immediately. Would you please consider the request to return our purchase funds and sales tax. (emphasis added)

NHTSA ID Number: 11519354[47]
NHTSA Posting Date: April 26, 2023
Model: ID.4 2021

Yesterday, April 26th, 2023 the above vehicle was involved in a serious accident, possibly related to the safety recall for the high voltage cell module. My wife was driving the vehicle on her way to work, as she did for the past 2 years. Sometimes she gets coffee for herself and a coworker, so that day she turned into a parking lot of the last MacDonalds before her job. She pulled up to the drive thru lane as she did many times before. She was not distracted by the phone, and her radio was turned off. There was nobody else in her vehicle, and her thought was on the coffee order. As she was pulling up to the 2 vehicles in front of her, something horrible happened in the next 3 or 4 seconds. Her vehicle accelerated suddenly, hit the car in front of her, bounced off to the right, and kept accelerating for the next 50 feet before hitting a semi truck with such a force that the front end of her vehicle is completely obliterated and the semi truck frame was broken. Thankfully, nobody got hurt seriously, and there was no fire. The first question from the Police officer was whether she hit the accelerator pedal by mistake. She responded that she did not hit the accelerator pedal, and does not understand what happened. She was shocked by the sudden fury of her vehicle, and stated that she was unable to stop it. **I believe what she is saying, because there was no reason for her to stomp hard on either pedal as she was coasting slowly, and with the vehicle's regenerative braking you only have to tap the brakes gently.** If she tapped the wrong pedal by mistake, the acceleration would not be so violent. To do what the vehicle did in such a short distance, the driver would have to stomp forcefully on the pedal and keep it floored all the time. There was no need to do that, and she never even attempted to do such violent acceleration anywhere. There is a real possibility that the vehicle did an unintended full force acceleration

---

[47] https://www.nhtsa.gov/?nhtsaId=11519354

caused by defect in the recalled module. GEICO has it (emphasis added)

NHTSA ID Number: 11566271[48]
NHTSA Posting Date: January 10, 2024
Model: ID.4 2023

I am writing to file a formal complaint with the National Highway Traffic Safety Administration (NHTSA) regarding a critical safety concern with my recently purchased vehicle, a VW ID 4 model from 2021-2023. Vehicle Information: VIN: [XXX] Make: Volkswagen Model: ID 4 Year: 2021-2023 Date of Purchase: January 5th, 2024 Incident Details: On [XXX], I experienced a hazardous incident involving sudden acceleration when releasing the brake pedal as I was coming to a stop and pulling into a parking space. Despite the fact that the pedal was not fully released, the vehicle accelerated forward, colliding with another vehicle at an approximate speed of 40-50 MPH. **Shockingly, neither the airbags deployed nor did the safety automatic braking system engage.** The incident raised significant safety concerns, especially considering similar reports from other VW ID 4 owners. Actions Taken: I promptly took the vehicle to VW Marin Dealership in San Rafael, CA, where their report claimed no issues with the vehicle. However, further research on my part revealed that this issue is prevalent among VW ID 4 models from 2021 to 2023. Attached to this letter, you will find pictures of both vehicles involved in the incident for your reference. Request for Investigation: I urge the NHTSA to thoroughly investigate this safety issue with VW ID 4 models from 2021-2023. The potential risks associated with sudden acceleration pose a serious threat to the safety of vehicle occupants and others on the road. Identifying and addressing the root cause of this problem is crucial to preventing future accidents and fatalities related to this faulty vehicle behavior. Your attention to this matter is greatly appreciated, and I trust that the NHTSA will take appropriate action to ensure the safety of all motorists. Sincerely, [XXX] [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) (emphasis added).

---

[48] https://www.nhtsa.gov/?nhtsaId=11566271

NHTSA ID Number: 11572142[49]
NHTSA Posting Date: February 13, 2024
Model: ID.4 2023

When I am parking at 5mph in a medical center parking structure, the car suddenly got an uncontrollable acceleration that hit the parking cement and hit the wall in front of the parking area. I cannot imagine that if it is not in the parking structure with 5 mph, it will be fatal or injured and hit more people and cars on the freeway. I want a safe vehicle and spent over $55K for my daily chore. I lost confident on an electric vehicle, and hope your agency will iron all these out prior to introduce to the public. It is similar to the following case: An owner from Georgia describes what happened after getting into the ID.4, putting a foot on the brake, and then putting it into gear. **"The car jumped forward and I had to press brakes with all my strength to keep it from accelerating to full 'throttle.'** It did the exact same when I put it in reverse. I turned the car off, got out, gave it a couple of minutes, and tried two more times. It did the same thing every time. "It is like the accelerator is pressed to the floor as soon as you put it in gear without you touching it. I almost hit my house due to the wheels being turned before the first try." Having had the car for only two weeks, "I called a tow truck to take it to the dealer." (emphasis added)

NHTSA ID Number: 11593929[50]
NHTSA Posting Date: May 22, 2024
Model: ID.4 2023

I was easing slowly into a parking space, with plenty of room on both sides (no cars); there was a shopping cart at the front of the spot to my left. I was probably straightening the steering wheel back to the center. The car took over, accelerated suddenly to a very fast speed, jumped a high curb, and stopped hard in the lot's main drive. The front right wheel clipped a tree through the mulch. **No safety features engaged.** There was significant damage to the vehicle, and the impact badly bruised my right hand. I am very safety conscious, easy on the pedals, and cruise into stops. We have used the travel assist but not the cruise control function (which may have been set when the car was in transit). Several

---

[49] https://www.nhtsa.gov/?nhtsaId=11572142
[50] https://www.nhtsa.gov/?nhtsaId=11593929

similar cases are reported on social media, with the leading theory being the accidental engagement of haptic steering wheel controls. A police officer took a report, but it has not been made available. I filed a report with the manufacturer and look forward to your investigation. (emphasis added)

NHTSA ID Number: 11593431[51]
NHTSA Posting Date: June 7, 2024
Model: ID.4 2023

The contact owns a 2023 Volkswagen ID.4. The contact stated that while driving at an undisclosed speed, the vehicle independently accelerated. **The contact stated that the brake pedal was depressed, however, the vehicle failed to stop as intended.** The contact stated that the vehicle rear-ended the contact's other parked vehicle. The contact stated that the vehicle crashed into the contact's residential iron fence and the fence was damaged. In addition, the vehicle crashed into the contact's home and damaged the 6ft window. The contact stated that the failure occurred while the contact was parking the vehicle in the contact's driveway. The contact stated that the front end of the vehicle was damaged. In addition, the rear end of the parked vehicle was damaged. There were no injuries sustained. No police or fire reports were filed. The contact stated that the vehicle was previously taken to the dealer for a service appointment on May 30, 2024. The vehicle remained at the contact's residence. The vehicle was not diagnosed or repaired by an independent mechanic or the dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 2,800. (emphasis added)

NHTSA ID Number: 11600784[52]
NHTSA Posting Date: July 5, 2024
Model: ID.4 2023

My 2023 ID4 suddenly accelerated and lunged forward (while my foot was on the brake) as I was turning right into a parking spot. I was going very slow with my foot on the brake . The ID4 lurched forward which propelled me in the wall of a concrete building that I was parking at

---

[51] https://www.nhtsa.gov/?nhtsaId=11593431
[52]

(luckily no damage to the building). The acceleration was so powerful it's like I floored it and frightening. **None of the warning signals, sensors or collision warnings went off, nor did the emergency braking (when an object is too close in the front of the vehicle). After the ID4 went into the wall- it had registered that there was a collision (but nothing before).** There was damage to the lower plastic bumper, the hood popped open (the latch to open the hood inside the vehicle now did not work) and some paint scratches. This had never happened before, I have taken it to my local VW dealer service department, unfortunately they have not been able to reproduce the issue. Had I been coming to stop at a traffic light, or been in a busy parking lot, it could have been much worse as this could have lurched into another vehicle, pedestrian or business store front. (emphasis added)

NHTSA ID Number: 11608745[53]
NHTSA Posting Date: August 15, 2024
Model: ID.4 2023

pulling into parking lot of **child's daycare, had foot on the break and then suddenly the car lunged forward and slammed into fence**. **had to forcefully slam on brakes to stop car** Car is currently at the dealership for collision repair, waiting to see what the computer reports. Police report has been filed. Do not have at this time Newton MA police dept report #24032707 No warning messages or previous symptoms. (emphasis added)

NHTSA ID Number: 11632402[54]
NHTSA Posting Date: December 26, 2024
Model: ID.4 2023

For the second time in this car, I experienced sudden acceleration while parking (turning right). I had to slam the brakes to prevent hitting a parked vehicle, causing whiplash. **No warning or safety features engaged**. See NHTSA crash incident report 11593929. There are sufficient similar reports to warrant an investigation and hold VW accountable. (emphasis added)

---

[53] https://www.nhtsa.gov/?nhtsaId=11608745
[54] https://www.nhtsa.gov/?nhtsaId=11632402

NHTSA ID Number: 11638342[55]
NHTSA Posting Date: January 24, 2025
Model: ID.4 2021

While stopped at a red light waiting to turn left, with foot on the brake, my car suddenly accelerated and lunged forward , plowing into the car in front of me with great force. I had to jam down the brake almost to the floor to get the car to stop. My foot was on the brake. There is no way I hit the accelerator. Even if I had, **the AEB system is supposed to prevent me crashing at close range.** I understand that this is a known issue related to the adaptive cruise control. The force of my car was so great that 3 cars in front of me sustained damage. (emphasis added)

NHTSA ID Number: 11643371[56]
NHTSA Posting Date: February 18, 2025
Model: ID.4 2022

I was parking the car in a parking lot. I turned left into the lot and then turned right into a spot and then decided to switch to the adjacent spot (also requiring me to turn right) to provide me with more room to park and leave the car. As I turned into the spot the car suddenly accelerated forward. I tried pushing the brakes and the car continued to accelerate and hit two fences. **No indication of a collision by car, no engagement of the automatic emergency braking. No recognition of the car that there was a fence in front. No automatic braking/warning lamps**. The vehicle was inspected only by the insurance agent and body shop for repair. (emphasis added)

NHTSA ID Number: 11646763[57]
NHTSA Posting Date: March 6, 2025
Model: ID.4 2022

---

[55] https://www.nhtsa.gov/?nhtsaId=11638342

[56] https://www.nhtsa.gov/?nhtsaId=11643371
[57] https://www.nhtsa.gov/?nhtsaId=11646763

I was turning into a parking spot in front of the entry doors to a Sheetz convenience store. I was slowing down, and had gotten halfway into the space. All of a sudden, the car surged forward, went over the curb and hit the bollard in front of the parking space. It was hit with such force that the bollard bent and went under our car. My memory is that I was pressing on the brake very hard, once the acceleration started. My husband was in the car with me and can attest to all that I have stated. If that bollard had not been there, and stopped my car, I feel certain that my car would have crashed into the store, seriously injuring (or killing) us and those inside the store. We are planning to report the accident to Volkswagen, and to request that they test the "black box" inside the car, to see if they can find out what went wrong. I have spoken to someone in the Sheetz corporate office , and she told me that they have a video recording of the event. She said she observed my car entering the parking space very slowly, and that the car suddenly accelerated. She is planning to provide that video to State Farm Insurance, our insurance company. Unfortunately, I did not take pictures, myself, of the damage to the front of the car. But we will be requesting that the collision repair shop take pictures before the car gets dismantled for repair. **We do not recall hearing any warning signals of the impending crash, and certainly did not experience any emergency braking. The airbags did not deploy**. (emphasis added)

39.    Below are examples of consumer complaints submitted to NHTSA that highlight severe physical injuries sustained by both drivers and passengers of Class Vehicles because of crashes due to sudden acceleration:

NHTSA ID Number: 11496048[58]
NHTSA Posting Date: December 3, 2022
Model: ID.4 2023

While I was pulling into a parking space in a parking garage, the car suddenly accelerated to a high rate of speed and crashed into the wall of the parking garage. The front and side air bags deployed. The crash caused significant front end damage to the car. The passenger (my husband) was not hurt but **I have bruises on my head, nose, chest,**

---

[58] https://www.nhtsa.gov/?nhtsaId=11496048

**and abdomen from the steering wheel and seat belt**. I was not sure that I had caused the crash, so checked the internet for any information and found that this has occurred to other drivers of this car. I have not yet gotten the read out of the car's black box. There were no warnings or messages before the crash. I am currently arranging the towing of the car. (emphasis added)

NHTSA ID Number: 11517068[59]
NHTSA Posting Date: April 6, 2023
Model: ID.4 2023

The above vehicle was involved in an unwarranted accident fortunately only involving vehicles. In a parking lot at rolling speed while turning right into the parking space the vehicle charged ahead full throttle crossing a parking bumper, 8'-0" inch loose dirt, another parking pumper, and still full throttle into a Tesla Y in the opposing parking space. Many including the investigating State Trooper, the body shop working on the vehicle, and numerous internet similar accidents strongly suggested an unsafe condition vs. an unsafe action. We drive a Mazda with the tech equipment, other Tesla's, etc. and all have the emergency braking benefit. They will not drive themselves into a wall, parked car etc. Additionally the air bags did not deploy - **wife's shoulder was bruised significantly**. Understandably, my wife no longer wishes to drive the vehicle which accounts for this letter to you. We would like to return the vehicle for a full refund immediately. Would you please consider the request to return our purchase funds and sales tax.  [XXX] INFORMATION Redacted PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). (emphasis added)

NHTSA ID Number: 11550130[60]
NHTSA Posting Date: October 13, 2023
Model: ID.4 2021

I was slowly driving down a lane in a parking lot. The parking spaces were perpendicular to a wall. I start to turn the steering wheel and slowly tap my brakes since the car was already going at a slow speed. All of a sudden, the car lunges forward and crashes into the wall beyond

---

[59] https://www.nhtsa.gov/?nhtsaId=11517068
[60] https://www.nhtsa.gov/?nhtsaId=11550130

the parking slot. The airbags blow up and, after impact, **my mom who is in the passenger seat complaints about severe chest pain.** Soon the ambulance is there to take my mom to the hospital **(she is eventually diagnosed with two broken ribs and a fractured cervical bone)**. I stay at the scene to talk to the police about what happened (the police gathered information from bystanders and took many pictures). I am in shock about the incident and trying to figure out what happened. I research the topic on the Internet and find out that there are others who have complained about sudden and unexpected acceleration in this car model. In fact, there is a class action lawsuit which explains that the overly sensitive cruise control (haptic, touch sensitive control on the steering wheel) can be accidently triggered and cause the sudden acceleration. Thank you for looking into this safety problem. (emphasis added)

NHTSA ID Number: 11594899[61]
NHTSA Posting Date: June 12, 2024
Model: ID.4 2023

The contact owned a 2023 Volkswagen ID4. The contact stated that while parking the vehicle and attempting to remove the key from the ignition the vehicle erroneously accelerated forward driving over a curb and crashed into a traffic pole. The vehicle continued to accelerate forward into an intersection and crashed head-on into a second vehicle. During the crash, both vehicles were destroyed. **The driver sustained a left arm laceration from the air bag deploying. The front passenger sustained a left arm laceration and abdomen contusion. The dog located in the rear passenger seat sustained an eye injury.** All required medical treatment. No injury was reported from the second vehicle. A police report was taken at the scene and the vehicles were towed away. The cause of the failure was not determined. The manufacturer and local dealer were not contacted. The failure mileage was 4,000. (emphasis added)

40.    Below are examples of consumer complaints submitted to

---

[61] https://www.nhtsa.gov/?nhtsaId=11594899

NHTSA that demonstrates Volkswagen either refusing to take responsibility for the

defect and blaming it on the driver, or Volkswagen falsely concluding that nothing

was wrong with the Class Vehicle's software:

> NHTSA ID Number: 11467680[62]
> NHTSA Posting Date: June 2, 2022
> Model: ID.4 2021
>
> 1. I picked up new ID.4 from the dealer on 10/01/2021. On 10/02/22, Electrical System Malfunction messages appeared on the infotainment, telling me to take it in for immediate repairs. The problem was taken care of. I was not told what was wrong. 2. On 11/10/2021, while pulling into a parking space in a lot at a cemetery, the car bolted forward and became unresponsive. I could not stop it, I could not steer it. It felt like it was driving itself. I destroyed a bench, some bushes, and some of the turf. The car had to be towed to a VW dealer affiliated collision center. The car was there for over two months and was returned to the dealership for "further diagnosis". **In the end, I was told that it had been "driver error"", and I was assured the car was 100% safe to drive.** I was never told what was done. The insurance payment for the damage was over $9000. 3. **On 06/02/2022, I had the same acceleration issue.** This time I was pulling over to a curb in a residential neighborhood (25 mph speed limit). I was using mode "B", regenerative braking. My foot was not on the accelerator. The car bolted forward and hit a parked Ford F150 in the backend. The force was so great, that the F150's rear end was lifted off the ground. You would think that crash would have stopped the ID.4. Instead, the vehicle swerved to the left, shot across the street and ended on a stranger's front yard, destroying his tree and landscaping. The car suddenly stopped, stuck in the landscape rocks. The vehicle then just shut itself off and became totally unresponsive. **My wife was slightly injured, even though she had her seatbelt on.** She could not open the door to get out and climbed out the driver's door. The car was towed to the dealer, insurance claim was filed. Preliminary estimates of damage- ID.4, F150, landscaping is over $17,000. My wife is petrified about riding in

---

[62] https://www.nhtsa.gov/?nhtsaId=11467680

the car. I want VW to repurchase or terminate my lease. The car has only 6000 miles! (emphasis added)

NHTSA ID Number: 11527690[63]
NHTSA Posting Date: January 31, 2023
Model: ID.4 2022

After using adaptive cruise control, driver pulled into a spot to pick up a pizza. Car was parked then lurched forward without pedal input, jumping over parking block and then crashed through front window of a store. Took out retaining wall and came to a stop at the back wall. Thankfully no one was injured. **Police report was filed and manufacturer was alerted who interrogated the vehicle but claimed nothing found to be wrong.** Vehicle was totaled and damages were paid. A number of other similar incidents have been reported with this vehicle so we felt it necessary to alert. (emphasis added)

NHTSA ID Number: 11604686[64]
NHTSA Posting Date: May 13, 2023
Model: ID.4 2022
On 5/13/2023, I drove using adaptive cruise control (ACC). I traveled approximately 9 miles without issues and turned left into a parking lot. Upon turning, the break was engaged and which canceled the cruise control. I do not recall the exact speed it was set but it was over 50mph. I drive my VW ID.4 in B mode which is brake energy recuperation mode and brakes the car as soon as the foot is lifted from the accelerator. In the parking lot, I was driving at a slow rate of speed because it was a Saturday morning and there were lots of kids going to the Jui Jitsu gym and dance studio which was my destination. While navigating at this slow speed, I typical lift my foot off of the accelerator rather than tapping the brakes as it is an effective method in the B driving mode. I was turning right into a spot, my foot was on the accelerator because there is not coasting in this mode to turn into the spot. As I was turning the wheel hard to the right, my hand grazed the capacitive controls of the ACC and resumed the cruise control causing my car to suddenly accelerate at the previously set speed into the curbing. As mentioned, my foot was on the accelerator as I was pulling

---

[63] https://www.nhtsa.gov/?nhtsaId=11527690
[64] https://www.nhtsa.gov/?nhtsaId=11604686

into the spot. When the car crashed into the sidewalk the impact caused my foot to depress further on the accelerator which caused a secondary impact into a support pillar further on the sidewalk. Fortunately, the pillar was there, otherwise, I would have crashed through the yoga studio directly behind the pillar which had a full class going. I also narrowly missed a father and son walking on the sidewalk to Jui Jitsu. **I notified VW and they analyzed the black box but claimed the accident to be my fault since the accelerator pedal was engaged, and I did not break until after impact.** I do not dispute that. (emphasis added)

NHTSA ID Number: 11543702[65]
NHTSA Posting Date: September 10, 2023
Model: ID.4 2022

I was slowly pulling into a parking space at the beach. Pulling into the space the car accelerated, fast. It crashed in to the two cement barriers at front of parking space. I heard the air hissing out of the right front passenger tire, as it deflated. The front of the car was badly damaged from the crash into the barriers. Luckily no one was injured or killed. This is the second acceleration problem we have experiencd. In May I had a deacceleration issue with this car. I was crossing traffic and when I pressed on the accelerator, it very slowly moved, not letting me accelerate. I was worried about the on coming traffic hitting me, but luckily they just honked and went around. Moments later Iaccelerated and the car worked normally again. **We took it to the VW shop and they said they didn't find anything. That they "reset it". It had worked normally until today. The system that malfunctioned was the speed control.** My safety and anyone around me was put at risk, by having a car accelerating when I didn't want it to. It's a Sunday, so don't know dealers response yet. Contacted insurance, police and will contact VW on Monday. **No warning messages. (emphasis addd)**

41.    In October 2022, Thomas Schäfer, the head of VW Passenger Cars, announced on social media that Volkswagen is "bringing back the push-button

---

[65] https://www.nhtsa.gov/?nhtsaId=11543702

steering wheel."[66] This announcement was neatly hidden in a post that boasted that Volkswagen's ambition was to "fulfil[] the VW customer promise in every aspect."[67] Schäfer's post made it sound as though Volkswagen was making this change simply because "[t]hat's what customers want from VW"[68] without acknowledging that the capacitive steering wheel was a design defect that was Volkswagen's fault. VW further mislead the public by stating after many of the above complaints had been filed with NHTSA, by misrepresenting to the publication *ARS Technica* in July 2024 that "We are aware of a **small** number of complaints." (emphasis added).[69] Moreover, despite this announcement, the 2024 ID.4 continues to use the capacitive design—its "IQ.DRIVE features lane centering and a **capacitive** steering wheel to help make driving easier."[70] This is in clear contradiction to Schäfer's post that touted: "One thing is clear: We are continually working on offering our customers what they really want. #Volkswagen will be the love brand once more!"[71] Despite

---

[66]    https://www.linkedin.com/feed/update/urn:li:activity:6988840351113355264/ (last accessed March 20, 2025)

[67] See *id.*

[68] See *id.*

[69]    https://arstechnica.com/cars/2024/07/vw-id-4-owners-report-unintended-acceleration-blame-steering-wheel-design/#:~:text=But%20the%20left%20side%20spoke,an%20investigation%20into%20the%20matter.

[70]    https://media.vw.com/en-us/press-kits/2024-id4-press-kit, (emphasis added, last accessed March 19, 2025)

[71]    https://www.linkedin.com/feed/update/urn:li:activity:6988840351113355264/ (last accessed March 19, 2025)

still not offering the ID.4 with actual buttons on the steering wheel in vehicles currently for sale in the United States, without admitting or disclosing the Defect, VW acknowledges what a mistake the capacitive buttons on the steering wheel are. In March of 2025, VW's design chief Andreas Mindt stated:

> "[w]e will never, ever make this mistake any more. On the steering wheel, we will have physical buttons. No guessing any more. There's feedback, it's real, and people love this. Honestly, it's a car. It's not a phone: it's a car."[72]

**Plaintiffs' Factual Allegations**

Plaintiff Janice Beecher

42.    Plaintiff Janice Beecher is a citizen and resident of New Britain, Connecticut.

43.    On or about March 26, 2024, Plaintiff Beecher leased a 2023 ID.4 from Gengras Volkswagen, located at 245 New Britain Ave, Plainville, CT 06062 for a total price of $44,026.75, to be paid in monthly installments of $416.76 for 36 months.

44.    Plaintiff Beecher made the decision to lease the 2023 ID.4 after considering Defendant's representations about the Class Vehicle, including the

---

[72]        https://www.autocar.co.uk/car-news/new-cars/volkswagen-reintroducing-physical-controls-vital-functions (last accessed March 19, 2025

reported safe technology in the all-electric SUV. Plaintiff Beecher chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

45.     Prior to her lease of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Beecher of the Defect. Plaintiff Beecher reasonably expected that the Class Vehicle, would function normally, and provide safe transportation, as an all-electric SUV with safe technology and in accordance with Defendant's specifications and representations.

46.     Plaintiff Beecher purchased the Class Vehicle for personal use. Plaintiff Beecher has always attempted to use the Class Vehicle in the normal and expected manner.

47.     On or about May 24, 2024, when her vehicle had roughly 500 miles, Plaintiff Beecher experienced the Defect. While pulling into a parking space, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control, when her hand lightly brushed against the steering wheel sensors. The Class Vehicle skipped over a curb and hit a tree, causing extensive damage to the Vehicle's undercarriage and wheels, amounting to around $14,172, plus $742 for the cost of a rental vehicle, and $206 for Medicat scan of her hand. As a result of the damage, the Vehicle was in the VW authorized dealer's repair shop for 100 days.

48.     The crash described above caused injury not only to the vehicle, but to Plaintiff Beecher who suffered a hand injury in the crash, as can be seen in the photos below.



49.     After the incident, Plaintiff Beecher wrote to Defendant's customer care on or around May 2024 to report the crash and have them investigate the issue with the Class Vehicle. In response, she received only a call and not an email, from Defendant's representative stating that they did not find any data pertaining to the crash on the Class Vehicle's EDR. No results of this investigation were shared with Plaintiff Beecher in writing. Defendant did not pursue any further investigation of the crash.

50.     Plaintiff Beecher has repeatedly observed that the hepatic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light

unintentional touch. Plaintiff Beecher experienced another incident when her Vehicle suddenly and unintentionally accelerated on December 24, 2024, while she was parking. Fortunately, Plaintiff Beecher had enough time to break hard to avoid another crash.

51. Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Beecher did not receive the benefit of her bargain. Had Plaintiff Beecher known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Beecher would not have purchased her Class Vehicle. As a result of the Defect, Plaintiff Beecher was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Omar Hakkaoui

52. Plaintiff Omar Hakkaoui is a citizen and resident of Norfolk, Massachusetts.

53. On or about June 28, 2022, Plaintiff Hakkaoui purchased a 2022 ID.4 from Boston VW located at 43 North Beacon St, Watertown MA 02472 for a total price of $50,636.75.

54. Plaintiff Hakkaoui made the decision to purchase his Class Vehicle after considering Defendant's representations about the Class Vehicle, including the

reported safe technology in the all-electric SUV. Plaintiff Hakkaoui chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

55.    Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Hakkaoui of the Defect. Plaintiff Hakkaoui reasonably expected that the Class Vehicle would function normally, and provide safe transportation, as an all-electric SUV with safe technology and in accordance with Defendant's specifications and representations.

56.    Plaintiff Hakkaoui purchased his Class Vehicle for personal use. Plaintiff Hakkaoui has always attempted to use his Class Vehicle in the normal and expected manner.

57.    In or around September 2022, when his vehicle had roughly 3,000 miles, Plaintiff Hakkaoui first experienced the Defect. Plaintiff Hakkaoui's wife experienced sudden acceleration on the Class Vehicle while she was parking it in their garage. As a consequence, their garage door was damaged, and the Class Vehicle's frontend was scratched. The damage to Plaintiff Hakkaoui's garage door at the time of the crash can be seen in the images below.





58.    Plaintiff Hakkaoui reached out to Defendant's customer care on or around September 2022 to report the crash and have them investigate the issue with

43

the Class Vehicle. Defendant's representative responded stating that they did not find any data pertaining to the crash on the Class Vehicle's Event Data Recorder (EDR).

59.    When Plaintiff Hakkaoui communicated with Defendant's authorized dealer about the Defect on or about September 29, 2022 he was simply told "there were no recalls available to address the Defect and that inspection showed no sign of any manufacturing shortcomings". The inspection performed, only involved Defendant test driving Plaintiff Hakkaoui's Class Vehicle for a mere nine miles over a period of forty minutes to reach this conclusion. Defendant did not pursue any further investigation of the crash.

60.    The Defect in Plaintiff Hakkaoui's vehicle presents safety issues. Plaintiff Hakkaoui and his wife rely on the Class Vehicle to drop off and pick up his children to and from school every day, averaging about 40 miles per day. Given the Defect's unpredictability, Plaintiff Hakkaoui has had to reassess whether the Class Vehicle is safe to continue using.

61.    Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Hakkaoui did not receive the benefit of his bargain. Had Plaintiff Hakkaoui known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Hakkaoui would not have purchased the Class Vehicle or would have paid

44

less for it.   As a result of the Defect, Plaintiff Hakkaoui was not able to use his vehicle for the particular purpose of providing safe and reasonably reliable transportation.

## CLASS ACTION ALLEGATIONS

62.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Nationwide Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

63.    In addition, the proposed state subclasses (the "State Subclasses") are defined as follows:

> **Connecticut Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Connecticut.

> **Massachusetts Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Massachusetts.

64.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

65.    Plaintiffs reserve the right to amend the Class and Subclass definitions if discovery and further investigation reveal that the Class and Subclass should be expanded or otherwise modified.

66.    The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

67.    **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses thousands of individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, address, and phone numbers of Class Members are identifiable through documents maintained by Volkswagen.

68.    **Commonality and Predominance:** This action involved common questions of law and fact which predominate over any questions solely affecting individual Class Members. These common questions include:

i.    Whether Defendant engaged in the conduct alleged herein;

ii.    Whether Defendant had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.    Whether Defendant should have had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.    When Defendant became aware of the Defect in the Class Vehicles

v.    Whether Defendant knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

vi.    Whether Defendant knowingly concealed the Defect in the Class Vehicles;

vii.    Whether Defendant's conduct as alleged herein violates consumer protection laws;

viii.    Whether Defendant's conduct as alleged herein violates warranty laws;

ix.    Whether Defendant's conduct as alleged herein violates other laws asserted herein;

x.    Whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect; and

xi.    Whether Plaintiffs and Class Members are entitled to damages and equitable relief.

69.    **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The Plaintiffs representing the

Class are advancing the same claims and legal theories on behalf of himself and all

other members of the Class that they represent, and there are no defenses that are

unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same

operative facts and are based on the same legal theories.

70.    **Adequacy:** Plaintiffs are adequate Class representatives because their

interests do not conflict with the interests of the other members of the Class they

seek to represent; Plaintiffs have retained counsel competent and experienced in

complex class action litigation; and Plaintiffs intend to prosecute this action

vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs

and their counsel.

71.    **Superiority:** A class action is superior to any other available means for

the fair and efficient adjudication of this controversy, and no unusual difficulties are

likely to be encountered in the management of this class action. The damages and

other detriment suffered by Plaintiffs and the other Class Members are relatively

small compared to the burden and expense that would be required to individually

litigate their claims against Defendant, so it would be virtually impossible for the

Class Members to individually seek redress for Defendant's wrongful conduct. Even

if Class Members could afford individual litigation, the court system could not;

individualized litigation creates a potential for inconsistent or contradictory

judgments, increased the delay and expense to the parties, and increases the expense

and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CLAIMS FOR RELIEF

### COUNT I
### Common Law Fraud by Omission
### (Brought on Behalf of the Nationwide Class and alternatively on behalf of the State Subclasses)

72.    Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

73.    Plaintiffs assert this theory of fraud by omission on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant.

74.    Defendant committed fraud by failing to disclose and actively concealing, at the point of sale and otherwise, the Defect.

75.    Defendant was under a duty to Plaintiffs and the Class Members to disclose the Defect because:

a.  Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;

b.  Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Defect; and

49

c.  Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the Defect.

d.  Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

76.    The Defect and the facts concealed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.

77.    Defendant concealed or did not disclose the Defect in order to induce Plaintiffs and the Class Members to purchase the Class Vehicles at a substantially higher price than they otherwise would have paid.

78.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendant's defective Class Vehicles.

79.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

80.    Plaintiffs and Class Members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

81.    Plaintiffs and the Class Members relied on Defendant's failure to disclose the Defect – in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiffs and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles. Meanwhile, Defendant has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

82.    As a direct and proximate result of Defendant's omissions, Plaintiffs and all members of the Class have been damaged in an amount to be proven at trial.

83.    Defendant's acts and/or omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich itself. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to punish Volkswagen and deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT II
### Common Law Breach of Implied Warranty
### (On Behalf of the Nationwide Class)

84.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

85.    Defendant is a merchant and was at all relevant times involved in the manufacturing, warranting, and distributing for resale to consumers. Defendant knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

86.    Defendant entered into agreements with retailers and suppliers to sell its Class Vehicles to Class Members.

87.    Defendant provided Plaintiffs and Class Members with implied warranties that the Class Vehicles, as electric SUVs, are merchantable and fit for the particular purposes for which they are used and sold.

88.    However, the Class Vehicles are and were not fit for their particular purpose of providing safe and reasonably reliable transportation.    The hypersensitivity of the capacitive touch controls on the steering wheel, and the Class Vehicles propensity of the ACC system to engage spontaneously accelerate when not intentionally engages poses an extreme risk to safety.    Therefore, the Class Vehicles are not fit for their particular purpose as an electric SUV.

89.    Similarly, a vehicle that does not allow the driver to operate it safely, when operating the vehicle in a prudent manner, is not merchantable.

90.    Privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties and their sale through authorized retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries.

91.    More specifically, Defendant's intention that its warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the Class Vehicles and warranties.

92.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, and distributed for sale by Defendant was safe and reliable for operation as an electric SUVs; and (ii) a warranty that the Class Vehicles would be fit for its intended use while it was being operated.

93.    Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale and thereafter, were not fit for the ordinary and intended purpose of providing Plaintiffs and Class Members with providing safe and reliable electric powered transportation on a daily basis.  Instead, the Class Vehicles suffers from a defective design and/or manufacture negating such use as transportation on a daily basis, as alleged herein.

94.    Defendant's sale of defective vehicles and failure to provide a refund caused the implied warranty to fail in its essential purpose.

95.    Defendant breached the implied warranties because the Class Vehicles were sold with the Defect, which substantially reduced and/or prevented them from being used as electric vehicles.

96.    Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

97.    As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are

entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT III
### Magnuson-Moss Warranty Act
### (On Behalf of the Nationwide Class)

98.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

99.    Plaintiffs and the Nationwide Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

100.    Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

101.    The Class Vehicle is a "consumer product[]" as defined in 15 U.S.C. § 2301(1).

102.    Defendant extended an implied warranty to Plaintiffs and the Nationwide Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers the Defect in its Class Vehicles.

103.    Defendant breached this implied warranty by selling a defective product that was neither merchantable nor fit for its intended purpose.

104.    Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

105.   Defendant breached its express warranties by offering for sale and selling vehicles that were by design and construction defective, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.

106.   Defendant also breached its express warranties by failing to provide an adequate and lasting remedy to cure the Defect within a reasonable time, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.  Indeed, while Defendant has suggested that there is no defect and has chosen to blame the resultant damage on the consumer rather than address the issue.

107.   As a direct and proximate result of Defendant's breach of the express and implied warranties under the Magnuson-Moss Act, Plaintiffs, and the Nationwide Class, have been damaged in an amount to be proven at trial.

**COUNT IV**
**Unjust Enrichment/Restitution**
**(Asserted on behalf of the Nationwide Class / Asserted in the Alternative**
**on behalf of the State Subclasses)**

108.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

109.   Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

110.   Defendant received a benefit from Plaintiffs and the members of the Nationwide Class and State Subclasses in the form of payment for the Class Vehicles.

111.   Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

112.   The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiffs and the other members of the Nationwide Class and State Subclasses.

113.   Defendant knows that the Class Vehicles do not operate as promised or as a reasonable consumer would expect of an electric vehicle, but nonetheless continues to sell them without warning. To make matters worse, Defendant actively lauded and emphasized the performance of the Class Vehicles' driver's assistance and safety features.

114.   Defendant's conduct is unjust, inequitable, and wrongful, but systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits, including the substantial premium that consumers pay for vehicles with electric-only driving capabilities.

115.   There is no justification for Defendant's continued silence, as customers purchased the defective Class Vehicles.

116. It is therefore against equity and good conscience to permit Defendant to retain the proceeds from its sales of the defective Class Vehicles.

117. Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

**COUNT V**
**Breach of Express Warranty**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut Subclass)**

118. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

119. Plaintiff Janice Beecher ("Connecticut Plaintiff") brings this count on behalf of herself and the Connecticut Subclass against Volkswagen.

120. Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

121. The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

122. The steering wheel, ACC system, driver's assistance systems, and related components were manufactured and/or installed in the Class Vehicles by Volkswagen and are covered by the express warranty.

123. Volkswagen provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, Volkswagen's express warranty is an express warranty under Connecticut state law.

124.    In a section entitled "What is covered," Volkswagen's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]his limited warranty covers any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects)..." The warranty further provides that "[r]epairs under this limited warranty are free of charge. Your Volkswagen dealer will repair the defective part or replace it with new or remanufactured genuine Volkswagen part."

125.    According to Volkswagen, "The New Vehicle Limited Warranty period is "4 years or 50,000 miles, whichever occurs first."

126.    Volkswagen's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Connecticut Plaintiff and members of the Connecticut Subclass purchased or leased the Class Vehicles with the defective capacitive steering wheel, ACC system and/or driver's assistance system, and/or related components.

127.    Connecticut Plaintiff and members of the Connecticut Subclass experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Connecticut Plaintiff and members of the Connecticut Subclass that the Class Vehicles were equipped with defective steering wheel

controls, ACC system and/or driver's assistance system, and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

128.    Volkswagen breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volkswagen and then failing to do so. Volkswagen has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

129.    Connecticut Plaintiff and members of the Connecticut Subclass have had sufficient direct dealings with either Volkswagen or its agents (i.e., dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Connecticut Plaintiff and each member of the Connecticut Subclass on the other hand.  Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Subclass are intended third-party beneficiaries of contracts between Volkswagen and its distributors and dealers, and specifically, of Volkswagen's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

60

130.   Any attempt by Volkswagen to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because Volkswagen knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Connecticut Plaintiff and the members of the Connecticut Subclass.  Among other things, Connecticut Plaintiff and members of the Connecticut Subclass did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Volkswagen and unreasonably favored Volkswagen. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Volkswagen and members of the Connecticut Subclass.

131.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiff and the members of the Connecticut Subclass whole, because Volkswagen has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

132.   Connecticut Plaintiff was not required to notify Volkswagen of the breach because affording Volkswagen a reasonable opportunity to cure its breach of

written warranty would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

133.    Nonetheless, Connecticut Plaintiff and members of the Connecticut Subclass provided notice to Volkswagen of the breach of express warranties when they took their vehicles to Volkswagen-authorized provider of warranty repairs.

134.    As a result of Volkswagen's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

135.    As a direct and proximate result of Defendant's breach of express warranties, Connecticut Plaintiff and members of the Connecticut Subclass have been damaged in an amount to be determined at trial.

136.    As a result of Volkswagen's breach of the express warranty, Connecticut Plaintiff and Connecticut Subclass Members are entitled to legal and equitable relief against Volkswagen, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VI
### Breach of the Implied Warranty of Merchantability
### Conn. Gen. Stat. Ann. § 42a-2-314, *et seq*.
### (On Behalf of the Connecticut Subclass)

137.   Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

138.   Connecticut Plaintiff brings this count on behalf of herself and the Connecticut Subclass against Volkswagen.

139.   Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

140.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

141.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Conn. Gen. Stat. Ann. § 42a-2-314.

142.   Volkswagen knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volkswagen directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom members of the Connecticut Subclass bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volkswagen knew that the Class Vehicles would and did pass unchanged from the authorized dealers to

members of the Connecticut Subclass, with no modification to the defective Class Vehicles.

143.   Volkswagen provided Connecticut Plaintiff and members of the Connecticut Subclass with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their defective steering wheel controls, ACC system and/or driver's assistance system, and related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

144.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volkswagen were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

145.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. Volkswagen knew of this defect at the time these sale or lease transactions occurred.

146.   As a result of Volkswagen's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Subclass suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Connecticut Plaintiff and members of the Connecticut Subclass were harmed and suffered actual damages in that the Class Vehicles are substantially certain to be damaged and/or fail before their expected useful life has run.

147.   Volkswagen's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

148.   Connecticut Plaintiff and members of the Connecticut Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volkswagen's conduct described herein.

149.   Connecticut Plaintiff and members of the Connecticut Subclass have had sufficient direct dealings with either Volkswagen or its agents (i.e., dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Connecticut Plaintiff and members of the Connecticut Subclass on the

other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Subclass are intended third-party beneficiaries of contracts between Volkswagen and its distributors and dealers, and specifically, of Volkswagen's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

150.  Connecticut Plaintiff and members of the Connecticut Subclass were not required to notify Volkswagen of the breach because affording Volkswagen a reasonable opportunity to cure its breach of warranty would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Connecticut Plaintiff and the Class Members and through other internal sources.

151.  Nonetheless, Connecticut Plaintiff and members of the Connecticut Subclass provided notice to Volkswagen of the breach of express warranties when they took their vehicles to Volkswagen-authorized provider of warranty repairs.

152.  As a direct and proximate cause of Volkswagen's breach, Connecticut Plaintiff and members of the Connecticut Subclass suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and

diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and members of the Connecticut Subclass have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

153.   As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Connecticut Plaintiff and members of the Connecticut Subclass have been damaged in an amount to be proven at trial.

**COUNT VII**
**Violations of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. § 42-110A, *et seq*.**
**(On Behalf of the Connecticut Subclass)**

154.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

155.   Connecticut Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Connecticut Subclass.

156.   Volkswagen, Connecticut Plaintiff, and Connecticut Subclass members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

157.   Volkswagen engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

158.   The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Volkswagen engaged in

unlawful trade practices, and unfair or deceptive acts or practices that violated the Connecticut UTPA.

159.  Volkswagen participated in unfair or deceptive trade practices that violated the Connecticut UTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volkswagen knowingly and intentionally omitted material facts in connection with the sale or lease of the Class Vehicles. Volkswagen systematically concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

160.  Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, unfair acts or practices, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

161. Volkswagen's unfair and deceptive acts or practices occurred repeatedly in Volkswagen's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

162.   Volkswagen knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

163.   Volkswagen knew or should have known that its conduct violated the Connecticut UTPA.

164.   Volkswagen was under a duty to Connecticut Plaintiff and the Connecticut Subclass Members to disclose the defective nature of the Class Vehicles because:

   a.  Volkswagen was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.  Volkswagen made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.  Volkswagen actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Subclass Members at the time of sale and thereafter.

165.   By failing to disclose the Defect, Volkswagen knowingly and intentionally concealed material facts and breached its duty not to do so.

166.   The facts concealed or not disclosed by Volkswagen to Connecticut Plaintiff and the Connecticut Subclass Members are material because a reasonable person would have considered them to be important in deciding whether or not to

purchase or lease Volkswagen's Class Vehicles, or to pay less for them. Whether a vehicle's steering wheel controls, ACC system and/or driver's assistance system is defective, which can lead to spontaneous and uncontrolled acceleration, is a material safety concern. Had Connecticut Plaintiff and the Connecticut Subclass Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

167.    Connecticut Plaintiff and the Connecticut Subclass Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

168.    As a result of Volkswagen's misconduct, Connecticut Plaintiff and the Connecticut Subclass Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

169.    As a direct and proximate result of Volkswagen's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Subclass Members have suffered and will continue to suffer actual damages.

170.    Volkswagen's violations present a continuing risk to Connecticut Plaintiffs and the Connecticut Subclass Members as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

171.    Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Subclass seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

## COUNT VIII
## Breach of the Massachusetts Express Warranty
## (Mass. Gen. Laws ch. 106, § 2-313)
## (On behalf of the Massachusetts Subclass)

170.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

171.   Plaintiff Omar Hakkaoui ("Massachusetts Plaintiff") brings this claim individually and on behalf of the proposed Massachusetts Subclass.

172.   Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles.

173.   In its NVLW, Volkswagen expressly warranted that it will "cover[] any repairs to correct a defect in [the] manufacturer's material or workmanship (i.e., mechanical defects)...."

174.   Volkswagen's NVLW formed the basis of the bargain that was reached when Massachusetts Plaintiff and the Massachusetts Subclass Members purchased or leased their Class Vehicles equipped with steering wheel controls, ACC system and/or driver's assistance systems from Volkswagen.

175.   Volkswagen breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Volkswagen. Volkswagen has not repaired or replaced, and have been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

176. Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass Members whole and because Volkswagen has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

177. Accordingly, recovery by Massachusetts Plaintiff and the Massachusetts Subclass Members is not limited to the limited warranty of repair or replacement of parts defective in materials or workmanship, and Massachusetts Plaintiff, individually and on behalf of the Massachusetts Subclass Members, seeks all remedies as allowed by law.

178. Also, as alleged in more detail herein, at the time that Volkswagen warranted and sold the Class Vehicles they knew that the Class Vehicles did not conform to Volkswagen's NVLW and were defective, and Volkswagen wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Massachusetts Plaintiff and the Massachusetts Subclass members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

179. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Volkswagen's

fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Massachusetts Plaintiff's and the Massachusetts Subclass Members' remedies would be insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass Members whole.

180.   Due to Volkswagen's breach of warranty as set forth herein, Massachusetts Plaintiff and the Massachusetts Subclass Members assert as an additional and/or alternative remedy, as set forth in Mass. Gen. Laws Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Massachusetts Plaintiff and to the Massachusetts Subclass Members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-608.

181.   Volkswagen was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

182.   As a direct and proximate result of Volkswagen's breach of express warranty, Massachusetts Plaintiff and the Massachusetts Subclass Members have been damaged in an amount to be determined at trial.

## COUNT IX
## Breach of the Massachusetts Implied Warranty of Merchantability
### (Mass. Gen. Laws ch. 106, §2-314)
### (On behalf of the Massachusetts Subclass)

183.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

184.   Massachusetts Plaintiff brings this claim individually and on behalf of the proposed Massachusetts Subclass.

185.   Volkswagen is and was at all relevant times merchants with respect to motor vehicles.

186.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

187.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are defective in that there are defects in the Vehicles' steering wheel controls, ACC system and/or driver's assistance system rendering certain crucial safety and other functions inoperative.

188.   Volkswagen were provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

189.   As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Massachusetts Plaintiff and the Massachusetts Subclass Members have been damaged in an amount to be proven at trial.

**COUNT X**
**Violations of the Massachusetts Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A)**
**(on behalf of the Massachusetts Subclass)**

190.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

191.   Massachusetts Plaintiff brings this claim individually and on behalf of the proposed Massachusetts Subclass.

192.   The Massachusetts Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ANN. ch. 93A, § 2 (West).

193.   Defendant engaged in unfair or deceptive acts or practices by falsely claiming that the Class Vehicles contain safe haptic control technology while failing to disclose a key defect in material, workmanship, and/or design. This defect results in sudden and unintended acceleration while owners are driving the Class Vehicle.

194.   Defendant's advertisements were likely to mislead a consumer acting reasonably under the circumstances. Consumers—who typically lack the incentive or ability to discover such a defect prior to purchase—would reasonably believe a manufacturer's claim; particularly one coming from Defendant, a well-established,

industry-leading vehicle manufacturer.

195.   Defendant's claims regarding safe technology were material. As noted above, consumers are interested in purchasing the best possible electric vehicles; and the fact that haptic control technology tends to be touted as a premium feature of higher-priced electric vehicle models is direct evidence of this materiality (i.e., it quantifies that materiality).

196.   The entire (or nearly the entire) subclass viewed Defendant's claims regarding safe technology, which were included on the Defendant's website and other promotional materials.

197.   Mr. Hakkaoui was injured by Defendant's deceptive claims. But for those claims, he would not have paid the MSRP for the Class Vehicle. Put differently, Plaintiff Hakkaoui overpaid for the Class Vehicle, and Mr. Hakkaoui did not receive the benefit of his bargain.

198.   Defendant knowingly failed to disclose the defect at issue here. As a large, sophisticated company, and one of the market leaders within the electric vehicle industry, Defendant would have run tests on its vehicles to determine whether the technology used in Class Vehicles is in fact safe. The fact that Defendant has not produced these tests, despite countless consumer complaints regarding the defect, indicates that (1) Defendant's own tests confirmed that the vehicles are defective, or (2) Defendant never ran its own tests, which means that it was

knowingly making claims regarding safe technology without any evidence to support those claims.

199.   Plaintiff Hakkaoui made a demand for relief, in writing, to Defendant at least 30 days prior to filing this complaint, as required by M.G.L. c. 93A § 9. The demand letter was sent on March 27, 2025, via certified mail, return receipt requested, advising Defendant that it was in violation of the M.G.L. c. 93A and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Massachusetts Subclass.

200.   Based on the foregoing, Plaintiff Hakkaoui and the other members of the Massachusetts Subclass are entitled to all remedies available pursuant to M.G.L c. 93A, including, but not limited to, monetary, compensatory, double or treble, punitive, and statutory damages; injunctive relief; restitution; disgorgement of all moneys obtained by means of Defendant's unlawful conduct; interest; attorneys' fees; and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.    Appoint Plaintiffs as representatives of the Nationwide Class and the respective State Subclasses and their counsel as Class Counsel;

C.    Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class Members are entitled;

D.    Award pre- and post-judgment interest on any monetary relief;

E.    Grant appropriate injunctive relief against Defendant, including an order requiring Volkswagen to buy back or permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.    Determine that Defendant is financially responsible for all Class notice and administration of Class Relief;

G.    Award reasonable attorney fees and costs; and

H.    Grant such further relief that this Court deems appropriate.

Dated: June 10, 2025

Respectfully submitted,

**LONGMAN LAW, P.C.**

By: Howard T. Longman
354 Eisenhower Parkway, Suite 1800
Livingston, N.J. 07039
Telephone: (973) 994-2315
Hlongman@longman.law

Nicholas A. Migliaccio (*pro hac* forthcoming)
Jason S. Rathod (*pro hac* forthcoming)
MIGLIACCIO & RATHOD LLP
412 H St. NE, Suite 302
Washington D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Scott D. Hirsch (*pro hac* forthcoming)
SCOTT HIRSCH LAW GROUP, PLLC
6810 N. St. Road 7
Coconut Creek, FL 33073
Telephone: (561) 569-6283
scott@scotthirschlawgroup.com

*Attorneys for Plaintiffs and the Proposed Class*