# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JANICE BEECHER, OMAR HAKKAOUI, ANDREA SMITH, SHANNON FRIEL, CATALIN POPESCU, IVAN DE LA CRUZ, NICOLE KAHHAN, PATRICIA SERIO, and MEGAN GATES, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> VOLKSWAGEN GROUP OF AMERICA, INC., <br><br> Defendant. | Case No. 2:25-cv-09555-MEF-LDW <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Janice Beecher, Omar Hakkaoui, Andrea Smith, Shannon Friel, Catalin Popescu, Ivan De La Cruz, Nicole Kahhan, Patricia Serio, and Megan Gates (the "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against Defendant Volkswagen Group of America, Inc. ("Defendant" or "Volkswagen"). For their Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

1

## INTRODUCTION

1.      This consumer class action arises from a defect found in the 2021-2025 model year Volkswagen ID.4 (the "Class Vehicles"). The Class Vehicles currently have a base MSRP of $39,995 for the 2021 Volkswagen ID.4[1], a base MSRP of $41,230 for the 2022 Volkswagen ID.4,[2] a base MSRP of $37,495 for the 2023 Volkswagen ID.4[3], a base MSRP of $39,735 for the 2024 Volkswagen ID.4[4], and a base MSRP of $39,995 for the 2025 Volkswagen ID.4.[5]

2.      Defendant touted that the Class Vehicles are all-electric SUVs with safe technology. Defendant boasts that the Class Vehicles adopt technology "that help make it easier than ever to adopt the EV lifestyle"[6] and technology that is "safety-enhancing and intelligent."[7] Defendant proudly maintains that the Class Vehicles' technology can almost exclusively be controlled through voice or touch and that "there are very few actual buttons."[8]

---

[1] https://media.vw.com/en-us/press-kits/2021-id4-press-kit (last accessed March 19, 2025)

[2] https://media.vw.com/en-us/releases/1661 (last accessed March 19, 2025)

[3] https://media.vw.com/en-us/releases/1699 (last accessed March 19, 2025)

[4]  https://media.vw.com/press-kits/2024-id4-press-kit (last accessed November 7, 2025)

[5]  https://media.vw.com/press-kits/2025-id4-press-kit (last accessed November 7, 2025)

[6]  https://www.vw.com/en/newsroom/everything-electric/vw-s-ev-history.html (last accessed March 19, 2025)

[7] https://www.vw.com/en/iq-drive/travel-assist.html (last accessed March 19, 2025)

[8] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)

3.      However, Defendant manufactured, marketed, and distributed the Class Vehicles without disclosing a key defect in material, workmanship, and/or design. Specifically, the Class Vehicles' overly touch sensitive capacitive steering wheels automatically engage Adaptive Cruise Control ("ACC") with a mere light brush of the hand over the steering wheel's haptic controls. This results in sudden and unintended acceleration while owners are driving the Class Vehicle. Plaintiffs have been involved in catastrophic crashes because of the Defect, leaving them terrified and hesitant to drive their Class Vehicles. In some instances, their vehicles are a total loss.

4.      In addition to concealing the Defect, Defendant actively mispresented the attributes and capabilities of the Class Vehicles by claiming, among other things, that the vehicles had been thoroughly tested, had no manufacturing shortcomings, and were equipped with robust technology that made the Class Vehicles safe to drive on a regular basis. In this case, Plaintiffs and class members have been left with a vehicle that without warning suddenly accelerate, at uncontrollable speeds, failing to trigger the emergency braking safety systems, resulting in an extreme safety risk to the owner, the vehicle, innocent bystanders, and surrounding property.

5.      Defendant knew or should have known before the time it sold the first Class Vehicle, that the Class Vehicles contained the Defect.

6.     The Defect exposes drivers and occupants of the Class Vehicles, as well as bystanders who are in proximity to the Class Vehicles when they spontaneously and uncontrollably accelerate, to an increased risk of accident injury, or death.

7.     Despite knowledge of the Defect from customer complaints, information sent from dealers, and its own internal records, Defendant has not offered its customers suitable repairs or replacements free of charge or offered to reimburse its customers. Instead, Defendant's investigations of Plaintiffs' complaints have continually led Defendant to conclude that the crashes with Class Vehicles were due to 'driver error' and had nothing to do with the Defect.

8.     Plaintiffs have suffered harm as a result of Defendant's decision not to disclose the Defect in the Class Vehicles. Plaintiffs purchased Class Vehicles which suffer from the Defect.

9.     On behalf of the class and subclasses they propose to represent, Plaintiffs seek an award of monetary damages, including the costs of inspecting and repairing the Class Vehicles, and appropriate injunctive and equitable relief, including an order requiring Defendant to adequately disclose and repair the Defect in its Class Vehicles.

10.     It is well settled that a "plaintiff is 'the master of the complaint,' and therefore controls much about [his or] her suit." *Royal Canin U.S.A., Inc. v.*

*Wullschleger*, 220 L.Ed.2d 289, 302 (U.S. 2025). As detailed herein, Plaintiffs' claims here focus on material omissions, not affirmative misrepresentations.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs.  This is a class action in which more than two-thirds of the proposed plaintiff class are citizens of states other than the Defendant.

12.    This Court has personal jurisdiction over Defendant Volkswagen Group of America, Inc. because it is incorporated in this district, conducts substantial business in this judicial district, and intentionally and purposefully placed the Class Vehicles into the stream of commerce within this district and throughout the United States.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant Volkswagen Group of America, Inc. is incorporated in this district, transacts business in this district and is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.

## PARTIES

14.    Plaintiff Janice Beecher is a citizen of New Britain, Connecticut who leased a Class Vehicle in Plainville, Connecticut in March 2024.

15.    Plaintiff Omar Hakkaoui is a citizen of Norfolk, Massachusetts who purchased a Class Vehicle in Watertown, Massachusetts in June 2022.

16.    Plaintiff Andrea Smith is a citizen of Litchfield Park, Arizona who purchased a Class Vehicle in Peoria, Arizona in July 2022.

17.    Plaintiff Shannon Friel is a citizen of Denver, Colorado who leased a Class Vehicle in Denver, Colorado in July 2025.

18.    Plaintiff Catalin Popescu is a citizen of Saco, Maine who leased a Class Vehicle in Saco, Maine in July 2024.

19.    Plaintiff Ivan De La Cruz is a citizen of Loxahatchee, Florida who leased a Class Vehicle in Coconut Creek, Florida in September 2025.

20.    Plaintiff Nicole Kahhan is a citizen of Jacksonville, Florida who purchased a Class Vehicle in Jacksonville, Florida in November 2022.Plaintiff Patricia Serio is a citizen of Redwood City, California who leased a Class Vehicle in March 2023.

21.    Plaintiff Megan Gates is a citizen of Lakeville, Minnesota who purchased a Class Vehicle in Inver Grove Heights, Minnesota in May 2025.

22.    Defendant Volkswagen Group of America, Inc., a subsidiary of Volkswagen AG, a public limited company in Germany, is a New Jersey Corporation with its principal place of business is located at 1950 Opportunity Way Suite 1500, Reston, VA 20190. Volkswagen Group of America, Inc. distributes

6

Class Vehicles to consumers through the U.S. Volkswagen Group of America Chattanooga Operations, LLC, a wholly owned subsidiary of Volkswagen Group of America, Inc., located in Chattanooga, Tennessee.

23. Defendant has designed, manufactured, imported, distributed, offered for sale, sold, and leased the Class Vehicles with the knowledge and intent to market, sell, and lease them in all fifty states.

24. Defendant developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials related to the ID.4 Vehicles with the intent that such documents should be purposefully distributed throughout all fifty states. Defendant is engaged in interstate commerce, selling vehicles through their network in every state of the United States.

**FACTUAL ALLEGATIONS**



Image of the Volkswagen ID.4 Vehicle

25.    The ID.4 first rolled off the lines at the Chattanooga plant in Tennessee in 2021, and it was announced as Volkswagen's first EV to be built and sold in the United States in July 2022.[9]

26.    In 2022, Volkswagen sold 193,200 ID.4s, marking Volkswagen's highest selling EV of that year.[10]

27.    The ID.4 is Volkswagen's first all-electric SUV and the brand's first global EV.[11] It has been produced and sold in China, the United States, and Europe since its release.[12]

28.    Volkswagen promised that the ID.4 would demonstrate "the company's biggest strengths: the development of modern electric vehicles that bring together price, performance and sustainability for customers."[13]

29.    The ID.4 was launched through a campaign in 2021 under the recurring message of "Before it can change the world, it has to change yours." The goal of this campaign was to demonstrate the versatility of the ID.4 and how EV adoption can

---

[9] VW ID.4 sales see a record quarter, but giddyup already | Electrek (last accessed March 19, 2025)

[10] Volkswagen Commits To $131 Billion In EV And Digital Development By 2028 (forbes.com) (last accessed March 19, 2025)

[11] https://www.media.vw.com/assets/documents/original/13020-2021ID4ReleaseFINAL.pdf p.1 (last accessed March 19, 2025)

[12] https://www.volkswagen-newsroom.com/en/id4-5840 (last accessed March 19, 2025)

[13] Id.

change the consumer's life at an individual level.[14] Kimberley Gardiner, senior vice president of Volkswagen brand marketing, stated that the purpose of the campaign was to show that the ID.4 is an "eSUV that meets everyday needs and is really fun to drive."[15]

30.    A hallmark of the ID.4, according to Volkswagen, is the model's host of features and technology "that help make it easier than ever to adopt the EV lifestyle."[16]

31.    Volkswagen also touted that the high-tech interiors of the ID.4 "mirrors the futuristic look of the exterior."[17] The technology is designed to function almost exclusively through voice or touch and "there are very few actual buttons."[18] The ID.Cockpit display in front of the driver is operated with touch-sensitive controls on the multifunction capacitive steering wheel which provide haptic feedback.

32.    ID.4's steering wheels have controls for both driver assistance systems and the media system. The controls for driver assistance are on the left-hand side of the steering wheel while the controls for the media system are on the right-hand side

---

[14] Volkswagen ID.4 EV campaign - Before it can change the world, it has to change yours - Volkswagen US Media Site (vw.com) (last accessed March 19, 2025)
[15] *See id.*
[16] The long journey of EVs, from Elektro Bus to Volkswagen ID.4 EV and beyond (vw.com) (last accessed March 19, 2025)
[17] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[18] *Id.*

of the steering wheel. Importantly, the conventional touch buttons on the steering wheel have been replaced by touch buttons on the multifunction steering wheel.[19]



Image of the ID.4 steering wheel and touch controls

33.    Volkswagen consistently maintained and advertised that the ID.4's technology is not only advanced but also paramount to consumers' safety.

---

[19] MC-10189712-0001.pdf (nhtsa.gov)





34.    A key component of the ID.4's technology is the IQ.Drive, which is a "safety-enhancing and intelligent" technology.[20] Specifically, it is advertised as an advanced driver assistance technology and a smart infotainment system that uses voice and touch.[21] The IQ.Drive system uses front and rear radar, a front camera and multiple ultrasound sensors to collect information from the surrounding areas. This

---

[20] VW Travel Assist: How Does It Work? | Volkswagen (last accessed March 19, 2025)

[21] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)

system in turn enables Travel Assist; Front Assist; Active Side Assist; Rear Traffic Alert; Adaptive Cruise Control ("ACC"); Lane Assist; and Emergency Assist.[22]

35.    Travel Assist, a feature of the IQ.Drive system, is a semi-automated driving assistant that includes features of ACC and Lane Assist. This feature is meant to help drivers maintain a safe distance from other vehicles on the road and assist drivers in staying in the center of the lane.

36.    ACC, a standard feature on the ID.4, allows drivers to set the vehicle's speed and spacing between other vehicles in front of them using the multifunction steering wheel. ACC uses a forward-facing radar to maintain a set speed and distance from the vehicle in front of it. Pressing the accelerator can help override the ACC function while "[p]ressing the brakes always cancels the ACC function."[23]

---

[22] *Id.*
[23] *Id.*



Closeup image of ID.4 Driver Assistance touch controls on steering wheel

37.    Front Assist, on the other hand, is designed to assist in warning drivers of potential frontal collisions with vehicles and pedestrians. Volkswagen advertised that it does so by engaging the automatic braking system to avoid or lessen the crash's impact.[24] This system warns the driver of potential imminent front-end collision situations both acoustically and visually through a warning symbol if the car is above 18mph. Additionally, an automatic jolt of the brakes can warn the driver

---

[24] Front Assist: To Warn You Of Potential Collisions | Volkswagen (vw.com) (last accessed March 19, 2025)

13

of the danger. In the event that the driver fails to brake, the Autonomous Emergency Braking ("AEB") system is activated to slow the vehicle. If the car is travelling below 18 mph and a potential frontal collision is detected, AEB is activated without a prior acoustic or visual warning. If the brake pedal is applied but the driver brakes too lightly, Braking Support is activated, which applies more pressure on the brakes for the driver.[25]

38.     Regardless of whether the car is travelling above or below 18mph, Volkswagen claims that the Emergency Braking system is activated through Front Assist. Per Volkswagen's advertisements, the only time activation of the Front Assist system may be limited is when the sensors are misaligned or damaged; the sensors are blocked by ice, mud, snow, dirt, mud or leaves; or if heavy cargo or trailers change the sensor angles.[26]



---

[25] https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[26] Front Assist: To Warn You of Potential Collisions | Volkswagen (vw.com)

39.    The ID.4s are equipped with an Event Data Recorder ("EDR"), sometimes referred to as the vehicle's 'black box.' EDRs can store data such as vehicle speed, brake application, and driver steering up to several seconds before a collision.[27] To retrieve information recorded on an EDR, owners are required to sign an EDR Authorization Form. The EDR report is usually accessed by engineers at Volkswagen to inspect ID.4s in the event of a collision.

40.    The 2021, 2022, 2023, 2024, and 2025 ID.4 models have the same features and specifications as noted above.

The Defect

41.    ID.4's technology, specifically its capacitive steering wheel and IQ.Drive system is defective.

42.    Since ID.4's release in 2021, consumers have repeatedly reported issues with the vehicle's touch-sensitive steering wheel controls, which control the vehicle's ACC functions.

43.    Specifically, the complaints have revolved around the steering wheel's cruise control buttons, which are capacitive rather than physical, and upon information and belief, set by software to be too sensitive and always in an active

---

[27] https://www.explico.com/post/passenger-vehicle-event-data-recorders-what-are-they-and-how-are-they-useful#:~:text=Event%20Data%20Recorders%2C%20or%20EDRs,collision%20severity%20during%20a%20collision. (last accessed March 19, 2025)

state. This means that a light brush with one's fingers or touch of the hand with low pressure over the controls on the wheel is enough to make the vehicle's system reengage to its last set speed on cruise control.[28]

44.     This has led to numerous incidents where drivers, often while parking, have experienced what appears to be the ACC controls suddenly activating, either due to the capacitive controls being inadvertently activated due to their sensitivity, or some software error in the system, causing the vehicle to unexpectedly accelerate. This has resulted in severe injuries, property damage, and significant financial burdens for owners. The sudden, uncontrollable acceleration has not only terrified drivers but also led to costly repairs for accidents beyond their control.

45.     Moreover, the Defect is not limited to the ACC controls suddenly activating but also incorporates a deeper software integration failure of the IQ.Drive System. The built-in safety mechanisms promised by Volkswagen via the IQ.Drive System, including the Travel Assist, Front Assist, Active Side Assist, Rear Traffic Alert, Lane Assist, and Emergency Assist, have repeatedly failed to activate during incidents of sudden and uncontrolled acceleration.

46.     Numerous NHTSA complaints, as detailed below, demonstrate that Volkswagen's promised safety features do not activate or are overridden when the

---

[28]     https://www.canberratimes.com.au/story/8709196/volkswagen-owners-claim-steering-wheel-buttons-are-causing-crashes-report/ (last accessed March 19, 2025)

16

ACC controls are activated, resulting in dangerous, repeated events of sudden and uncontrolled acceleration. Despite affected drivers reporting having depressed the brake pedal prior to and/or during the uncontrolled and sudden acceleration, the Class Vehicles have failed to come to a stop. This constitutes a fundamental manufacturing and safety defect, as the system is supposed to prevent precisely these situations.

47. Volkswagen was or should have been aware, through consumer complaints, NHTSA reports, and dealer incident analysis, that the IQ.Drive system—integral to the ID.4's safety—in fact exposes drivers to catastrophic risk due to software mismanagement of sensor data. Volkswagen's failure to re-code, recall, or provide effective software updates demonstrates knowing concealment of the Defect.

48. On several occasions, where consumers have reported these incidents to Volkswagen, the company has avoided taking responsibility and blamed the accidents on 'driver error,' while falsely continuing to maintain that the car is safe to drive.

49. The National Highway Traffic Safety Administration ("NHTSA") has received numerous related complaints involving ID.4's 2021-2025 models, which illustrate the significance of the defective haptic controls on the steering wheel.

Below are examples of consumer complaints submitted to NHTSA regarding sudden acceleration issues with the Class Vehicles:

> NHTSA ID Number: 11542693[29]
> NHTSA Posting Date: November 19, 2021
> Model: ID.4 2021
>
> This car was marketed as an easy transition from gasoline powered engines, meaning its braking maneuvers should not have been largely different. However the 2021 electric did not come with auto hold which VW later determined should be added for brake safety reasons. In 2022 VW had a software upgrade and as of Sept. 2023 it has yet to be installed for me. However any update was already too late for me. In Nov. 2021 this scenario happened: I pulled up to my garage and realized the car was not aligned with the garage door so (after braking and bringing the car to a full stop) I chose "R" to proceed with the slight correction. I did not touch the accelerator but the car careened backwards down driveway and impaled itself on a large landscape rock (which stopped the descent). I just missed hitting a telephone pole and/or landing crosswise in the street at the bottom of my driveway. The incline was not steep but the backward momentum was great. I could have been severely injured but luckily only the car sustained heavy damage!
>
> NHTSA ID Number: 11522547[30]
> NHTSA Posting Date: May 15, 2023
> Model: ID.4 2022
>
> I have experienced within 3 months two incidents of unattended, out of control acceleration when pulling into a parking spot. First I drove into some bushes, at the second incident I drove over a sidewalk almost into a building. It was very scary. I found in the internet another

---

[29] https://www.nhtsa.gov/?nhtsaId=11542693
[30] https://www.nhtsa.gov/?nhtsaId=11522547

18

person who has experienced the same thing. https://www.vwidtalk.com/threads/sudden-acceleration.6037/ I have not contacted the dealer yet. I cannot reproduce it. I am very sure I did not step on the accelerator.

NHTSA ID Number: 11541568[31]
NHTSA Posting Date: August 29, 2023
Model: ID.4 2021

The steering wheel controls on our 2021 Volkswagen ID.4 are haptic. That means that if you brush them with your fingers or hand with light pressure, they can activate. When leaving a neighborhood street, I turned the steering wheel approximately 180 degrees to pull out from a parking spot next to the curb. Upon releasing my grip a bit on the steering wheel (to let it rotate back to 'straight') my right thumb grazed the cruise control activation button (which is normally on the left side of the steering wheel). Since I had been using cruise control earlier in the drive, the cruise control resumed and the car accelerated without my providing any pedal input. Luckily I realized what had happened and pushed the brake pedal to cancel cruise control. The cruise control was set to 15 mph. I am thankful it was not set to something higher, like 65 mph. I don't know how fast the car would have accelerated in that case.

NHTSA ID Number: 11544772[32]
NHTSA Posting Date: September 13, 2023
Model: ID.4 2022

Two days ago I was pulling into a parking spot in a shopping center. The car suddenly accelerated forward and I hit a concrete parking block. This is the third time over the past 7 months that this has occurred, where the car suddenly accelerates when in a low speed. After the

---

[31] https://www.nhtsa.gov/?nhtsaId=11541568
[32] https://www.nhtsa.gov/?nhtsaId=11544772

19

first time it happened, I called the dealership to ask if any other customers had this issue, but they said no. For them to run a diagnostic on it, they would have to recreate what had occurred. We all know that is impossible. So I ignored it, as it did not happen again until three months later. Then once again two days ago.

NHTSA ID Number: 11563099[33]
NHTSA Posting Date: January 2, 2024
Model: ID.4 2022

The car has now 3 times over the last year suddenly lurched forward while braking and pulling into a parking spot. The first time it went over a curb and into a yard. We thought it could be a mistake, but my wife, driving, has never had an accident in 40 years driving. Happened again, and we thought maybe it had something to do with cruise control and hepatic sensitive buttons. But we keep that system off unless we are on the highway. This time it lurched forward but she managed to get it to stop just as it touched the parked car in front. No damage. Foot was on the brake as coming to a stop. This car should not be allowed on the road.

NHTSA ID Number: 11592927[34]
NHTSA Posting Date: April 21, 2024
Model: ID.4 2023

I was halfway into a parking stall. There was a cement sign post at the end of the stall and a truck facing me opposite. About six feet from the post the car accelerated and glanced off the post and hit the truck slightly. It happened very fast but I am 99% sure the car accelerated on its own. We did a search afterwards and found many reports of our model doing similar things.

---

[33] https://www.nhtsa.gov/?nhtsaId=11603099
[34] https://www.nhtsa.gov/?nhtsaId=11592927

20

NHTSA ID Number: 11593243[35]
NHTSA Posting Date: June 6, 2024
Model: ID.4 2022

Oct 9th 23 - My wife pulled into the office parking lot, and as she braked after parking the car. Post braking suddenly she realized the car was morning forward and it hit the car parked in front of her slot. The car being driven in the B mode, so it could recharge. The front bumper and grill were damaged incurring a loss of $ 6,972.76. Fortunately [this] did [n]ot cause a[n]y bodily injury to either me or other people in the parking lot. June 6th 24 - I pulled into the grocery store parking lot, and as i braked and parked the car, i noticed the very same phenomenon , after stopping suddenly i realize[d]      that the car went over the curb of the parking lot, hit the car parked next to me and then jumped to the other side of the road and i had to steer into the next parking lot. Again causing severe damage to my car as well as the car parked next to me. Fortunately there was nobody walking in the parking lot, or no other car that was entering the parking lot, for as the car jumped the curb it could lead to a very fatal accident.

NHTSA ID Number: 11603151[36]
NHTSA Posting Date: July 4, 2024
Model: ID.4 2023

On 7/4/2024 at approximately 6pm, I disconnected my 2023 VW ID4 from an electrical charging station. I moved my vehicle 2 blocks away to an apartment building parking lot, which I had parked in previously. While pulling into the parking spot, I was coming to a complete stop, perhaps going 1-2 miles per hour and as I came to a stop, the car accelerated out of nowhere and crashed into a few small trees and a chain link fence for the neighbor's home. I had a passenger in the front passenger seat and neither of us could understand what had just happened. It

---

[35] https://www.nhtsa.gov/?nhtsaId=11593243
[36] https://www.nhtsa.gov/?nhtsaId=11603151

made no sense and I have no idea what happened to cause the acceleration.

NHTSA ID Number: 11604974[37]
NHTSA Posting Date: July 9, 2024
Model: ID.4 2023

Was stationary in dense traffic, all waiting for a local bridge to open. We had been waiting for 10 or so minutes. Had braked and stopped close to car in front, car in Auto Hold. All of a sudden, my car accelerated quickly into stationary car in front, twice I believe, before I was able to brake and turn car off. I do not know why this happened or whether there were any warnings. Affected my car, car in front of me, and car in front of them. No one hurt, my car front rather damaged, perhaps $12,000+, car in front damaged front and rear. We were able to drive away, but my car not safe to drive. Is currently parked and waiting to be towed once collision shop space is available. I have not taken to dealer to test as is not safe to drive. No one has inspected in person yet.

NHTSA ID Number: 11604230[38]
NHTSA Posting Date: July 11, 2024
Model: ID.4 2023

Steering wheel has capacitive touch control for cruise controls and other options. While turning in corners or exiting from highways unknowingly capacitive controls are getting activated and it sets the speed to highway cruise speed limit or previous cruise speed, creating a panic situation. It is a safety issue and potentially crashes. I have avoided 10 different instances so far. It has to be recalled for this issue and fix has to be done for this.

---

[37] https://www.nhtsa.gov/?nhtsaId=11604974
[38] https://www.nhtsa.gov/?nhtsaId=11604230

NHTSA ID Number: 11603099[39]
NHTSA Posting Date: July 17, 2024
Model: ID.4 2023

The contact owns a 2023 Volkswagen ID.4. The contact stated while driving at 5 MPH, the service brake independently activated and steered in the opposite direction in which the vehicle was being steered. The vehicle independently accelerated and crashed into the rear of a parked vehicle. The parked vehicle was damaged to the rear of the vehicle. The contact's vehicle was damaged to the front center of the vehicle. The contact's adult daughter and adult friend were passengers in the vehicle when the failure occurred. The contact stated that no injuries were sustained. No Police report was filed. The contact stated that the driver of the parked vehicle confirmed that the contact did not have control of the vehicle when the failure occurred. The contact's vehicle was taken to the dealer, however the contact was requested to pay a diagnostic fee. The vehicle was not diagnosed or repaired by an independent mechanic or the dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 12,000.

NHTSA ID Number: 11605013[40]
NHTSA Posting Date: July 28, 2024
Model: ID.4 2022

Vehicle suffers from unintended and sudden acceleration when the "resume' capacitive touch button is accidentally brushed against. The vehicle is subject to injure or kill the vehicles occupants or others struck by the vehicle. Vehicle advised there is "no issue" with the vehicle but they did acknowledge the problem with the design of the steering wheel. The issue is intermittent and has occurred while driving at slow speeds in parking lots when the steering

---

[39] https://www.nhtsa.gov/?nhtsaId=11603099
[40] https://www.nhtsa.gov/?nhtsaId=11605013

23

wheel is frequently turned more than 90 degrees and a body part can unintentionally touch the 'Resume" button.

NHTSA ID Number: 11605012[41]
NHTSA Posting Date: July 28, 2024
Model: ID.4 2021

Vehicle suffers from unintended and sudden acceleration when the "resume' capacitive touch button is accidentally brushed against. The vehicle is subject to injure or kill the vehicles occupants or others struck by the vehicle. Vehicle advised there is "no issue" with the vehicle but they did acknowledge the problem with the design of the steering wheel. The issue is intermittent and has occurred while driving at slow speeds in parking lots when the steering wheel is frequently turned more than 90 degrees and a body part can unintentionally touch the 'Resume" button.

NHTSA ID Number: 11625016[42]
NHTSA Posting Date: November 13, 2024
Model: ID.4 2022

Was coming to stopped traffic, suddenly car accelerated quickly and rear ended car in front, which then hit 2 cars in front. Event data recorder showed the acceleration; not sure what happened. Car has haptic button for adaptive cruise control and ? Engaged on resume button left side of steering wheel. VW says not a manufacturing defect. Fortunately no injuries - air bags did not deploy.

NHTSA ID Number: 11643685[43]
NHTSA Posting Date: February 19, 2025
Model: ID.4 2023

I was easing into a parking spot and braking when the car suddenly and uncontrollably accelerated, leveling a light

---

[41] https://www.nhtsa.gov/?nhtsaId=11605012
[42] https://www.nhtsa.gov/?nhtsaId=11625016
[43] https://www.nhtsa.gov/?nhtsaId=11643685

pole in front of me and finally coming to a stop on top of the light pole base.

NHTSA ID Number: 11690745[44]
NHTSA Posting Date: January 10, 2025
Model: ID.4 2022

1. I still can't make sense of what exactly malfunctioned at my car accident on 9/26/2025 but I have reported to the Volkswagen Customer Service on 9/27/2025 and they couldn't give me a precise answer and told me they will have to research and call me back yesterday - 9/30/2025 but I haven't got a call as of this writing. It basically activated something that accelerated suddenly the car and it is like someone took control over the car causing me to crash with 2 cars in front of me. Yes, it is available for inspection. 2. I don't feel safe anymore with that car and also I am terrified that innocent people's lives will be put at risk. 3. I have seen some articles around the internet with the same experience that I had and it looks like Volkswagen has a law suit about it. 4. No, but I have reported to 911 and my insurance. 5. No, there's no any warning on the car dashboard before this incident happened.

NHTSA ID Number: 11657616[45]
NHTSA Posting Date: April 29, 2025
Model: ID.4 2021

I was pulling into a parking space and slowly moving forward to get to the front of the space. The car spurted forward about 2 feet with force and crashed into a cement based light standard. There was significant damage to the front end. No injuries. Airbag did not inflate. Vehicle is currently at body shop but no one has looked at the 'black box'. Geico rep and adjuster at the body shop have looked at the car. Safety was at risk due to crashing in to a solid

---

[44] https://www.nhtsa.gov/?nhtsaId=11690745
[45] https://www.nhtsa.gov/?nhtsaId=11657616

25

object. Fortunately I was going slow when it accelerated and did not have enough time or space to cause injuries

NHTSA ID Number: 11657958[46]
NHTSA Posting Date: April 30, 2025
Model: ID.4 2024

I am filing this formal complaint with the National Highway Traffic Safety Administration regarding a critical safety failure involving my 2024 Volkswagen ID.4. The incident, which occurred on [XXX], involved sudden and unintended acceleration while slowly parking at a Walgreens in Saco, Maine, resulting in a collision with the building. I delayed this submission until the official police report (Saco Police Crash Report #[XXX]) became available on April 21, 2025, to ensure accuracy and proper documentation. Incident Details: •Date/Time: [XXX] •Location: Walgreens Pharmacy, [XXX] •Vehicle: 2024 VW ID.4 (VIN: [XXX] ) •Conditions: daylight conditions, no contributing environmental factors. While shifting from Drive to Park with my foot fully on the brake, the vehicle surged forward twice without accelerator input. IQ Drive, Collision mitigation systems and Park Distance Control (PDC) failed to engage. All driver-assistance features were deactivated. No airbags deployed. Supporting Documentation (attached): •Saco Police Crash Report # [XXX] •Crash scene photographs Prior Warnings: •In August 2024, a powertrain warning appeared; VW service dismissed it as non-critical. •On the morning of the crash, the vehicle emitted an abnormal sound during initial startup Medical Context: At the time of the incident, I was recovering from major cardiothoracic surgery ([XXX]). Though belted, the sudden jolt near my surgical site raised post-operative risks and safety concerns. Request for Action: I respectfully request that NHTSA: 1.Investigate this incident for potential inclusion in a broader pattern of unintended acceleration in the VW ID.4 model. 2.Review

---

[46] https://www.nhtsa.gov/?nhtsaId=11657958

related TSBs, consumer complaints, or internal manufacturer field reports. 3.Secure pre-reset data from the vehicle's ECU and EDR. 4.Notify Volkswagen of its duty to report Thank you for your attention to this serious matter INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

NHTSA ID Number: 11664879[47]
NHTSA Posting Date: June 4, 2025
Model: ID.4 2023

I was driving off the freeway in my ID4 and had been driving with both B mode (Regenerative braking) and the cruise control on. I then proceeded to drive approx 4 miles, still in B mode. I pulled into a parking space at my local swim club, and as I pulled into the space I took my foot off the accelerator, and began to slow down. As I was about to break to bring the car to a complete standstill, the adaptive cruise control kicked in and launched my car forward over the small concrete bollard, through a chain-link fence and into a tree stump (roughly the length of the car again). This caused considerable damage to my vehicle, but more so I am concerned for other drivers that these two drive modes conflict with each other and cause a serious safety concern. Insurance claim has been logged with AAA.

NHTSA ID Number: 11668778[48]
NHTSA Posting Date: June 23, 2025
Model: ID.4 2021

The vehicle accelerated without control and crashed into the wall between my garage and the adjacent laundry room. That day someone could have easily been seriously hurt or killed. The problem was investigated but could not been reproduced. The vehicle was inspected by a team of

---

[47] https://www.nhtsa.gov/?nhtsaId=11664879
[48] https://www.nhtsa.gov/?nhtsaId=11668778

27

investigators from the Manufacturer, VW. No warning signs or abnormal situations prior the the incident. The vehicle was in our possession and driven for 3 years, about 55k miles, no issues ever. The driver at the time is an experienced driver and familiar with the vehicle operation for three years.

NHTSA ID Number: 11680157[49]
NHTSA Posting Date: August 12, 2025
Model: ID.4 2021

I was pulling into street parking spot behind a parked car at a slow speed and braking to stop. I put my foot on the brake to bring the car to a complete stop but instead of slowing down the car accelerated straight into the vehicle in front of me. The rear end of the car in front of me was substantially damaged.

NHTSA ID Number: 11680647[50]
NHTSA Posting Date: August 14, 2025
Model: ID.4 2024

The contact owns a 2024 Volkswagen ID.4. The contact stated upon pulling to a parking space and depressing the brake pedal, the brake Auto Brake Hold system engaged; however, the vehicle accelerated unintendedly, and the front end of the vehicle crashed into the side of one unoccupied parked vehicle, and then crashed into the front of a second unoccupied parked vehicle, which hit the front of a third unoccupied parked vehicle. The brake pedal was depressed during the failure, but the vehicle failed to respond. The air bags did not deploy. No injury was sustained. A police report was filed, but the information was not available. The vehicle was towed to Triple A storage facility. The vehicle was then towed to an autobody repair shop, where an estimate of the damage sustained was provided. The vehicle was not repaired. The

---

[49] https://www.nhtsa.gov/?nhtsaId=11680157
[50] https://www.nhtsa.gov/?nhtsaId=11680647

dealer was notified of the failure, and the contact requested an investigation of the failure. The vehicle was in the process of being towed to the dealer auto collision center. The vehicle was not diagnosed or repaired. The manufacturer was notified of the failure and sent a data retriever authorization form and an event questionnaire form, which the contact had filled out and returned to the manufacturer. The failure mileage was approximately 3,800.

NHTSA ID Number: 11683989[51]
NHTSA Posting Date: August 29, 2025
Model: ID.4 2025

On [XXX], I was parking my 2025 VW ID.4 car in a parking spot in B mode and applying the brake to come to a stop. The car suddenly accelerated forward (of its own will) at maximum speed such that the car ran over a bollard, a sidewalk and into a brick wall causing significant damage. In the space of perhaps 10 feet at most the car went from a stopping position to taking out a brick wall on a commercial building. This is so incredibly dangerous as someone could have been on the sidewalk and killed. I could have been killed as my airbag never deployed despite charging with great speed into a brick wall! NHTSA must do something to resolve this. VW has overwhelming knowledge of this defect. In June 2025 a class action lawsuit was filed against the VW for this exact reason - link here: [XXX] Per the lawsuit there have been deaths related to this defect. This was never disclosed to me when I bought the car....as a matter of fact, the EV safety features in their sales pitch was one of the overwhelming reasons I bought the car. There are also many blogs related to this issue describing almost exactly what happened to me. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

---

[51] https://www.nhtsa.gov/?nhtsaId=11683989

29

NHTSA ID Number: 11695332[52]
NHTSA Posting Date: October 23, 2025
Model: ID.4 2025

I drove our ID4 to pick up a neighbor's son from school. Using the regenerative braking mode, I came to a stop on a side street, just beyond a school crossing where middle school kids were everywhere, at which time the car lunged forward at a high rate of speed while my foot was still on the brake. Luckily we ran into a parked service van that slowed our progress while I put the car in the parking mode, which finally stopped the car. We both experienced the hard impact of hitting the truck and noticed that the air bags did not deploy. There are skid marks that confirm that the brakes were employed while the car moved independently. We are grateful we didn't hit anyone. I will not drive this car again. There were no indications that anything we amiss prior to this malfunction. Our insurance adjustor will be coming by in the next day or two to inspect the car. This could have been a tragic event!!!!!

NHTSA ID Number: 11689963[53]
NHTSA Posting Date: September 26, 2025
Model: ID.4 2025

While driving slowly in B mode, I began pulling into a parking space in Home Depot parking lot next to a planter, keeping my foot on the brake pedal. Suddenly, the vehicle unexpectedly accelerated, surged over the tire stop, crossed a raised concrete center walkway, and continued over the planter on the opposite side. The vehicle finally came to a stop after traveling approximately 50 feet, despite my foot remaining on the brake pedal throughout the incident. One tire is flat and the wheel is damaged. There are scrap marks on the other tires. We can not see if there is other damages of the vehicle. Fortunately there were no other cars in the opposite parking spot or

---

[52] https://www.nhtsa.gov/?nhtsaId=11695332
[53] https://www.nhtsa.gov/?nhtsaId=11689963

pedestrians on the walkway. Vehicle damage is one thing, the safety issue is another concern.

NHTSA ID Number: 11679529[54]
NHTSA Posting Date: August 9, 2025
Model: ID.4 2025

the vehicle unexpectedly accelerated while parking. the vehicle was in regenerative breaking mode and my foot was on the brake pedal. at no point was my foot in contact with the acceleration pedal.

50.    Below are examples of consumer complaints submitted to NHTSA stating that the promised IQ.Drive safety features failed to activate in critical situations, leading to fatal crashes involving Class Vehicles. Several of these complaints describe instances where the emergency braking system failed to activate, or the Class Vehicle continued to accelerate despite the driver pressing the brakes. These incidents contradict Volkswagen's claim that "[p]ressing the brakes always cancels the ACC function."[55]:

NHTSA ID Number: 11446521[56]
NHTSA Posting Date: October 13, 2021
Model: ID.4 2021

In October, 11 weeks ago, while parallel parking, which I do everyday for work, I reversed back into an empty spot, toggled into Drive to straighten out my car and my car accelerated and hit the car parked in front of me. I kept

---

[54] https://www.nhtsa.gov/?nhtsaId=11679529
[55]  https://media.vw.com/en-us/press-kits/2023-id4-press-kit (last accessed March 19, 2025)
[56] https://www.nhtsa.gov/?nhtsaId=11446521

stomping on the break pedal but it was stiff, I couldn't press it down at all. The break pedal was as if the car was turned off. Even though it has been 11 weeks ago, I will not drive the car because VW has not fixed the problem and I do not feel safe. The body repair has been done. The car remains at the dealership where I bought it and is available for inspection. I could of hit many children because I was parking at an Elementary school when this unintended acceleration coupled with no brakes happened. It is VW's first ever ALL ELECTRIC car and the ID4's have NEVER had a software update. VW says, no technicians or trained mechanics, software would have to be done at dealer and could take all day, no software to download using Wi-Fi, may need bigger battery and no parts available. VW corporate fly out to inspect the car and run reports but they refuse to give me a copy and so does the dealership. VW is taking no responsibility and said the brake peddle was never applied, only the accelerator. I never put my foot on or near the accelerator because I was only inching forward to straighten my wheels out. When the car was put into drive it does not need any gas to move only a few inches forward. My insurance representative tried to run a report but he said there was no information at all on the recorder. He said I shouldn't have towed my car back to the dealer because information may have been erased. **There were no warnings or assist to stop the car.** This has not just happened to me but to many others as well. I can send documentation for that if you need. (emphasis added)

NHTSA ID Number: 11470359[57]
NHTSA Posting Date: June 21, 2022
Model: ID.4 2021

6/21/22 When I was pulling into a parking lot space, the car suddenly accelerated and the steering wheel turned uncontrollably, **I could not stop the car, the brakes didn't respond at all.** The car was driving by itself, I

---

[57] https://www.nhtsa.gov/?nhtsaId=11470359

couldn't do anything to stop it, until I ran into two parked cars where it finally stopped; thank God no injuries. The car was undriveable, and was towed away, I'll have it inspected by the body shop and see if it can be repaired. This was a terrifying experience not being able to control the car, the car pretty much went into run away mode. I hope this gets reported to VW and an investigate gets conducted to find the root cause it as this could happen again to anybody. (emphasis added)

NHTSA ID Number: 11576674[58]
NHTSA Posting Date: March 6, 2023
Model: ID.4 2023

As a civilian I appreciate this opportunity to express grievances, yet totally fighting way over my weight. Having now focused on the following: **The programming that does not release the adaptive speed control/stop & stop/go programming upon manual braking.** This failure clearly introduces the unexpected acceleration factor that was the initiating factor of my wife's accident. The character of Manufacturer Volkswagen/Audi of America, INC having repeatedly refused to allocate repair parts vs. maintain production of new vehicles. Cumulative more than 75,000 ID.4 were delivered in the U.S. in 2023, 11.5% share. My observations are based upon comparing the programming and reliability of the three tech vehicles we own: Mazda I-Loop, VW ID.4 and a Tesla X. The VW is a genuinely substantial vehicle of impressive physical characteristics hamstrung by a programming failure and management lack of character.

---

[58] https://www.nhtsa.gov/?nhtsaId=11576674

33

NHTSA ID Number: 11517068[59]
NHTSA Posting Date: April 6, 2023
Model: ID.4 2023

To Whom It May Concern RE: ID.4 VIN: [XXX] Unexpected acceleration The above vehicle was involved in an unwarranted accident fortunately only involving vehicles. In a parking lot at rolling speed while turning right into the parking space the vehicle charged ahead full throttle crossing a parking bumper, 8'-0" inch loose dirt, another parking pumper, and still full throttle into a Tesla Y in the opposing parking space. Many including the investigating State Trooper, the body shop working on the vehicle, and numerous internet similar accidents strongly suggested an unsafe condition vs. an unsafe action. **We drive a Mazda with the tech equipment, other Tesla's, etc. and all have the emergency braking benefit. They will not drive themselves into a wall, parked car etc. Additionally the air bags did not deploy** - wife's shoulder was bruised significantly. Understandably, my wife no longer wishes to drive the vehicle which accounts for this letter to you. We would like to return the vehicle for a full refund immediately. Would you please consider the request to return our purchase funds and sales tax. (emphasis added)

NHTSA ID Number: 11519354[60]
NHTSA Posting Date: April 26, 2023
Model: ID.4 2021

Yesterday, April 26th, 2023 the above vehicle was involved in a serious accident, possibly related to the safety recall for the high voltage cell module. My wife was driving the vehicle on her way to work, as she did for the past 2 years. Sometimes she gets coffee for herself and a coworker, so that day she turned into a parking lot of the

---

[59] https://www.nhtsa.gov/?nhtsaId=11517068
[60] https://www.nhtsa.gov/?nhtsaId=11519354

34

last MacDonalds before her job. She pulled up to the drive thru lane as she did many times before. She was not distracted by the phone, and her radio was turned off. There was nobody else in her vehicle, and her thought was on the coffee order. As she was pulling up to the 2 vehicles in front of her, something horrible happened in the next 3 or 4 seconds. Her vehicle accelerated suddenly, hit the car in front of her, bounced off to the right, and kept accelerating for the next 50 feet before hitting a semi truck with such a force that the front end of her vehicle is completely obliterated and the semi truck frame was broken. Thankfully, nobody got hurt seriously, and there was no fire. The first question from the Police officer was whether she hit the accelerator pedal by mistake. She responded that she did not hit the accelerator pedal, and does not understand what happened. She was shocked by the sudden fury of her vehicle, and stated that she was unable to stop it. **I believe what she is saying, because there was no reason for her to stomp hard on either pedal as she was coasting slowly, and with the vehicle's regenerative braking you only have to tap the brakes gently.** If she tapped the wrong pedal by mistake, the acceleration would not be so violent. To do what the vehicle did in such a short distance, the driver would have to stomp forcefully on the pedal and keep it floored all the time. There was no need to do that, and she never even attempted to do such violent acceleration anywhere. There is a real possibility that the vehicle did an unintended full force acceleration caused by defect in the recalled module. GEICO has it (emphasis added)

NHTSA ID Number: 11566271[61]
NHTSA Posting Date: January 10, 2024
Model: ID.4 2023

I am writing to file a formal complaint with the National Highway Traffic Safety Administration (NHTSA) regarding a critical safety concern with my recently

---

[61] https://www.nhtsa.gov/?nhtsaId=11566271

35

purchased vehicle, a VW ID 4 model from 2021-2023. Vehicle Information: VIN: [XXX] Make: Volkswagen Model: ID 4 Year: 2021-2023 Date of Purchase: January 5th, 2024 Incident Details: On [XXX], I experienced a hazardous incident involving sudden acceleration when releasing the brake pedal as I was coming to a stop and pulling into a parking space. Despite the fact that the pedal was not fully released, the vehicle accelerated forward, colliding with another vehicle at an approximate speed of 40-50 MPH. **Shockingly, neither the airbags deployed nor did the safety automatic braking system engage.** The incident raised significant safety concerns, especially considering similar reports from other VW ID 4 owners. Actions Taken: I promptly took the vehicle to VW Marin Dealership in San Rafael, CA, where their report claimed no issues with the vehicle. However, further research on my part revealed that this issue is prevalent among VW ID 4 models from 2021 to 2023. Attached to this letter, you will find pictures of both vehicles involved in the incident for your reference. Request for Investigation: I urge the NHTSA to thoroughly investigate this safety issue with VW ID 4 models from 2021-2023. The potential risks associated with sudden acceleration pose a serious threat to the safety of vehicle occupants and others on the road. Identifying and addressing the root cause of this problem is crucial to preventing future accidents and fatalities related to this faulty vehicle behavior. Your attention to this matter is greatly appreciated, and I trust that the NHTSA will take appropriate action to ensure the safety of all motorists. Sincerely, [XXX] [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) (emphasis added).

NHTSA ID Number: 11572142[62]
NHTSA Posting Date: February 13, 2024
Model: ID.4 2023

When I am parking at 5mph in a medical center parking structure, the car suddenly got an uncontrollable acceleration that hit the parking cement and hit the wall in front of the parking area. I cannot imagine that if it is not in the parking structure with 5 mph, it will be fatal or injured and hit more people and cars on the freeway. I want a safe vehicle and spent over $55K for my daily chore. I lost confident on an electric vehicle, and hope your agency will iron all these out prior to introduce to the public. It is similar to the following case: An owner from Georgia describes what happened after getting into the ID.4, putting a foot on the brake, and then putting it into gear. **"The car jumped forward and I had to press brakes with all my strength to keep it from accelerating to full 'throttle.'** It did the exact same when I put it in reverse. I turned the car off, got out, gave it a couple of minutes, and tried two more times. It did the same thing every time. "It is like the accelerator is pressed to the floor as soon as you put it in gear without you touching it. I almost hit my house due to the wheels being turned before the first try." Having had the car for only two weeks, "I called a tow truck to take it to the dealer." (emphasis added)

NHTSA ID Number: 11593929[63]
NHTSA Posting Date: May 22, 2024
Model: ID.4 2023

I was easing slowly into a parking space, with plenty of room on both sides (no cars); there was a shopping cart at the front of the spot to my left. I was probably straightening the steering wheel back to the center. The car took over, accelerated suddenly to a very fast speed, jumped a high curb, and stopped hard in the lot's main

---

[62] https://www.nhtsa.gov/?nhtsaId=11572142
[63] https://www.nhtsa.gov/?nhtsaId=11593929

37

drive. The front right wheel clipped a tree through the mulch. **No safety features engaged.** There was significant damage to the vehicle, and the impact badly bruised my right hand. I am very safety conscious, easy on the pedals, and cruise into stops. We have used the travel assist but not the cruise control function (which may have been set when the car was in transit). Several similar cases are reported on social media, with the leading theory being the accidental engagement of haptic steering wheel controls. A police officer took a report, but it has not been made available. I filed a report with the manufacturer and look forward to your investigation. (emphasis added)

NHTSA ID Number: 11593431[64]
NHTSA Posting Date: June 7, 2024
Model: ID.4 2023

The contact owns a 2023 Volkswagen ID.4. The contact stated that while driving at an undisclosed speed, the vehicle independently accelerated. **The contact stated that the brake pedal was depressed, however, the vehicle failed to stop as intended.** The contact stated that the vehicle rear-ended the contact's other parked vehicle. The contact stated that the vehicle crashed into the contact's residential iron fence and the fence was damaged. In addition, the vehicle crashed into the contact's home and damaged the 6ft window. The contact stated that the failure occurred while the contact was parking the vehicle in the contact's driveway. The contact stated that the front end of the vehicle was damaged. In addition, the rear end of the parked vehicle was damaged. There were no injuries sustained. No police or fire reports were filed. The contact stated that the vehicle was previously taken to the dealer for a service appointment on May 30, 2024. The vehicle remained at the contact's residence. The vehicle was not diagnosed or repaired by an independent mechanic or the dealer. The manufacturer was not made aware of the

---

[64] https://www.nhtsa.gov/?nhtsaId=11593431

failure. The failure mileage was approximately 2,800. (emphasis added)

NHTSA ID Number: 11600784[65]
NHTSA Posting Date: July 5, 2024
Model: ID.4 2023

My 2023 ID4 suddenly accelerated and lunged forward (while my foot was on the brake) as I was turning right into a parking spot. I was going very slow with my foot on the brake . The ID4 lurched forward which propelled me in the wall of a concrete building that I was parking at (luckily no damage to the building). The acceleration was so powerful it's like I floored it and frightening. **None of the warning signals, sensors or collision warnings went off, nor did the emergency braking (when an object is too close in the front of the vehicle). After the ID4 went into the wall- it had registered that there was a collision (but nothing before).** There was damage to the lower plastic bumper, the hood popped open (the latch to open the hood inside the vehicle now did not work) and some paint scratches. This had never happened before, I have taken it to my local VW dealer service department, unfortunately they have not been able to reproduce the issue. Had I been coming to stop at a traffic light, or been in a busy parking lot, it could have been much worse as this could have lurched into another vehicle, pedestrian or business store front. (emphasis added)

NHTSA ID Number: 11608745[66]
NHTSA Posting Date: August 15, 2024
Model: ID.4 2023

pulling into parking lot of **child's daycare, had foot on the break and then suddenly the car lunged forward and slammed into fence**. **had to forcefully slam on brakes to stop car.** Car is currently at the dealership for

---

[65] https://www.nhtsa.gov/?nhtsaId=11600784
[66] https://www.nhtsa.gov/?nhtsaId=11608745

collision repair, waiting to see what the computer reports. Police report has been filed. Do not have at this time Newton MA police dept report #24032707 No warning messages or previous symptoms. (emphasis added)

NHTSA ID Number: 11632402[67]
NHTSA Posting Date: December 26, 2024
Model: ID.4 2023

For the second time in this car, I experienced sudden acceleration while parking (turning right). I had to slam the brakes to prevent hitting a parked vehicle, causing whiplash. **No warning or safety features engaged**. See NHTSA crash incident report 11593929. There are sufficient similar reports to warrant an investigation and hold VW accountable. (emphasis added)

NHTSA ID Number: 11638342[68]
NHTSA Posting Date: January 24, 2025
Model: ID.4 2021

While stopped at a red light waiting to turn left, with foot on the brake, my car suddenly accelerated and lunged forward, plowing into the car in front of me with great force. I had to jam down the brake almost to the floor to get the car to stop. My foot was on the brake. There is no way I hit the accelerator. Even if I had, **the AEB system is supposed to prevent me crashing at close range.** I understand that this is a known issue related to the adaptive cruise control. The force of my car was so great that 3 cars in front of me sustained damage. (emphasis added)

---

[67] https://www.nhtsa.gov/?nhtsaId=11632402
[68] https://www.nhtsa.gov/?nhtsaId=11638342

40

NHTSA ID Number: 11643371[69]
NHTSA Posting Date: February 18, 2025
Model: ID.4 2022

I was parking the car in a parking lot. I turned left into the lot and then turned right into a spot and then decided to switch to the adjacent spot (also requiring me to turn right) to provide me with more room to park and leave the car. As I turned into the spot the car suddenly accelerated forward. I tried pushing the brakes and the car continued to accelerate and hit two fences. **No indication of a collision by car, no engagement of the automatic emergency braking. No recognition of the car that there was a fence in front. No automatic braking/warning lamps**. The vehicle was inspected only by the insurance agent and body shop for repair. (emphasis added)

NHTSA ID Number: 11646763[70]
NHTSA Posting Date: March 6, 2025
Model: ID.4 2022

I was turning into a parking spot in front of the entry doors to a Sheetz convenience store. I was slowing down, and had gotten halfway into the space. All of a sudden, the car surged forward, went over the curb and hit the bollard in front of the parking space. It was hit with such force that the bollard bent and went under our car. My memory is that I was pressing on the brake very hard, once the acceleration started. My husband was in the car with me and can attest to all that I have stated. If that bollard had not been there, and stopped my car, I feel certain that my car would have crashed into the store, seriously injuring (or killing) us and those inside the store. We are planning to report the accident to Volkswagen, and to request that they test the "black box" inside the car, to see if they can find out what went wrong. I have spoken to someone in

---

[69] https://www.nhtsa.gov/?nhtsaId=11643371
[70] https://www.nhtsa.gov/?nhtsaId=11646763

41

the Sheetz corporate office , and she told me that they have a video recording of the event. She said she observed my car entering the parking space very slowly, and that the car suddenly accelerated. She is planning to provide that video to State Farm Insurance, our insurance company. Unfortunately, I did not take pictures, myself, of the damage to the front of the car. But we will be requesting that the collision repair shop take pictures before the car gets dismantled for repair. **We do not recall hearing any warning signals of the impending crash, and certainly did not experience any emergency braking. The airbags did not deploy**. (emphasis added)

NHTSA ID Number: 11684400[71]
NHTSA Posting Date: September 2, 2025
Model: ID.4 2025

The contact leased a 2025 Volkswagen ID.4. The contact stated that while driving at 5-10 MPH, attempting to park, the vehicle suddenly and rapidly accelerated on its own. **The brake pedal was applied but failed to stop the vehicle,** resulting in a crash with a parked 2011 Honda Odyssey belonging to the contact. There was no police report filed. reported injuries. air bag deployment or fire. No warning lights were illuminated prior to the incident. The local dealer was not contacted, and the vehicle was not diagnosed or repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 132,000. (emphasis added)

NHTSA ID Number: 11685187[72]
NHTSA Posting Date: September 5, 2025
Model: ID.4 2023

The cruise control failed to slow down , instead it accelerated . My safety and the safety of my families was put at risk due to a sudden stop in I25 southbound cause

---

[71] https://www.nhtsa.gov/?nhtsaId=11684400
[72] https://www.nhtsa.gov/?nhtsaId=11685187

us to slow down and when I pushed the down arrows to slow us down and **pushed the brake pedal we didn't slow down, instead we were jolted forward in accelerating speeds**. Thankfully we missed the car in front of us due to us me swerving into the shoulder to assure no collision. The problem has happened on 4 different occasions. Volkswagen is aware of the issue and we have not received any kind of update or remedy for the defect. No one has inspected it , we were to have an appointment this Monday Sept 9th to have it all checked out. The gps , sos button , road side assistance and speedometer aren't functioning properly in our car as well. No warnings lights were on and no notifications of any problems. (emphasis added)

51.  Below are examples of consumer complaints submitted to NHTSA that highlight severe physical injuries sustained by both drivers and passengers of Class Vehicles because of crashes due to sudden acceleration:

> NHTSA ID Number: 11496048[73]
> NHTSA Posting Date: December 3, 2022
> Model: ID.4 2023
>
> While I was pulling into a parking space in a parking garage, the car suddenly accelerated to a high rate of speed and crashed into the wall of the parking garage. The front and side air bags deployed. The crash caused significant front end damage to the car. The passenger (my husband) was not hurt but **I have bruises on my head, nose, chest, and abdomen from the steering wheel and seat belt**. I was not sure that I had caused the crash, so checked the internet for any information and found that this has occurred to other drivers of this car. I have not yet gotten the read out of the car's black box. There were no warnings or messages before the crash. I am currently arranging the towing of the car. (emphasis added)

---

[73] https://www.nhtsa.gov/?nhtsaId=11496048

43

NHTSA ID Number: 11517068[74]
NHTSA Posting Date: April 6, 2023
Model: ID.4 2023

The above vehicle was involved in an unwarranted accident fortunately only involving vehicles. In a parking lot at rolling speed while turning right into the parking space the vehicle charged ahead full throttle crossing a parking bumper, 8'-0" inch loose dirt, another parking pumper, and still full throttle into a Tesla Y in the opposing parking space. Many including the investigating State Trooper, the body shop working on the vehicle, and numerous internet similar accidents strongly suggested an unsafe condition vs. an unsafe action. We drive a Mazda with the tech equipment, other Tesla's, etc. and all have the emergency braking benefit. They will not drive themselves into a wall, parked car etc. Additionally the air bags did not deploy - **wife's shoulder was bruised significantly**. Understandably, my wife no longer wishes to drive the vehicle which accounts for this letter to you. We would like to return the vehicle for a full refund immediately. Would you please consider the request to return our purchase funds and sales tax. [XXX] INFORMATION Redacted PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). (emphasis added)

NHTSA ID Number: 11550130[75]
NHTSA Posting Date: October 13, 2023
Model: ID.4 2021

I was slowly driving down a lane in a parking lot. The parking spaces were perpendicular to a wall. I start to turn the steering wheel and slowly tap my brakes since the car was already going at a slow speed. All of a sudden, the car lunges forward and crashes into the wall beyond the

---

[74] https://www.nhtsa.gov/?nhtsaId=11517068
[75] https://www.nhtsa.gov/?nhtsaId=11550130

44

parking slot. The airbags blow up and, after impact, **my mom who is in the passenger seat complaints about severe chest pain.** Soon the ambulance is there to take my mom to the hospital **(she is eventually diagnosed with two broken ribs and a fractured cervical bone)**. I stay at the scene to talk to the police about what happened (the police gathered information from bystanders and took many pictures). I am in shock about the incident and trying to figure out what happened. I research the topic on the Internet and find out that there are others who have complained about sudden and unexpected acceleration in this car model. In fact, there is a class action lawsuit which explains that the overly sensitive cruise control (haptic, touch sensitive control on the steering wheel) can be accidently triggered and cause the sudden acceleration. Thank you for looking into this safety problem. (emphasis added)

NHTSA ID Number: 11594899[76]
NHTSA Posting Date: June 12, 2024
Model: ID.4 2023

The contact owned a 2023 Volkswagen ID4. The contact stated that while parking the vehicle and attempting to remove the key from the ignition the vehicle erroneously accelerated forward driving over a curb and crashed into a traffic pole. The vehicle continued to accelerate forward into an intersection and crashed head-on into a second vehicle. During the crash, both vehicles were destroyed. **The driver sustained a left arm laceration from the air bag deploying. The front passenger sustained a left arm laceration and abdomen contusion. The dog located in the rear passenger seat sustained an eye injury.** All required medical treatment. No injury was reported from the second vehicle. A police report was taken at the scene and the vehicles were towed away. The cause of the failure was not determined. The manufacturer

---

[76] https://www.nhtsa.gov/?nhtsaId=11594899

and local dealer were not contacted. The failure mileage was 4,000. (emphasis added)

NHTSA ID Number: 11635609[77]
NHTSA Posting Date: January 13, 2025
Model: ID.4 2022

The contact owned a 2022 Volkswagen ID.4 The contact stated while the driver was driving at an undisclosed speed, the vehicle unintendedly accelerated causing the vehicle to veer off the road, and control was lost. As a result, the vehicle crashed into a ditch, over a sound barrier, and in the middle of a neighborhood road where it came to a stop. The air bags did deploy. No warning lights were illuminated. **The driver suffered a mild brain injury, lung injury, and fractured ribs that required medical attention. The driver had an occupant in the vehicle during the failure who was his son and sustained a fractured femur that required surgery, a fractured clavicle, brain damage, and a mild concussion that required medical attention.** A police report was filed. The dealer was not contacted. The vehicle was not diagnosed or repaired. The vehicle was destroyed and towed to an impound lot. The insurance company was currently inspecting the vehicle and pending results. The manufacturer was not made aware of the failure. The failure mileage was not available. (emphasis added)

NHTSA ID Number: 11693946[78]
NHTSA Posting Date: October 16, 2025
Model: ID.4 2023

On October 04/2025 The vehicle was parked and stationary when it suddenly accelerated forward on its own. The brakes were completely unresponsive. I had a passenger in the front seat, and both she and I are certain that I was pressing the brake, but the car did not slow down

---

[77] https://www.nhtsa.gov/?nhtsaId=11635609
[78] https://www.nhtsa.gov/?nhtsaId=11693946

at all. Within a few seconds, the vehicle gained speed, and I lost control. There was no space to maneuver, and I could do nothing but brace myself against the seat and watch my rear passengers. The vehicle continued forward and crashed into a tree directly in front, causing damage to the right side of the bumper, and a large rock in front also received the impact. The airbags did not deploy. **The two rear passengers struck their heads during the impact and sustained bumps, and my dog was also affected in the collision.** This accident occurred despite the car having a recent annual inspection and software update. The sudden acceleration is not the only issue I have experienced with this vehicle. I have had additional safety concerns. The doors would lock, unlock and open by themselves while driving on the freeway. On May 2024, my dog was trapped inside when the doors locked automatically with my keys inside the car. I had to ask a police official in my neighborhood for a phone to call roadside assistance, and it took several hours to get my dog out of the vehicle. (emphasis added)

52.    Below are examples of consumer complaints submitted to NHTSA that demonstrates Volkswagen either refusing to take responsibility for the defect and blaming it on the driver, or Volkswagen falsely concluding that nothing was wrong with the Class Vehicle's software:

NHTSA ID Number: 11467680[79]
NHTSA Posting Date: June 2, 2022
Model: ID.4 2021

1. I picked up new ID.4 from the dealer on 10/01/2021. On 10/02/22, Electrical System Malfunction messages appeared on the infotainment, telling me to take it in for immediate repairs. The problem was taken care of. I was

---

[79] https://www.nhtsa.gov/?nhtsaId=11467680

47

not told what was wrong. 2. On 11/10/2021, while pulling into a parking space in a lot at a cemetery, the car bolted forward and became unresponsive. I could not stop it, I could not steer it. It felt like it was driving itself. I destroyed a bench, some bushes, and some of the turf. The car had to be towed to a VW dealer affiliated collision center. The car was there for over two months and was returned to the dealership for "further diagnosis". **In the end, I was told that it had been "driver error"", and I was assured the car was 100% safe to drive.** I was never told what was done. The insurance payment for the damage was over $9000. 3. **On 06/02/2022, I had the same acceleration issue.** This time I was pulling over to a curb in a residential neighborhood (25 mph speed limit). I was using mode "B", regenerative braking. My foot was not on the accelerator. The car bolted forward and hit a parked Ford F150 in the backend. The force was so great, that the F150's rear end was lifted off the ground. You would think that crash would have stopped the ID.4. Instead, the vehicle swerved to the left, shot across the street and ended on a stranger's front yard, destroying his tree and landscaping. The car suddenly stopped, stuck in the landscape rocks. The vehicle then just shut itself off and became totally unresponsive. **My wife was slightly injured, even though she had her seatbelt on.** She could not open the door to get out and climbed out the driver's door. The car was towed to the dealer, insurance claim was filed. Preliminary estimates of damage- ID.4, F150, landscaping is over $17,000. My wife is petrified about riding in the car. I want VW to repurchase or terminate my lease. The car has only 6000 miles! (emphasis added)

NHTSA ID Number: 11527690[80]
NHTSA Posting Date: January 31, 2023
Model: ID.4 2022

After using adaptive cruise control, driver pulled into a spot to pick up a pizza. Car was parked then lurched

---

[80] https://www.nhtsa.gov/?nhtsaId=11527690

forward without pedal input, jumping over parking block and then crashed through front window of a store. Took out retaining wall and came to a stop at the back wall. Thankfully no one was injured. **Police report was filed and manufacturer was alerted who interrogated the vehicle but claimed nothing found to be wrong.** Vehicle was totaled and damages were paid. A number of other similar incidents have been reported with this vehicle so we felt it necessary to alert. (emphasis added)

NHTSA ID Number: 11604686[81]
NHTSA Posting Date: May 13, 2023
Model: ID.4 2022

On 5/13/2023, I drove using adaptive cruise control (ACC). I traveled approximately 9 miles without issues and turned left into a parking lot. Upon turning, the break was engaged and which canceled the cruise control. I do not recall the exact speed it was set but it was over 50mph. I drive my VW ID.4 in B mode which is brake energy recuperation mode and brakes the car as soon as the foot is lifted from the accelerator. In the parking lot, I was driving at a slow rate of speed because it was a Saturday morning and there were lots of kids going to the Jui Jitsu gym and dance studio which was my destination. While navigating at this slow speed, I typical lift my foot off of the accelerator rather than tapping the brakes as it is an effective method in the B driving mode. I was turning right into a spot, my foot was on the accelerator because there is not coasting in this mode to turn into the spot. As I was turning the wheel hard to the right, my hand grazed the capacitive controls of the ACC and resumed the cruise control causing my car to suddenly accelerate at the previously set speed into the curbing. As mentioned, my foot was on the accelerator as I was pulling into the spot. When the car crashed into the sidewalk the impact caused my foot to depress further on the accelerator which caused a secondary impact into a support pillar further on the

---

[81] https://www.nhtsa.gov/?nhtsaId=11604686

sidewalk. Fortunately, the pillar was there, otherwise, I would have crashed through the yoga studio directly behind the pillar which had a full class going. I also narrowly missed a father and son walking on the sidewalk to Jui Jitsu. **I notified VW and they analyzed the black box but claimed the accident to be my fault since the accelerator pedal was engaged, and I did not break until after impact.** I do not dispute that. (emphasis added)

NHTSA ID Number: 11543702[82]
NHTSA Posting Date: September 10, 2023
Model: ID.4 2022

I was slowly pulling into a parking space at the beach. Pulling into the space the car accelerated, fast. It crashed in to the two cement barriers at front of parking space. I heard the air hissing out of the right front passenger tire, as it deflated. The front of the car was badly damaged from the crash into the barriers. Luckily no one was injured or killed. This is the second acceleration problem we have experiencd. In May I had a deacceleration issue with this car. I was crossing traffic and when I pressed on the accelerator, it very slowly moved, not letting me accelerate. I was worried about the on coming traffic hitting me, but luckily they just honked and went around. Moments later I accelerated and the car worked normally again. **We took it to the VW shop and they said they didn't find anything. That they "reset it". It had worked normally until today. The system that malfunctioned was the speed control.** My safety and anyone around me was put at risk, by having a car accelerating when I didn't want it to. It's a Sunday, so don't know dealers response yet. Contacted insurance, police and will contact VW on Monday. **No warning messages. (emphasis added)**

---

[82] https://www.nhtsa.gov/?nhtsaId=11543702

NHTSA ID Number: 11674313[83]
NHTSA Posting Date: July 17, 2025
Model: ID.4 2023

The incident occurred on May 24, 2025, while preparing to park the 2023 VW ID4. I had two occupants in the car with me. At the time of the incident, I was moving very slow with my foot on the brake, just about ready to stop and put the car in the park position, when the ID4 suddenly violently lurched forward. The car went over a cement parking stop continuing forward on to a sidewalk and then hit a building. I tried to stop the vehicle as quickly as I could. No collision lights, none of the usual sensors, and no automatic Collison braking came on. The only braking was by me. If someone would have been walking in front of the car at the time of the incident there would have been serious injuries, or deaths. Had the car had more room to accelerate before it hit the building, I think myself & my passengers could have been injured. **The vehicle was taken into VW dealership who had the car for five weeks. The car was inspected by a VW engineer, final report states driver pressed the accelerator causing the vehicle to go forward at 54% acceleration. I expressed to the VW dealership that the car DID lunge but that I did not touch the accelerator.** I had 2 passengers that can also verify that there were no warning lamps, sensors, or symptoms prior to the incident and normally the front sensors start beeping when you get too close to anything! After this incident I started to do some research and found on a VW Vortex forum that this type of incident has happened to numerous owners of ID 4's. Some of the writers to the forum had the exact same incident as mine, stating they were pulling into a parking spot ready to park and the car lunged. I also found it was happening to Audi owners a sister company of VW. **My greatest concern is the frequency of this incident and the company's refusal to take any responsibility which was also widely reported on line.** We had owned the VW ID4 for 2.5 years

---

[83] https://www.nhtsa.gov/?nhtsaId=11674313

51

and never had anything like this happened before. (emphasis added)

NHTSA ID Number: 11687156[84]
NHTSA Posting Date: September 14, 2025
Model: ID.4 2022

[XXX] [XXX] September 14, 2025 National Highway Traffic Safety Administration (NHTSA) Office of Defects Investigation 1200 New Jersey Avenue, SE Washington, DC 20590 Subject: Formal Complaint – Safety Defect in 2022 Volkswagen ID.4 (Power Steering and Brake Failure) Dear Sir or Madam, I am submitting this formal complaint regarding a serious safety defect in my 2022 Volkswagen ID.4, which resulted in a crash and a minor injury to my wife. This defect poses a substantial risk of death or serious injury to the driving public. On [XXX], my wife experienced sudden unintended acceleration, followed immediately by complete loss of braking and steering control. She was unable to avoid leaving the roadway and entered a ditch, sustaining a minor injury. The vehicle suffered fender damage. The vehicle was towed to our authorized Volkswagen dealership. The dealership's technician documented that the power steering module failed. **However, Volkswagen of America subsequently dispatched an engineer, who instructed the dealer not to communicate further with us. Volkswagen headquarters later claimed the power steering module failed only because the vehicle entered the ditch—an explanation directly at odds with the technician's report and a witness account. Volkswagen has refused to accept responsibility, declined to cover medical or repair costs, and denied replacement of the failed power steering module.** Our insurance provider also declined coverage, determining that the accident was caused by a mechanical failure. Legal and Regulatory References 1.49 U.S.C. § 30118 – Motor Vehicle Safety Act Requires manufacturers to notify NHTSA and vehicle

---

[84] https://www.nhtsa.gov/?nhtsaId=11687156

owners when they determine a motor vehicle contains a defect related to motor vehicle safety. The failure of the power steering and braking systems clearly qualifies as a "safety-related defect" because it directly compromises steering and stopping ability. 2.49 C.F.R. Part 573 – Defect a INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). (emphasis added)

53.     In October 2022, Thomas Schäfer, the head of VW Passenger Cars, announced on social media that Volkswagen is "bringing back the push-button steering wheel."[85] This announcement was neatly hidden in a post that boasted that Volkswagen's ambition was to "fulfil[] the VW customer promise in every aspect."[86] Schäfer's post made it sound as though Volkswagen was making this change simply because "[t]hat's what customers want from VW"[87] without acknowledging that the capacitive steering wheel was a design defect that was Volkswagen's fault. VW further mislead the public by stating after many of the above complaints had been filed with NHTSA, by misrepresenting to the publication *ARS Technica* in July 2024 that "We are aware of a **small** number of complaints." (emphasis added).[88] Moreover, despite this announcement, the 2025 ID.4 continues to use the capacitive

---

[85] https://www.linkedin.com/feed/update/urn:li:activity:6988840351113355264/ (last accessed March 20, 2025)

[86] See *id.*

[87] See *id.*

[88] https://arstechnica.com/cars/2024/07/vw-id-4-owners-report-unintended-acceleration-blame-steering-wheel-design/#:~:text=But%20the%20left%20side%20spoke,an%20investigation%20into%20the%20matter.

design—its "IQ.DRIVE features lane centering and a **capacitive** steering wheel to help make driving easier."[89] This is in clear contradiction to Schäfer's post that touted: "One thing is clear: We are continually working on offering our customers what they really want. #Volkswagen will be the love brand once more!"[90] Despite still not offering the ID.4 with actual buttons on the steering wheel in vehicles currently for sale in the United States, without admitting or disclosing the Defect, Volkswagen acknowledges what a mistake the capacitive buttons on the steering wheel are.  In March of 2025, VW's design chief Andreas Mindt stated:

> "[w]e will never, ever make this mistake any more. On the steering wheel, we will have physical buttons. No guessing any more.  There's feedback, it's real, and people love this.  Honestly, it's a car. It's not a phone: it's a car."[91]

54.    Consumers who purchase or lease vehicles, including the Class Vehicles, reasonably and legitimately expect that those vehicles will properly and safely function for years.

55.    In purchasing or leasing vehicles, including the Class Vehicles, Plaintiffs and the members of the Class reasonably and legitimately expected that their vehicles would operate reliably, safely, and operate in accordance with all

---

[89] https://media.vw.com/en-us/press-kits/2024-id4-press-kit, (emphasis added, last accessed March 19, 2025)

[90] https://www.linkedin.com/feed/update/urn:li:activity:6988840351113355264/ (last accessed March 19, 2025)

[91] https://www.autocar.co.uk/car-news/new-cars/volkswagen-reintroducing-physical-controls-vital-functions (last accessed March 19, 2025

intended purposes – including not spontaneously accelerating without control resulting in severe crashes.

56. In purchasing or leasing their vehicles Plaintiffs and the members of the Class reasonably and legitimately expected that the Class Vehicles would be free from the Defect, as well as the extreme safety risk to both life and property as a result of the Defect.

57. The existence of the Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease a Volkswagen vehicle.

58. Consumers, such as the Plaintiffs and members of the Class, reasonably and legitimately expect and assume that a vehicle's ACC system and redundant safety features will function in their intended manner, will not pose a safety hazard, and are free from defects. Plaintiffs and the members of the Class also reasonably and legitimately expect and assume that Defendant will not sell or lease vehicles with a known defect, will disclose any such defects to consumers when they learn of them, and take all steps to remedy any defect in a manner that does not cause additional cost to the consumer.

59. It was reasonable and legitimate for Plaintiffs and the members of the Class to expect Volkswagen not to actively and intentionally conceal problems from

them – such as the Defect described herein, and to deny the existence of these defects for years after becoming aware of the problems.

60.    Throughout the operative class period, Volkswagen marketed, promoted and advertised the Class Vehicles as safe, reliable, and specifically containing "safety-enhancing and intelligent" technology.

61.    Plaintiffs and the members of the Class reasonably and legitimately expected Volkswagen to disclose the existence of the problems with the ACC system and controls and the IQ.Drive system, and that the Class Vehicles were at risk of spontaneously and unintentionally accelerating, resulting in crashes, that were known to VW at the time of sale or lease of the Class Vehicles.

62.    Had Plaintiffs and the members of the Class known about the Defect while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Class Vehicles or, at the very least, would have paid less for them particularly due to the increased risk of accident, injury or death.

Plaintiffs' Factual Allegations

Plaintiff Janice Beecher

63.    Plaintiff Janice Beecher is a citizen and resident of New Britain, Connecticut.

64.    On or about March 26, 2024, Plaintiff Beecher leased a 2023 ID.4 from Gengras Volkswagen, located at 245 New Britain Ave, Plainville, CT 06062 for a

total price of $44,026.75, to be paid in monthly installments of $416.76 for 36 months.

65.   Plaintiff Beecher made the decision to lease the 2023 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Beecher chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

66.   Prior to her lease of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Beecher of the Defect. Plaintiff Beecher reasonably expected that the Class Vehicle, would function normally, and provide safe transportation, as an all-electric SUV with safe technology and in accordance with Defendant's specifications and representations.

67.   Plaintiff Beecher purchased the Class Vehicle for personal use. Plaintiff Beecher has always attempted to use the Class Vehicle in the normal and expected manner.

68.   On or about May 24, 2024, when her vehicle had roughly 500 miles, Plaintiff Beecher experienced the Defect. While pulling into a parking space at a creeping speed, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control, when her hand lightly brushed against the steering wheel sensors.  Plaintiff Beecher tried to engage the brakes, but they would not engage. The Class Vehicle skipped over a curb and hit a tree, causing extensive

damage to the Vehicle's undercarriage and wheels, amounting to around $14,172, plus $742 for the cost of a rental vehicle, and $206 for Medicat scan of her hand. As a result of the damage, the Vehicle was in the Volkswagen's authorized dealer's repair shop for 100 days.

69.    The crash described above caused injury not only to the vehicle, but to Plaintiff Beecher who suffered a hand injury in the crash, as can be seen in the photos below.



70.    After the incident, Plaintiff Beecher wrote to Defendant's customer care on or around May 2024 to report the crash and have them investigate the issue with the Class Vehicle. In response, she received only a call and not an email, from Defendant's representative stating that they did not find any data pertaining to the crash on the Class Vehicle's EDR. No results of this investigation were shared with

Plaintiff Beecher in writing. Defendant did not pursue any further investigation of the crash.

71.    Plaintiff Beecher has repeatedly observed that the hepatic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light unintentional touch.   Plaintiff Beecher experienced another incident when her Vehicle suddenly and unintentionally accelerated on December 24, 2024, while she was parking.  Fortunately, Plaintiff Beecher had enough time to break hard to avoid another crash.

72.    Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Beecher did not receive the benefit of her bargain. Had Plaintiff Beecher known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Beecher would not have purchased her Class Vehicle. As a result of the Defect, Plaintiff Beecher was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Omar Hakkaoui

73.    Plaintiff Omar Hakkaoui is a citizen and resident of Norfolk, Massachusetts.

59

74.    On or about June 28, 2022, Plaintiff Hakkaoui purchased a 2022 ID.4 from Boston VW located at 43 North Beacon St, Watertown MA 02472 for a total price of $50,636.75.

75.    Plaintiff Hakkaoui made the decision to purchase his Class Vehicle after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Hakkaoui chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

76.    Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Hakkaoui of the Defect. Plaintiff Hakkaoui reasonably expected that the Class Vehicle would function normally, and provide safe transportation, as an all-electric SUV with safe technology and in accordance with Defendant's specifications and representations.

77.    Plaintiff Hakkaoui purchased his Class Vehicle for personal use. Plaintiff Hakkaoui has always attempted to use his Class Vehicle in the normal and expected manner.

78.    In or around September 2022, when his vehicle had roughly 3,000 miles, Plaintiff Hakkaoui first experienced the Defect. Plaintiff Hakkaoui's wife experienced sudden acceleration on the Class Vehicle while she was parking it in their garage. As a consequence, their garage door was damaged, and the Class

Vehicle's frontend was scratched. The damage to Plaintiff Hakkaoui's garage door

at the time of the crash can be seen in the images below.





79.    Plaintiff Hakkaoui reached out to Defendant's customer care on or around September 2022 to report the crash and have them investigate the issue with the Class Vehicle. Defendant's representative responded stating that they did not find any data pertaining to the crash on the Class Vehicle's Event Data Recorder (EDR).

80.    When Plaintiff Hakkaoui communicated with Defendant's authorized dealer about the Defect on or about September 29, 2022 he was simply told "there were no recalls available to address the Defect and that inspection showed no sign of any manufacturing shortcomings". The inspection performed, only involved Defendant test driving Plaintiff Hakkaoui's Class Vehicle for a mere nine miles over a period of forty minutes to reach this conclusion. Defendant did not pursue any further investigation of the crash.

81.    The Defect in Plaintiff Hakkaoui's vehicle presents safety issues. Plaintiff Hakkaoui and his wife rely on the Class Vehicle to drop off and pick up his children to and from school every day, averaging about 40 miles per day. Given the Defect's unpredictability, Plaintiff Hakkaoui has had to reassess whether the Class Vehicle is safe to continue using.  Plaintiff Hakkaoui and his wife remain in constant fear when driving their Class Vehicle and that it will experience another event of uncontrolled acceleration and inability to stop due to the Defect. This fear for his safety and that of his family, has become so great that he is willing to sell his vehicle,

even at a loss, but fears this will happen to another family if the Defect is not corrected.

82.    Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Hakkaoui did not receive the benefit of his bargain. Had Plaintiff Hakkaoui known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Hakkaoui would not have purchased the Class Vehicle or would have paid less for it.   As a result of the Defect, Plaintiff Hakkaoui was not able to use his vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Andrea Smith

83.    Plaintiff Andrea Smith is a citizen of Litchfield Park, Arizona.

84.    Plaintiff Smith purchased a Class Vehicle in Peoria, Arizona in July 2022.

85.    On or about July 24, 2022, Plaintiff Smith purchased a 2022 ID.4 from Lunde's Peoria Volkswagen, located at 8801 West Ball Road, Peoria, AZ 85382 for a total price of approximately $57,630.27, after trading in her previous vehicle.

86.    Plaintiff Smith made the decision to purchase the 2022 ID.4 after considering Defendant's representations about the Class Vehicle, including the

reported safe technology in the all-electric SUV. Plaintiff Smith chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

87.    Prior to her purchase of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Smith of the Defect. Plaintiff Smith reasonably expected that the Class Vehicle would function normally as an all-electric SUV with safe technology and provide safe transportation, in accordance with Defendant's specifications and representations.

88.    Plaintiff Smith purchased the Class Vehicle for personal use. Plaintiff Smith has always attempted to use the Class Vehicle in the normal and expected manner.

89.    On or about May 13, 2023, when her vehicle had roughly 15,000 miles, Plaintiff Smith experienced the Defect. While pulling into a parking space, the Class Vehicle suddenly accelerated when her hand lightly brushed against the steering wheel sensors, consistent with the activation of the automatic cruise control. The Class Vehicle skipped over a curb and hit a support pillar on the sidewalk. Had the car not been stopped by the support pillar, it would have crashed into the yoga studio behind the pillar, which had an active session underway at the time of the crash. The incident caused extensive damage to the Vehicle's front bumper and undercarriage, amounting to around $15,733.75. This amount, plus approximately $900 for the cost of a rental vehicle, was paid by Plaintiff's insurance alongside Plaintiff's $500

deductible. As a result of the damage, the Vehicle was in the VW authorized dealer's repair shop for 45 days.

90.    The crash described above caused injury not only to the vehicle, as can be seen in the photos below, but to Plaintiff Smith and her daughter,  who was a passenger in the Vehicle, both of whom suffered injury in the form of bruising and pain due to the crash. As a result of the incident, Plaintiff Smith's daughter is afraid of learning how to drive.







91.     After the incident, Plaintiff Smith wrote to Defendant's customer care on or around May 14, 2023 to report the crash and have them investigate the issue with the Class Vehicle. In response, she received an email from Defendant's representative stating that they did not find any data pertaining to the crash on the Class Vehicle's EDR. On or around June 1, 2023, Plaintiff Smith received a copy of the EDR report dated May 30, 2023. Defendant did not pursue any further investigation of the crash.

92. Plaintiff Smith has repeatedly observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

93. Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Smith did not receive the benefit of her bargain. Had Plaintiff Smith known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Smith would not have purchased her Class Vehicle. As a result of the Defect, Plaintiff Smith was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Catalin Popescu

94. Plaintiff Catalin Popescu is a citizen of Saco, Maine.

95. Plaintiff Popescu leased a Class Vehicle in Saco, Maine in July 2024.

96. On or about July 9, 2024, Plaintiff Popescu leased a 2024 ID.4 Pro from Jack Volkswagen of Saco, located at 784 Portland Rd, Saco, ME 04072 for a total price of $50,312.32. Plaintiff provided $11,041.57 at lease signing and has made monthly payments of $541.57.

97. Plaintiff Popescu made the decision to lease the 2024 ID.4 Pro after considering Defendant's representations about the Class Vehicle, including the

reported safe technology in the all-electric SUV. Plaintiff Popescu chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

98.   Prior to his leasing of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Popescu of the Defect. Plaintiff Popescu reasonably expected that the Class Vehicle, would function normally, as an all-electric SUV with safe technology, and provide safe transportation, in accordance with Defendant's specifications and representations.

99.   Plaintiff Popescu leased the Class Vehicle for personal use. Plaintiff Popescu has always attempted to use the Class Vehicle in the normal and expected manner.

100.  On or about April 6, 2025, just six weeks after Plaintiff Popescu's open-heart aortic hemi-arch replacement surgery, when his vehicle had roughly 9,830 miles, Plaintiff Popescu experienced the Defect. While pulling into a parking space, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control. He was pulling into the parking spot while driving in mode B and had both his hands placed on the steering wheel in order to maneuver the vehicle. The Class Vehicle jumped the curb and struck the exterior wall of a Walgreens. Police officers were called to the scene of the incident, and a formal report was filed with the Saco Police Department. At no point before, during, or after the collision did the Vehicle register the wall within its system. There were no

70

warning indications notifying Plaintiff of the wall in front during the incident, and neither the emergency brakes nor the airbags deployed at any point. The incident caused extensive damage to the Vehicle. Plaintiff's wife sustained injury during the collision, and she had to receive physical therapy, the cost for which amounted to approximately $10,000. As a result of the incident, the Vehicle was totaled.







101.    The crash described above caused injury not only to the vehicle, but to Plaintiff Popescu's wife who suffered shoulder and upper thoracic injury in the crash. The upper thoracic injury was caused in the same area where she previously underwent radiation therapy for cancer.

102.    After the incident, Plaintiff Popescu wrote to Defendant's local dealership on or around April 9, 2025 to report the crash and have them investigate the issue with the Class Vehicle. Plaintiff Popescu did not receive a response.

103.   On April 10, 2025, Plaintiff Popescu asked his insurance adjuster to request an EDR report, but he did not receive any such report from either Volkswagen or insurance representative.

104.   On April 11, 2025, Plaintiff Popescu's vehicle was moved to a insurance salvage facility named Insurance Auto Auctions.

105.   On April 30, 2025, Plaintiff Popescu reported the incident to the National Highway Traffic Safety Administration via their online portal.

106.   Plaintiff Popescu then attempted to contact Volkswagen Customer Care via phone call on April 15, 2025, to request an investigation. Once again, Plaintiff Popescu did not receive a call back. Defendant did not pursue any further investigation of the crash.

107.   Plaintiff Popescu has previously observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

108.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Popescu did not receive the benefit of his bargain. Had Plaintiff Popescu known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Popescu would not have leased his Class Vehicle. As a result of the Defect,

Plaintiff Popescu was not able to use his vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Ivan De La Cruz

109. Plaintiff Ivan De La Cruz is a citizen of Loxahatchee, Florida.

110. Plaintiff De La Cruz leased a Class Vehicle in Coconut Creek, Florida in September 2025.

111. On or about September 27, 2025, Plaintiff De La Cruz leased a 2025 ID.4 from Gunther Volkswagen of Coconut Creek, located at 4300 N State Road 7, Coconut Creek, FL 33073 for a total price of $51,955.51. Plaintiff provided $12,500 at lease signing and has made monthly payments of $320.86.

112. Plaintiff De La Cruz made the decision to lease the 2025 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff De La Cruz chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

113. Prior to his leasing of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff De La Cruz of the Defect. Plaintiff De La Cruz reasonably expected that the Class Vehicle would function normally, as an all-electric SUV with safe technology, and provide safe transportation, in accordance with Defendant's specifications and representations.

75

114. Plaintiff De La Cruz leased the Class Vehicle for personal use. Plaintiff De La Cruz has always attempted to use the Class Vehicle in the normal and expected manner.

115. On or about October 22, 2025, when his vehicle had roughly 1,000 miles, Plaintiff De La Cruz's wife, Carolina Diaz experienced the Defect. While pulling into their home garage, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control. She was pulling into the parking spot and had her hands placed on the steering wheel in order to maneuver the vehicle. Despite Plaintiff's wife's attempts to press on the brakes, the brakes did not engage at any point during the incident, but airbags deployed upon collision. Plaintiff's wife sustained injury during the collision, and she is currently undergoing physical therapy, the cost for which Plaintiff De La Cruz estimates will amount to $1,000.

116. The Class Vehicle struck the back wall of their garage, causing extensive damage to both the Vehicle and the wall, amounting to approximately $13,000 in repairs to Plaintiff's Vehicle and approximately $50,000 in repairs to Plaintiff's home. Until the repairs to Plaintiff's Class Vehicle are complete, he will have to incur rental car expenses of approximately $15 per day.











117.    The crash described above caused injury not only to the vehicle, but to Plaintiff De La Cruz's wife who suffered burns in her left hand and bruises to her lip as a result of the deployment of the airbags. She also suffered three herniated discs in her neck and one in her middle back due to the impact of the crash.

118.    After the incident, Plaintiff De La Cruz attempted to contact Volkswagen via phone call on October 22, 2025, to report the crash and have them investigate the issue with the Class Vehicle. On October 23, 2025, Plaintiff De La Cruz followed up with Volkswagen customer care via email. In response, he received a phone call from Defendant's representative who attributed the incident to driver error and did not find any manufacturing defect. On November 7, 2025

Plaintiff De La Cruz received a copy of the EDR report dated November 3, 2025. Defendant did not pursue any further investigation of the crash.

119.   Plaintiff De La Cruz has repeatedly observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

120.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff De La Cruz did not receive the benefit of his bargain. Had Plaintiff De La Cruz known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff De La Cruz would not have leased his Class Vehicle. As a result of the Defect, Plaintiff De La Cruz was not able to use his vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Nicole Kahhan

121.   Plaintiff Nicole Kahhan is a citizen of Jacksonville, Florida.

122.   Plaintiff Kahaan purchased a Class Vehicle in Jacksonville, Florida in November 2022.

123.   On or about November 29, 2022, Plaintiff Kahhan purchased a 2023 ID.4 Pro S from Tom Bush Regency Motors, located at 9850 Atlantic Boulevard, Jacksonville, FL 32225 for a total price of approximately $43,000.

80

124.   Plaintiff Kahhan made the decision to purchase the 2023 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Kahhan chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

125.   Prior to her purchase of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Kahhan of the Defect. Plaintiff Kahhan reasonably expected that the Class Vehicle would function normally, as an all-electric SUV with safe technology, and provide safe transportation in accordance with Defendant's specifications and representations.

126.   Plaintiff Kahhan purchased the Class Vehicle for personal use. Plaintiff Kahhan has always attempted to use the Class Vehicle in the normal and expected manner.

127.   On or about June 30, 2025, when her vehicle had roughly 23,000 miles, Plaintiff Kahhan experienced the Defect. While pulling into a parking space, the Class Vehicle suddenly accelerated, consistent with the activation of automatic cruise control. She was pulling into the parking spot while driving in mode B and had her hands placed on the steering wheel in order to maneuver the vehicle. The Class Vehicle jumped the curb, went onto the sidewalk and struck the door and exterior brick wall of a building in front of the parking spot, amounting to $6,093.76 in property damages. The incident caused extensive damage to the Vehicle, and the

front and backseat airbags deployed upon impact. As a result of the damage, the

Vehicle was deemed a total loss by Plaintiff's insurance company.







128.   The crash described above caused injury not only to the vehicle, but to Plaintiff Kahhan and her 10-year-old daughter, both of whom suffered an injury in the crash. Plaintiff Kahhan had to get physical therapy due to the injuries caused by the incident. Plaintiff Kahhan's initial medical expenses, including but not limited to ambulance transportation, emergency room visit and physical therapy appointment, amounted to roughly $15,000 with at least $500 having to be paid out-of-pocket. Her daughter's medical expenses amounted to roughly $2,830.

129.   After the incident, Plaintiff Kahhan attempted to contact Defendant's Customer Care via phone call to report the crash and have them investigate the issue

with the Class Vehicle but was instructed to send them an email instead. In response to her email, an investigation was conducted by the Defendant. This investigation reportedly included inspecting the vehicle and downloading the EDR logs. On or around July 22, 2025, Plaintiff Kahhan received a copy of the EDR report dated July 18, 2023. Defendant's representative stated that per the Class Vehicle's EDR report, the incident was a result of driver error caused by a misapplication of pedals. The Defendant's response neither stated that the Vehicle registered the wall in its system, nor did it register that the emergency brakes had been engaged. The Defendant's response stated that the report does not contain a data point for the cruise control. Defendant did not pursue any further investigation of the crash.

130. Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Kahhan did not receive the benefit of her bargain. Had Plaintiff Kahhan known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Kahhan would not have purchased her Class Vehicle. As a result of the Defect, Plaintiff Kahhan was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Patricia Serio

131. Plaintiff Patricia Serio is a citizen of Redwood City, California.

132.  Plaintiff Serio leased a Class Vehicle in North Olmsted, Ohio in March 2023.

133.  On or about March 20, 2023, Plaintiff Serio leased a 2023 ID.4 Pro S from Ken Ganley Volkswagen, located at 25580 Lorain Rd, North Olmsted, OH 44070 for a monthly payment of approximately $899 with an up-front payment of $9,197.72.

134. Plaintiff Serio made the decision to lease the 2023 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Serio chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

135.  Prior to her lease of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Serio of the Defect. Plaintiff Serio reasonably expected that the Class Vehicle would function normally as an all-electric SUV with safe technology and provide safe transportation, in accordance with Defendant's specifications and representations.

136.  Plaintiff Serio leased the Class Vehicle for personal use. Plaintiff Serio has always attempted to use the Class Vehicle in the normal and expected manner.

137. On or about August 5, 2025 when her vehicle had roughly 27,000 miles, Plaintiff Serio experienced the Defect. While driving through a parking lot in Ohio at less than 2mph, the Class Vehicle suddenly accelerated to a very high speed

and crashed into the building in front of her. It damaged the wall of a business as a result. As she put the Vehicle in reverse to get away, it accelerated again and hit an iron post. The impact of this was so great that it caused the iron post to bend over. As a result of the incident, Plaintiff Serio's vehicle was totaled.







138.    The crash described above caused injury not only to the vehicle, but to Plaintiff Serio herself, who suffered an injury in the crash, causing bruising and pain to her upper body, including her neck, chest and shoulders.

139.    On or around August 29, 2025, a Volkswagen Customer Care representative wrote to Plaintiff Serio in an email, noting that the incident was

90

caused due to misapplication of pedals. Defendant did not pursue any further investigation of the crash.

140.   Plaintiff Serio has repeatedly observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

141.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Serio did not receive the benefit of her bargain. Had Plaintiff Serio known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Serio would not have leased her Class Vehicle. As a result of the Defect, Plaintiff Serio was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Shannon Friel

142.   Plaintiff Shannon Friel is a citizen of Denver, Colorado.

143.   Plaintiff Friel leased a Class Vehicle in Thornton, Colorado in July 2025.

144.   On or about July 17, 2025, Plaintiff Friel leased a 2025 ID.4 Pro S from O'Meara Volkswagen of Thornton, located at 1900 West 104th Avenue, Thornton, CO 80234 for a total price of $50,554.73. Plaintiff provided $13,558.76 at lease signing and has made monthly payments of $208.76.

145. Plaintiff Friel made the decision to lease the 2025 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Friel chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

146. Prior to her leasing of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Friel of the Defect. Plaintiff Friel reasonably expected that the Class Vehicle would function normally as an all-electric SUV with safe technology and provide safe transportation, in accordance with Defendant's specifications and representations.

147. Plaintiff Friel leased the Class Vehicle for personal use. Plaintiff Friel has always attempted to use the Class Vehicle in the normal and expected manner.

148. On or about August 27, 2025, when her vehicle had roughly 600 miles, Plaintiff Friel experienced the Defect. While pulling into a parking space, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control. She was slowly pulling into the parking spot in a parking lot of a Department of Motor Vehicles office while driving in B mode and had both her hands placed on the steering wheel in order to maneuver the vehicle. Upon sudden acceleration, the Class Vehicle drove over a curb and a bollard and ran into a brick wall causing significant damage to her Vehicle. Video footage of the incident shows a young woman sitting by the curb next to the parking space Plaintiff Friel was

92

pulling into, who nearly missed getting hit by the Vehicle. At no point before, during, or after the collision did the Class Vehicle register the objects in front of the Vehicle within its system. There were no warning indications notifying Plaintiff of the bollard in front during the incident, and neither the emergency brakes nor the airbags deployed at any point. Moreover, even though her foot was pressed down on the brake, it did not help stop the acceleration. The brick wall was the sole reason the Vehicle came to a halt. The incident caused extensive damage to the Class Vehicle. As a result of the incident, the Class Vehicle will likely be deemed a total loss by her insurance company.









149.   The crash described above caused injury not only to the vehicle, but to Plaintiff Friel herself, who suffered a headache as a result of the crash.

150.   Plaintiff Friel has repeatedly observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

151.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Friel did not receive the benefit of her bargain. Had Plaintiff Friel known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff

Friel would not have leased her Class Vehicle. As a result of the Defect, Plaintiff Friel was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

Plaintiff Megan Gates

152.  Plaintiff Megan Gates is a citizen of Lakeville, Minnesota.

153.  Plaintiff Gates purchased a used Class Vehicle in Inver Grove Heights, Minnesota in May 2025.

154.  On or about May 3, 2025, Plaintiff Gates purchased a 2021 ID.4 from Volkswagen of Inver Grove, located at 1325 50th St E, Inver Grove Heights, MN 555077 for a total price of $38,635.00 with monthly payments of $577.25.

155.  Plaintiff Gates made the decision to purchase the 2021 ID.4 after considering Defendant's representations about the Class Vehicle, including the reported safe technology in the all-electric SUV. Plaintiff Gates chose the Class Vehicle based on Defendant's reputation for manufacturing quality vehicles.

156.  Prior to her purchasing of the Class Vehicle, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Gates of the Defect. Plaintiff Gates reasonably expected that the Class Vehicle would function normally as an all-electric SUV with safe technology and provide safe transportation, in accordance with Defendant's specifications and representations.

98

157.    Plaintiff Gates purchased the Class Vehicle for personal use. Plaintiff Gates has always attempted to use the Class Vehicle in the normal and expected manner.

158.    On or about July 21, 2025, when her vehicle had roughly 45,000 miles, Plaintiff Gates experienced the Defect. While reversing out of a parking space, the Class Vehicle suddenly accelerated, consistent with the activation of the automatic cruise control. She was slowly backing out of a parking space and had both her hands placed on the steering wheel in order to maneuver the vehicle. Plaintiff was in the process of putting the Vehicle in drive mode when it experienced sudden acceleration, and the Class Vehicle ran into a wall causing significant damage to her Vehicle. Video footage of the incident shows the Vehicle coming to a stop after reversing out of the parking space before accelerating suddenly and crashing into a wall. At no point before, during, or after the collision did the Class Vehicle register the wall in front of the Vehicle within its system. Despite Plaintiff repeatedly applying the brakes, it did not stop the sudden acceleration, and airbags deployed upon collision. Police officers were called to the scene of the incident, and a formal incident report was filed with the Hennepin County Sheriff's Office. The incident caused extensive damage to the Class Vehicle. As a result of the incident, the Class Vehicle was deemed a total loss per her insurance company.

99









159.  The crash described above caused injury not only to the vehicle, but to Plaintiff Gates herself, who had to receive physical therapy and sustained burns and scrapes across her upper body due to the collision.

160.  On or around July 28, 2025 and August 11, 2025, Plaintiff Gates attempted to contact the Volkswagen of Inver Grove regarding the incident via phone call but did not receive a call back. Defendant did not pursue any further investigation of the crash.

161.  On or around August 11, 2025, Plaintiff Gates hired JZ Engineering, LLC to produce an EDR report of the incident.

162.  Plaintiff Gates has repeatedly observed that the haptic controls on the steering wheel of the ID.4 are highly sensitive and easily activated by light and unintentional touch.

163.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Gates did not receive the benefit of her bargain. Had Plaintiff Gates known that the vehicle spontaneously accelerated and led to severe crashes due to overly touch sensitive ACC controls on the steering wheel, Plaintiff Gates would not have purchased her Class Vehicle. As a result of the Defect, Plaintiff Gates was not able to use her vehicle for the particular purpose of providing safe and reasonably reliable transportation.

## CLASS ACTION ALLEGATIONS

164.   Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Nationwide Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

165.   In addition, the proposed state subclasses (the "State Subclasses") are defined as follows:

> **Connecticut Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Connecticut.
>
> **Massachusetts Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Massachusetts.
>
> **Arizona Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Arizona
>
> **Maine Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Maine.

**Florida Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Florida.

**Colorado Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Colorado.

**Ohio Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Ohio.

**Minnesota Subclass**: All persons who bought or leased, other than for resale, a Class Vehicle in the state of Minnesota.

166. Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

167. Plaintiffs reserve the right to amend the Class and Subclass definitions if discovery and further investigation reveal that the Class and Subclass should be expanded or otherwise modified.

168. The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

169. **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses thousands of individuals dispersed throughout the United States. The number of Class Members

is so numerous that joinder of all Class Members is impracticable. The names, address, and phone numbers of Class Members are identifiable through documents maintained by Volkswagen.

170. **Commonality and Predominance:** This action involved common questions of law and fact which predominate over any questions solely affecting individual Class Members. These common questions include:

i.    Whether Defendant engaged in the conduct alleged herein;

ii.    Whether Defendant had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.    Whether Defendant should have had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.    When Defendant became aware of the Defect in the Class Vehicles

v.    Whether Defendant knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

vi.    Whether Defendant knowingly concealed the Defect in the Class Vehicles;

vii.    Whether Defendant's conduct as alleged herein violates consumer protection laws;

viii.   Whether Defendant's conduct as alleged herein violates warranty laws;

ix.   Whether Defendant's conduct as alleged herein violates other laws asserted herein;

x.   Whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect; and

xi.   Whether Plaintiffs and Class Members are entitled to damages and equitable relief.

171.   **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of himself and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

172.   **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

173.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increased the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CLAIMS FOR RELIEF

### COUNT I
### Common Law Fraud by Omission
### (Brought on Behalf of the Nationwide Class and alternatively on behalf of the State Subclasses)

174.    Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

107

175. Plaintiffs assert this theory of fraud by omission on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant.

176. Defendant committed fraud by failing to disclose and actively concealing, at the point of sale and otherwise, the Defect.

177. Defendant was under a duty to Plaintiffs and the Class Members to disclose the Defect because:

a. Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;

b. Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Defect; and

c. Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the Defect.

d. Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

178. The Defect and the facts concealed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.

179.   Defendant concealed or did not disclose the Defect in order to induce Plaintiffs and the Class Members to purchase the Class Vehicles at a substantially higher price than they otherwise would have paid.

180.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendant's defective Class Vehicles.

181.   Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

182.   Plaintiffs and Class Members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

183.   Plaintiffs and the Class Members relied on Defendant's failure to disclose the Defect – in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiffs and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles. Meanwhile, Defendant has sold more Class Vehicles than it

otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

184. As a direct and proximate result of Defendant's omissions, Plaintiffs and all members of the Class have been damaged in an amount to be proven at trial.

185. Defendant's acts and/or omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich itself. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to punish Volkswagen and deter such conduct in the future, which amount shall be determined according to proof at trial.

**COUNT II**
**Common Law Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

186. Plaintiffs hereby adopt and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

187. Defendant is a merchant and was at all relevant times involved in the manufacturing, warranting, and distributing for resale to consumers. Defendant knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

188. Defendant entered into agreements with retailers and suppliers to sell its Class Vehicles to Class Members.

110

189. Defendant's Owner Manual was provided with every Class Vehicle and contained affirmations of fact or promise made by the Defendant to Class Members relating to performance of the Class Vehicles which became part of the basis of the bargain and thus an express warranty that the Class Vehicles shall conform to the affirmation. Moreover, the description of the Class Vehicles in the Owner Manual was made part of the basis of the bargain and created an express warranty that the Class Vehicles shall conform to the description.

190. The steering wheel, ACC system, driver's assistance systems, and related components were manufactured and/or installed in the Class Vehicles by Volkswagen and are covered by the express warranty.

191. Volkswagen provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Volkswagen's express warranty is an express warranty under Connecticut state law.

192. In a section entitled "What is covered," Volkswagen's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]his limited warranty covers any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects)..." The warranty further provides that "[r]epairs under this limited warranty are free of charge. Your Volkswagen dealer

will repair the defective part or replace it with new or remanufactured genuine Volkswagen part."

193. According to Volkswagen, "The New Vehicle Limited Warranty period is "4 years or 50,000 miles, whichever occurs first."

194. Volkswagen's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiffs and Class Members purchased or leased the Class Vehicles with the defective capacitive steering wheel, ACC system and/or driver's assistance system, and/or related components.

195. The Plaintiffs and Class Members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiffs and Class Members that the Class Vehicles were equipped with defective steering wheel controls, ACC system and/or driver's assistance system, and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

196. Volkswagen breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volkswagen and then failing to do so. Volkswagen has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

197. As a result of the Defendant's actions, Plaintiffs and Class Members have suffered economic damages including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of the Class Vehicles, and other related damage.

198. Defendant's attempt to disclaim or limit its express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because Volkswagen knowingly sold a defective product without informing consumers about the manufacturing and/or material defect.

199. Furthermore, Defendant continues to charge Class Members for parts used to mitigate the Defect and/or has failed to repair the defective Class Vehicles.

200. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Volkswagen and Class Members, and Volkswagen knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

201. In addition, Volkswagen's warranty fails of its essential purpose because Volkswagen has been and is unable to effectively repair the Defect. As

113

described above, Volkswagen simply shirks responsibility and blames the customer for the manifestation and catastrophic results of the Defect.

202. Plaintiffs and Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## COUNT III
### Common Law Breach of Implied Warranty
### (On Behalf of the Nationwide Class)

203. Plaintiffs hereby adopt and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

204. Defendant is a merchant and was at all relevant times involved in the manufacturing, warranting, and distributing for resale to consumers. Defendant knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

205. Defendant entered into agreements with retailers and suppliers to sell its Class Vehicles to Class Members.

206. Defendant provided Plaintiffs and Class Members with implied warranties that the Class Vehicles, as electric SUVs, are merchantable and fit for the particular purposes for which they are used and sold.

207. However, the Class Vehicles are and were not fit for their particular purpose of providing safe and reasonably reliable transportation. The

114

hypersensitivity of the capacitive touch controls on the steering wheel, and the Class Vehicles propensity of the ACC system to engage spontaneously accelerate when not intentionally engages poses an extreme risk to safety.    Therefore, the Class Vehicles are not fit for their particular purpose as an electric SUV.

208.    Similarly, a vehicle that does not allow the driver to operate it safely, when operating the vehicle in a prudent manner, is not merchantable.

209.    Privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties and their sale through authorized retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries.

210.    More specifically, Defendant's intention that its warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the Class Vehicles and warranties.

211.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, and

115

distributed for sale by Defendant was safe and reliable for operation as an electric SUVs; and (ii) a warranty that the Class Vehicles would be fit for its intended use while it was being operated.

212. Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale and thereafter, were not fit for the ordinary and intended purpose of providing Plaintiffs and Class Members with providing safe and reliable electric powered transportation on a daily basis. Instead, the Class Vehicles suffers from a defective design and/or manufacture negating such use as transportation on a daily basis, as alleged herein.

213. Defendant's sale of defective vehicles and failure to provide a refund caused the implied warranty to fail in its essential purpose.

214. Defendant breached the implied warranties because the Class Vehicles were sold with the Defect, which substantially reduced and/or prevented them from being used as electric vehicles.

215. Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

216.  As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT IV
### Magnuson-Moss Warranty Act
### (On Behalf of the Nationwide Class)

217.  Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

218.  Plaintiffs and the Nationwide Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

219.  Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

220.  The Class Vehicle is a "consumer product[]" as defined in 15 U.S.C. § 2301(1).

221.  Defendant extended an implied warranty to Plaintiffs and the Nationwide Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers the Defect in its Class Vehicles.

222.  Defendant breached this implied warranty by selling a defective product that was neither merchantable nor fit for its intended purpose.

117

223.    Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

224.    Defendant breached its express warranties by offering for sale and selling vehicles that were by design and construction defective, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.

225.    Defendant also breached its express warranties by failing to provide an adequate and lasting remedy to cure the Defect within a reasonable time, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.  Indeed, while Defendant has suggested that there is no defect and has chosen to blame the resultant damage on the consumer rather than address the issue.

226.    As a direct and proximate result of Defendant's breach of the express and implied warranties under the Magnuson-Moss Act, Plaintiffs, and the Nationwide Class, have been damaged in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment/Restitution**
**(Asserted on behalf of the Nationwide Class / Asserted in the Alternative on behalf of the State Subclasses)**

227.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

228.    Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

118

229. Defendant received a benefit from Plaintiffs and the members of the Nationwide Class and State Subclasses in the form of payment for the Class Vehicles.

230. Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

231. The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiffs and the other members of the Nationwide Class and State Subclasses.

232. Defendant knows that the Class Vehicles do not operate as promised or as a reasonable consumer would expect of an electric vehicle, but nonetheless continues to sell them without warning. To make matters worse, Defendant actively lauded and emphasized the performance of the Class Vehicles' driver's assistance and safety features.

233. Defendant's conduct is unjust, inequitable, and wrongful, but systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits, including the substantial premium that consumers pay for vehicles with electric-only driving capabilities.

234. There is no justification for Defendant's continued silence, as customers purchased the defective Class Vehicles.

235.    It is therefore against equity and good conscience to permit Defendant to retain the proceeds from its sales of the defective Class Vehicles.

236.    Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

**COUNT VI**
**Violation of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. § 56:8)**
**(On Behalf of the Nationwide Class)**

237.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

238.    As a New Jersey corporation, Defendant is required to abide by the dictates of New Jersey law, including the New Jersey Consumer Fraud Act. Defendant is a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

239.    The marketing and branding of the Class Vehicles are advertisements within the meaning of N.J. Stat. Ann. § 56:8-1(a).

240.    The Class Vehicles are merchandise within the meaning of N.J. Stat. Ann. § 56:8-1(c).

241.    N.J. Stat. Ann. § 56:8-2 provides, in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such

120

concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice…

242.   As explained above, Defendant knew or had reason to know of the defective nature of their products prior to the branding, marketing, and sales of those products. Defendant therefore knowingly and unconscionably concealed, misrepresented, and omitted material facts with the intent that consumers would rely on such concealments, misrepresentations, and omissions in purchasing the defective products.

243.   Defendant's concealments, misrepresentations, and omissions were material because Plaintiffs and Class members would not have purchased the Class Vehicles had they known of their defective nature.

244.   Pursuant to N.J. Stat. Ann. § 56:8-2.11, Defendant is liable for full refunds of all moneys acquired by means of its unlawful branding, marketing, and sales, as well as treble damages. Plaintiffs and Class members seek all relief dictated by this law, in addition to such other relief as is deemed just and proper.

## COUNT VII
### Breach of Express Warranty
### Conn. Gen. Stat. Ann. § 42A-2-313
### (On Behalf of the Connecticut Subclass)

245. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

246. Plaintiff Janice Beecher ("Connecticut Plaintiff") brings this count on behalf of herself and the Connecticut Subclass against Volkswagen.

247. Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

248. The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

249. The steering wheel, ACC system, driver's assistance systems, and related components were manufactured and/or installed in the Class Vehicles by Volkswagen and are covered by the express warranty.

250. Volkswagen provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Volkswagen's express warranty is an express warranty under Connecticut state law.

251. In a section entitled "What is covered," Volkswagen's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]his limited warranty covers any repair to correct a defect in manufacturer's material or

workmanship (i.e., mechanical defects)...” The warranty further provides that “[r]epairs under this limited warranty are free of charge. Your Volkswagen dealer will repair the defective part or replace it with new or remanufactured genuine Volkswagen part.”

252.  According to Volkswagen, “The New Vehicle Limited Warranty period is “4 years or 50,000 miles, whichever occurs first.”

253.  Volkswagen's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Connecticut Plaintiff and members of the Connecticut Subclass purchased or leased the Class Vehicles with the defective capacitive steering wheel, ACC system and/or driver's assistance system, and/or related components.

254.  Connecticut Plaintiff and members of the Connecticut Subclass experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Connecticut Plaintiff and members of the Connecticut Subclass that the Class Vehicles were equipped with defective steering wheel controls, ACC system and/or driver's assistance system, and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

255.  Volkswagen breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in

123

materials or workmanship of any part supplied by Volkswagen and then failing to do so. Volkswagen has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

256. Connecticut Plaintiff and members of the Connecticut Subclass have had sufficient direct dealings with either Volkswagen or its agents (i.e., dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Connecticut Plaintiff and each member of the Connecticut Subclass on the other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Subclass are intended third-party beneficiaries of contracts between Volkswagen and its distributors and dealers, and specifically, of Volkswagen's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

257. Any attempt by Volkswagen to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Volkswagen knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Connecticut Plaintiff and the members

124

of the Connecticut Subclass. Among other things, Connecticut Plaintiff and members of the Connecticut Subclass did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Volkswagen and unreasonably favored Volkswagen. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Volkswagen and members of the Connecticut Subclass.

258. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiff and the members of the Connecticut Subclass whole, because Volkswagen has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

259. On March 27, 2025, the Connecticut Plaintiff notified Volkswagen of the breach within a reasonable time of its breach, and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure their breaches would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

260. Nonetheless, Connecticut Plaintiff and members of the Connecticut Subclass provided notice to Volkswagen of the breach of express warranties when they took their vehicles to Volkswagen-authorized provider of warranty repairs.

261. As a result of Volkswagen's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

262. As a direct and proximate result of Defendant's breach of express warranties, Connecticut Plaintiff and members of the Connecticut Subclass have been damaged in an amount to be determined at trial.

263. As a result of Volkswagen's breach of the express warranty, Connecticut Plaintiff and Connecticut Subclass Members are entitled to legal and equitable relief against Volkswagen, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT VIII**
**Breach of the Implied Warranty of Merchantability**
**Conn. Gen. Stat. Ann. § 42a-2-314, *et seq*.**
**(On Behalf of the Connecticut Subclass)**

264. Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

265. Connecticut Plaintiff brings this count on behalf of herself and the Connecticut Subclass against Volkswagen.

126

266. Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

267. The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

268. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Conn. Gen. Stat. Ann. § 42a-2-314.

269. Volkswagen knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volkswagen directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom members of the Connecticut Subclass bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volkswagen knew that the Class Vehicles would and did pass unchanged from the authorized dealers to members of the Connecticut Subclass, with no modification to the defective Class Vehicles.

270. Volkswagen provided Connecticut Plaintiff and members of the Connecticut Subclass with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class

127

Vehicles and their defective steering wheel controls, ACC system and/or driver's assistance system, and related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

271.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volkswagen were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

272.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volkswagen knew of this defect at the time these sale or lease transactions occurred.

273. As a result of Volkswagen's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Subclass suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Connecticut Plaintiff and members of the Connecticut Subclass were harmed and suffered actual damages in that the Class

128

Vehicles are substantially certain to be damaged and/or fail before their expected useful life has run.

274. Volkswagen's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

275. Connecticut Plaintiff and members of the Connecticut Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volkswagen's conduct described herein.

276. Connecticut Plaintiff and members of the Connecticut Subclass have had sufficient direct dealings with either Volkswagen or its agents (i.e., dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Connecticut Plaintiff and members of the Connecticut Subclass on the other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Subclass are intended third-party beneficiaries of contracts between Volkswagen and its distributors and dealers, and specifically, of Volkswagen's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under

129

the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

277. On March 27, 2025, Connecticut Plaintiff notified Volkswagen of the breach within a reasonable time of its breach, and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure their breaches would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Connecticut Plaintiff and the Class Members and through other internal sources.

278. Nonetheless, Connecticut Plaintiff and members of the Connecticut Subclass provided notice to Volkswagen of the breach of express warranties when they took their vehicles to Volkswagen-authorized provider of warranty repairs.

279. As a direct and proximate cause of Volkswagen's breach, Connecticut Plaintiff and members of the Connecticut Subclass suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and members of the Connecticut Subclass have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

280. As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Connecticut Plaintiff and members of the Connecticut Subclass have been damaged in an amount to be proven at trial.

**COUNT IX**
**Violations of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. § 42-110A, *et seq.***
**(On Behalf of the Connecticut Subclass)**

281.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

282.    Connecticut Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Connecticut Subclass.

283.    Volkswagen, Connecticut Plaintiff, and Connecticut Subclass members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

284.    Volkswagen engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

285.    The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Volkswagen engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Connecticut UTPA.

286.    Volkswagen participated in unfair or deceptive trade practices that violated the Connecticut UTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting

131

itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volkswagen knowingly and intentionally omitted material facts in connection with the sale or lease of the Class Vehicles. Volkswagen systematically concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

287. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, unfair acts or practices, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

288. Volkswagen's unfair and deceptive acts or practices occurred repeatedly in Volkswagen's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

289. Volkswagen knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

290. Volkswagen knew or should have known that its conduct violated the Connecticut UTPA.

132

291. Volkswagen was under a duty to Connecticut Plaintiff and the Connecticut Subclass Members to disclose the defective nature of the Class Vehicles because:

    a. Volkswagen was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b. Volkswagen made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c. Volkswagen actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Subclass Members at the time of sale and thereafter.

292. By failing to disclose the Defect, Volkswagen knowingly and intentionally concealed material facts and breached its duty not to do so.

293. The facts concealed or not disclosed by Volkswagen to Connecticut Plaintiff and the Connecticut Subclass Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volkswagen's Class Vehicles, or to pay less for them. Whether a vehicle's steering wheel controls, ACC system and/or driver's assistance system is defective, which can lead to spontaneous and uncontrolled acceleration, is a material safety concern. Had Connecticut Plaintiff and the Connecticut Subclass Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

294. Connecticut Plaintiff and the Connecticut Subclass Members are

reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

295. As a result of Volkswagen's misconduct, Connecticut Plaintiff and the Connecticut Subclass Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

296. As a direct and proximate result of Volkswagen's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Subclass Members have suffered and will continue to suffer actual damages.

297. Volkswagen's violations present a continuing risk to Connecticut Plaintiffs and the Connecticut Subclass Members as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

298. Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Subclass seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

## COUNT X
### Breach of the Massachusetts Express Warranty
### (Mass. Gen. Laws ch. 106, § 2-313)
### (On behalf of the Massachusetts Subclass)

299. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

300. Plaintiff Omar Hakkaoui ("Massachusetts Plaintiff") brings this claim individually and on behalf of the proposed Massachusetts Subclass.

134

301.   Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles.

302.   In its NVLW, Volkswagen expressly warranted that it will "cover[] any repairs to correct a defect in [the] manufacturer's material or workmanship (i.e., mechanical defects)…."

303.   Volkswagen's NVLW formed the basis of the bargain that was reached when Massachusetts Plaintiff and the Massachusetts Subclass Members purchased or leased their Class Vehicles equipped with steering wheel controls, ACC system and/or driver's assistance systems from Volkswagen.

304.   Volkswagen breached the express warranty to repair and/or replace to correct defects in materials and workmanship of any part supplied by Volkswagen. Volkswagen has not repaired or replaced, and have been unable to repair or replace, the Class Vehicles' materials and workmanship defects.

305.   Furthermore, the limited warranty of repair and/or replacement to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass Members whole and because Volkswagen has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

306. Accordingly,   recovery   by   Massachusetts   Plaintiff   and   the Massachusetts Subclass Members is not limited to the limited warranty of repair or

135

replacement of parts defective in materials or workmanship, and Massachusetts Plaintiff, individually and on behalf of the Massachusetts Subclass Members, seeks all remedies as allowed by law.

307. Also, as alleged in more detail herein, at the time that Volkswagen warranted and sold the Class Vehicles they knew that the Class Vehicles did not conform to Volkswagen's NVLW and were defective, and Volkswagen wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Massachusetts Plaintiff and the Massachusetts Subclass members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

308. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacement or repair, as many incidental and consequential damages have already been suffered due to Volkswagen's fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Massachusetts Plaintiff's and the Massachusetts Subclass Members' remedies would be insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass Members whole.

309. Due to Volkswagen's breach of warranty as set forth herein, Massachusetts Plaintiff and the Massachusetts Subclass Members assert as an

136

additional and/or alternative remedy, as set forth in Mass. Gen. Laws Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Massachusetts Plaintiff and to the Massachusetts Subclass Members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-608.

310. Volkswagen was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

311. As a direct and proximate result of Volkswagen's breach of express warranty, Massachusetts Plaintiff and the Massachusetts Subclass Members have been damaged in an amount to be determined at trial.

**COUNT XI**
**Breach of the Massachusetts Implied Warranty of Merchantability**
**(Mass. Gen. Laws ch. 106, §2-314)**
**(On behalf of the Massachusetts Subclass)**

312. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

313. Massachusetts Plaintiff brings this claim individually and on behalf of the proposed Massachusetts Subclass.

314. Volkswagen is and was at all relevant times merchants with respect to motor vehicles.

315. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

316. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are defective in that there are defects in the Vehicles' steering wheel controls, ACC system and/or driver's assistance system rendering certain crucial safety and other functions inoperative.

317. Volkswagen were provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

318. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Massachusetts Plaintiff and the Massachusetts Subclass Members have been damaged in an amount to be proven at trial.

**COUNT XII**
**Violations of the Massachusetts Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A)**
**(on behalf of the Massachusetts Subclass)**

319. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

320. Massachusetts Plaintiff brings this claim individually and on behalf of the proposed Massachusetts Subclass.

138

321.   The Massachusetts Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ANN. ch. 93A, § 2 (West).

322.   Defendant engaged in unfair or deceptive acts or practices by falsely claiming that the Class Vehicles contain safe haptic control technology while failing to disclose a key defect in material, workmanship, and/or design. This defect results in sudden and unintended acceleration while owners are driving the Class Vehicle.

323.   Defendant's advertisements were likely to mislead a consumer acting reasonably under the circumstances. Consumers—who typically lack the incentive or ability to discover such a defect prior to purchase—would reasonably believe a manufacturer's claim; particularly one coming from Defendant, a well-established, industry-leading vehicle manufacturer.

324.   Defendant's claims regarding safe technology were material. As noted above, consumers are interested in purchasing the best possible electric vehicles; and the fact that haptic control technology tends to be touted as a premium feature of higher-priced electric vehicle models is direct evidence of this materiality (i.e., it quantifies that materiality).

325.   The entire (or nearly the entire) subclass viewed Defendant's claims regarding safe technology, which were included on the Defendant's website and other promotional materials.

139

326. Mr. Hakkaoui was injured by Defendant's deceptive claims. But for those claims, he would not have paid the MSRP for the Class Vehicle. Put differently, Plaintiff Hakkaoui overpaid for the Class Vehicle, and Mr. Hakkaoui did not receive the benefit of his bargain.

327. Defendant knowingly failed to disclose the defect at issue here. As a large, sophisticated company, and one of the market leaders within the electric vehicle industry, Defendant would have run tests on its vehicles to determine whether the technology used in Class Vehicles is in fact safe. The fact that Defendant has not produced these tests, despite countless consumer complaints regarding the defect, indicates that (1) Defendant's own tests confirmed that the vehicles are defective, or (2) Defendant never ran its own tests, which means that it was knowingly making claims regarding safe technology without any evidence to support those claims.

328. Plaintiff Hakkaoui made a demand for relief, in writing, to Defendant at least 30 days prior to filing this complaint, as required by M.G.L. c. 93A § 9. The demand letter was sent on March 27, 2025, via certified mail, return receipt requested, advising Defendant that it was in violation of the M.G.L. c. 93A and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The

140

letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Massachusetts Subclass.

329. Based on the foregoing, Plaintiff Hakkaoui and the other members of the Massachusetts Subclass are entitled to all remedies available pursuant to M.G.L c. 93A, including, but not limited to, monetary, compensatory, double or treble, punitive, and statutory damages; injunctive relief; restitution; disgorgement of all moneys obtained by means of Defendant's unlawful conduct; interest; attorneys' fees; and costs.

## COUNT XIII
### Violation of Ohio's Consumer Sales Practices Act
### Ohio Rev. Code Ann. § 1345.01, *et seq*. (the "CSPA")
### (On Behalf of the Ohio Subclass)

330. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

331. Plaintiff Serio (for purposes of this section, the "Ohio Plaintiff") brings this claim individually and on behalf of the proposed Ohio Subclass.

332. Volkswagen is a "person" within the meaning of CSPA § 1345.01(B) and is a "[s]upplier... engaged in the business of effecting or soliciting consumer transactions..." within the meaning of CSPA § 1345.01(C).

333. Volkswagen's acts and practices, as alleged in this Complaint, violate

141

CSPA § 1345.02(A), (B)(1) and (B)(2) because they include unfair and deceptive acts and practices in connection with consumer transactions – the sale of defective Class Vehicles.

334. Defendant engaged in unfair or deceptive acts or practices by falsely claiming that the Class Vehicles contain safe haptic control technology while failing to disclose a key defect in material, workmanship, and/or design. This defect results in sudden and unintended acceleration while owners are driving the Class Vehicle.

335. Defendant's advertisements were likely to mislead a consumer acting reasonably under the circumstances. Consumers—who typically lack the incentive or ability to discover such a defect prior to purchase—would reasonably believe a manufacturer's claim; particularly one coming from Defendant, a well-established, industry-leading vehicle manufacturer.

336. Defendant's claims regarding safe technology were material. As noted above, consumers are interested in purchasing the best possible electric vehicles; and the fact that haptic control technology tends to be touted as a premium feature of higher-priced electric vehicle models is direct evidence of this materiality (i.e., it quantifies that materiality).

337. The entire (or nearly the entire) subclass viewed Defendant's claims regarding safe technology, which were included on the Defendant's website and other promotional materials.

338. Ms. Serio was injured by Defendant's deceptive claims. But for those claims, she would not have paid the MSRP for the Class Vehicle. Put differently, Plaintiff Serio overpaid for the Class Vehicle, and Ms. Serio did not receive the benefit of her bargain. Accordingly, Volkswagen also committed unconscionable acts and practices in violation of CSPA § 1345.03(B)(3).

339. Defendant knowingly failed to disclose the defect at issue here. As a large, sophisticated company, and one of the market leaders within the electric vehicle industry, Defendant would have run tests on its vehicles to determine whether the technology used in Class Vehicles is in fact safe. The fact that Defendant has not produced these tests, despite countless consumer complaints regarding the defect, indicates that (1) Defendant's own tests confirmed that the vehicles are defective, or (2) Defendant never ran its own tests, which means that it was knowingly making claims regarding safe technology without any evidence to support those claims.

340. Through its design, development, and pre-release testing of the ACC system, as well as through other consumer complaints, Volkswagen knew that the Class Vehicles' ACC system was defective and prone to the failure described throughout this Complaint.

341. Volkswagen was under a duty to disclose that the Class Vehicles were defective because it had superior knowledge of the Defect – stemming from its own

143

production thereof, repair requests, complaints made directly to Volkswagen and its dealer network, online complaints, quality control and pre-release testing, and online reputation management.

342. Plaintiff Serio made a demand for relief, in writing, to Defendant prior to filing this complaint, sent on October 30, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in violation of the CSPA § 1345.01 and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all others similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Ohio Subclass.

343. Moreover, Requisite notice to Volkswagen of its violations required under CSPA § 1345.09(B) has been satisfied here as Volkswagen's violations constitute acts and practices that have been declared to be deceptive or unconscionable by rules adopted under CSPA § 1345.05(b)(2). Additionally, notice to VW has likewise been satisfied under CSPA § 1345.09(B) due to deceptive and unconscionable acts and practices similar to those alleged herein having already

144

been determined by courts of the State of Ohio to be in violation of both CSPA §§ 1345.02 and 1345.03.

344.    Plaintiff Serio and the Ohio Subclass were injured by Volkswagen's CSPA violations. As a result, Plaintiff Serio seeks and is entitled to economic damages resulting from Defendant's violation of the CSPA, as well as to declaratory and injunctive relief under CSPA § 1345.09, such damages and relief to be further determined at trial.

345.    Because Volkswagen knowingly committed the violations alleged herein, Plaintiff Serio also seeks attorney's fees under CSPA § 1345.09(F)(2).

**COUNT XIV**
**Violations of the Colorado Consumer Protection Act**
**(Colo. Rev. Stat. § 6-1-101, *et. seq.*)**
**(On Behalf of the Colorado Subclass)**

346.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

347.    Plaintiff Friel (for purposes of this section, the "Colorado Plaintiff") brings this claim individually and on behalf of the proposed Colorado Subclass.

348.    Defendant, Plaintiff, and the Colorado Subclass members are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101, et seq.

349.    The Colorado Plaintiff and the Colorado Subclass members are "consumers" within the meaning of Col. Rev. Stat § 6-1-113(1)(a).

350.    The Colorado CPA makes unlawful deceptive trade practices in the course of a person's business. Defendant engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado Subclass members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Defendant knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to Defendant at the time of advertisement or sale with the intent to induce Colorado Subclass members to purchase, lease or retain the Class Vehicles.

351.    In the course of their business, Defendant violated the Colorado CPA. As detailed above, Defendant willfully failed to disclose the Defect with the intent that consumers rely on that failure to disclose in deciding whether to purchase a Class Vehicle. By failing to disclose the Defect while advertising the Class Vehicles as electric vehicles with advanced and reliable safety features, Defendant engaged in one or more of the following unfair or deceptive acts or practices as defined in Colo. Rev. Stat. § 6-1-105:

> A. Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

B. Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

C. Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

D. Failing to disclose material information concerning the Class Vehicles known to Defendant at the time of advertisement or sale, with the intention of inducing Plaintiff and Class members to purchase or lease the vehicles.

352. Defendant's failure to disclose the true characteristics of the Defect was material to Plaintiff and the Colorado Subclass, as Defendant intended. Had they known the truth, Plaintiff and the Colorado Subclass would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Class Vehicles rendered legal to sell—would have paid significantly less for them.

353. Plaintiff and the Colorado Subclass members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant failed to disclose, until the Defect manifested in their Class Vehicles. Plaintiff and the Colorado Subclass members did not, and could not, unravel Defendant's deception on their own.

354. Defendant had an ongoing duty to Plaintiff and the Colorado Subclass

to refrain from unfair and deceptive practices under the Colorado CPA in the course of their business. Specifically, Defendant owed Plaintiff and Colorado Subclass members a duty to disclose all the material facts concerning the Defect because they possessed exclusive knowledge and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

355. Plaintiff Friel made a demand for relief, in writing, to Defendant prior to filing this complaint, sent on November 18, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in violation of the Colorado CPA and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all others similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Colorado Subclass.

356. Plaintiff and Colorado Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

357. Defendant's violations present a continuing risk to Plaintiff and the

148

Colorado Subclass, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

358.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff and the Colorado Subclass seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Colorado CPA.

**COUNT XV**
**Violation of the Florida Unfair & Deceptive Trade Practices Act**
**(Fla. Stat. § 501.201. *et seq*.)**
**(On Behalf of the Florida Subclass)**

359.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

360.   Plaintiffs De La Cruz and Kahhan (for purposes of this section, the "Florida Plaintiffs") bring this claim individually and on behalf of the proposed Florida Subclass.

361.   The Florida Plaintiffs and Florida Subclass members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.203(7).

362.   Defendant engaged in "trade or commerce" within the meaning of Florida statutes § 501.203(8).

363.   The FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

149

conduct of any trade of commerce." Fla. Stat. § 501.204(1)

364. By the conduct described in detail above and incorporated herein, Volkswagen engaged in unfair or deceptive acts in violation of FDUTPA.

365. Volkswagen's omissions regarding the ACC Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) a Class Vehicle,

366. Volkswagen's omissions regarding the ACC Defect were likely to deceive a consumer acting reasonably in the same circumstances as the Florida Plaintiffs and the other Florida Subclass members.

367. Volkswagen intended for the Florida Plaintiffs and the Florida Subclass members to rely on Volkswagen's omissions of fact regarding the ACC Defect.

368. The Florida Plaintiffs and the Florida Subclass members justifiably acted or relied to their detriment upon Volkswagen's omissions of fact concerning the above-described Defect, as evidenced by The Florida Plaintiffs' and the Florida Subclass members' purchase of their vehicles.

369. Had Volkswagen disclosed all material information regarding the Defect to the Florida Plaintiffs and the Florida Subclass members, then they would not have purchased or leased their vehicles or would have paid less to do so.

370. Volkswagen's omissions deceived the Florida Plaintiffs and the Florida Subclass members.

371.   Volkswagen acted willfully in not disclosing the Defect to the Florida Plaintiffs and the Florida Subclass members.

372.   Volkswagen's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

373.   The Florida Plaintiffs and the Florida Subclass members suffered ascertainable loss and actual damages as a direct result of Volkswagen's omission of and failure to disclose the Defect. The Florida Plaintiffs and the Florida Subclass members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed.

374.   Volkswagen's violations present a continuing risk to the Florida Plaintiffs and the Florida Subclass, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

375.   The Florida Plaintiffs and the Florida Subclass seek an award of compensatory damages, punitive damages, reasonable attorneys' fees pursuant to Florida Statute section 501.201 et seq., costs, interest and any other just and proper relief available under FDUTPA.

## COUNT XVI
### Breach of Express Warranty
### (Fla. Stat. §§ 672.313 and 680.21)
### (On Behalf of the Florida Subclass)

376.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

377.   Plaintiffs De La Cruz and Kahhan (for purposes of this section, the "Florida Plaintiffs") bring this claim individually and on behalf of the proposed Florida Subclass.

378.   Volkswagen is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. § 672.104 and is a "seller" of motor vehicles under § 672.103.

379.   With respect to leases, Volkswagen is and was all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031.

380.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. § 672. 105 and § 680.1031.

381.   Volkswagen's NVLW formed the basis of the bargain that was reached when the Florida Plaintiffs and the Florida Subclass members purchased or leased their Class Vehicles with the Defect.

382.   Volkswagen breached the express warranty to repair parts defective in material or workmanship by failing to repair the Defect.

383.   Volkswagen has not repaired, and has been unable to repair, the ACC

Defect in Florida Plaintiffs' Class Vehicle or the Class Vehicles of the Florida Subclass members.

384. Volkswagen was provided notice of the Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering analysis.

385. The NVLW fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make the Florida Plaintiffs and the Florida Subclass members whole and because Volkswagen has failed and/or has refused to adequately provide promised remedies within a reasonable time.

386. Accordingly, recovery by the Florida Plaintiffs and the Florida Subclass members is not limited to the limited warranty of repair/replacement, and the Florida Plaintiffs, individually and on behalf of the Florida Subclass members, seek all remedies as allowed by law.

387. Also, as alleged in more detail herein, at the time that Volkswagen warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Volkswagen improperly concealed material facts regarding its Class Vehicles. The Florida Plaintiffs and the Florida Subclass members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

388. Moreover, much of the damage flowing from the Class Vehicles cannot

153

be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Volkswagen's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Florida Plaintiffs' and the Florida Subclass members' remedies would be insufficient to make the Florida Plaintiffs and the Florida Subclass members whole, as well as the fact that the manifestation of the Defect has in many cases caused a total loss to the Florida Plaintiffs' and the Florida Subclass members' Class Vehicles.

389.   As a direct and proximate result of Volkswagen's breach of express warranty, the Florida Plaintiffs and the Florida Subclass members have been damaged in an amount to be determined at trial.

**COUNT XVII**
**Breach of Implied Warranty of Merchantability**
**(Fla. Stat. §§ 672.314 and 680.212)**
**(On Behalf of the Florida Subclass)**

390.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

391.   Plaintiffs De La Cruz and Kahhan (for purposes of this section, the "Florida Plaintiffs") bring this claim individually and on behalf of the proposed Florida Subclass.

392.   Volkswagen is a merchant with respect to the Class Vehicles, as that term is used in Fla. Stat. § 672.104,

154

393.    The Class Vehicles are goods as that term is used in Fla. Stat. § 672.105.

394.    The Florida Plaintiffs and Florida Subclass members are buyers as that term is used in Fla. Stat. § 672.103, and Volkswagen is a seller as that term is used in Fla. Stat. § 672.103.

395.    The Florida Plaintiffs leased or purchased their Class Vehicle from Volkswagen and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

396.    There is privity because the Florida Plaintiffs' and the Florida Subclass members' dealerships were agents of Volkswagen, and the Florida Plaintiffs and the Florida Subclass members had sufficient contacts with Volkswagen.  Privity is not required in this case, however, because Florida Plaintiffs and the Florida Subclass members are the intended third-party beneficiaries of contracts between Volkswagen and its dealerships, and are the intended beneficiaries of Volkswagen's implied warranties. The dealerships were not intended to be the ultimate consumers of the Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumer only.

397.    Volkswagen breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

398. Volkswagen has actual knowledge of the Defect as alleged herein, satisfying any notice requirement. Moreover, due to Volkswagen's failure to remedy the Defect, any notice requirement is futile. Notwithstanding, the Florida Plaintiffs made a demand for relief, in writing, to Defendant prior to filing this complaint, sent on October 30, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in breach of the applicable warranties and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of the Florida Plaintiffs and "all other persons similarly situated." Defendant did not provide the requested class-wide relief and the Florida Plaintiffs have not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by the Florida Plaintiffs and the Florida Subclass.

399. The NVLW fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make the Florida Plaintiffs and the Florida Subclass members whole and because Volkswagen has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

400. As a direct and proximate result of the Defect, the Florida Plaintiffs have not appreciated the benefit of their bargain and has suffered actual damages, as

156

well as incidental and consequential damages, in an amount to be determined at trial.

## COUNT XVIII
### Violation of the Arizona Consumer Fraud Act
### (Ariz. Rev. Stat. § 44-1521, *et. seq.*)
### (On Behalf of the Arizona Subclass)

401.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

402.   Plaintiff Smith (for purposes of this section, the "Arizona Plaintiff") brings this claim individually and on behalf of the proposed Arizona Subclass.

403.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). Volkswagen concealed and failed to disclose the Defect. Volkswagen had an ongoing duty to the Arizona Plaintiff and the Arizona Subclass members to refrain from unfair and deceptive practices under the Arizona CFA in the course of its business.

404.   Volkswagen is a "person" within the meaning of the Arizona CFA, Ariz. Rev. Stat. § 44-1521(6). Each Class Vehicle at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

157

405. Defendant engaged in false, misleading, and deceptive practices in violation of the ACFA, which the Arizona Plaintiff and the Arizona Subclass members relied on to their detriment.

406. By failing to disclose and actively concealing the Defect, Volkswagen engaged in deceptive business practices prohibited by the ACFA, including (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when they are not, and (3) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the vehicles.

407. The facts concealed and omitted by Volkswagen from the Arizona Plaintiff and the Arizona Subclass members, concerning the Defect, are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the class vehicles or pay a lower price. Had the Arizona Plaintiff and the Arizona Subclass members known of the true facts, that the Class Vehicles contained an inherent dangerous defect as described in this complaint, at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those Class Vehicles, or would have paid substantially less for the Class Vehicles than they did.

408. Pursuant to the Arizona CFA, the Arizona Plaintiff seeks monetary

relief against Volkswagen in an amount to be determined at trial.

409.   The Arizona Plaintiff also seeks an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

### COUNT XIX
### Breach of Implied Warranty of Merchantability
### (Ariz. Rev. Stat. § 47-2314)
### (On Behalf of the Arizona Subclass)

410.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

411.   Plaintiff Smith (for purposes of this section, the "Arizona Plaintiff") brings this claim individually and on behalf of the proposed Arizona Subclass.

412.   Volkswagen is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

413.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Ariz. Rev. Stat. § 47-2314. These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe to drive and Volkswagen has no repair available.

414.   Volkswagen was provided notice of these issues by numerous complaints filed against it, including the instant action, and by numerous letters and

159

communications sent by the Arizona Plaintiff and the Class. Specifically the Arizona Plaintiff sent Volkswagen notice of its breach on October 30, 2025.

415. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, the Arizona Plaintiff and the members of the Arizona Subclass have been damaged in an amount to be proven at trial.

## COUNT XX
### Breach of Express Warranty
### (Ariz. Rev. State. §§ 47-2313 and 47-2A210)
### (On Behalf of the Arizona Subclass)

416. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

417. Plaintiff Smith (for purposes of this section, the "Arizona Plaintiff") brings this claim individually and on behalf of the proposed Arizona Subclass.

418. Volkswagen was a "merchant" at all times relevant with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and a "seller" of motor vehicles under § 47-2103(A)(4).

419. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

420. In connection with the sale or lease of the Class Vehicles, Volkswagen provided purchasers or lessees of the Class Vehicles with its 4-year/50,000-mile NVLW as described herein, which was an express warranty and became part of the basis of the parties' bargain.

160

421.    Volkswagen breached its express warranties by selling and leasing the Class Vehicles with the ACC Defect and refusing or failing to honor the warranties by providing free repairs or replacements to correct the Defect during the applicable warranty periods described herein.

422.    Volkswagen has not repaired or adjusted, and has been able to repair or adjust, the Class Vehicles to remediate or fix the Defect.

423.    Volkswagen's breach of the express warranties deprived the Arizona Plaintiff and the Arizona Subclass members of the benefit of the bargain.

424.    On October 30, 2025, the Arizona Plaintiff notified Volkswagen of the breach within a reasonable time of its breach, and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure their breaches would have been futile. Volkswagen also knew of the Defect and but chose to conceal it as a means of avoiding compliance with its warranty obligations.

425.    Furthermore, the limited warranty or repair and/or adjustment to defective parts fails of its essential purpose because the contractual remedy is insufficient to make the Arizona Plaintiff and the Arizona Subclass members whole and because Volkswagen has failed and/or refused to adequately provide the promised remedies within a reasonable time.

426.    The Arizona Plaintiff and the Arizona Subclass members have complied with all obligations under the warranty, or otherwise have been excused

161

from performance of said obligations as a result of Volkswagen's conduct described herein.

427. Volkswagen has also been provided notice of these issues by numerous complaints as described herein.

428. As a direct and proximate cause of Volkswagen's breach, the Arizona Plaintiff and the Arizona Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. The Arizona Plaintiff and the Arizona Subclass members have also incurred and will continue to incur costs related to the repair of their Class Vehicles as a result of the manifestation of the Defect.

429. Accordingly, The Arizona Plaintiff and the Arizona Subclass members have been damaged in an amount to be determined at trial.

**COUNT XXI**
**Violation of Maine Unfair Trade Practices Act**
**(Me. Rev. Stat. Ann. Tit. 5 § 205-a et seq.)**
**(On Behalf of the Maine Subclass)**

430. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

431. Plaintiff Popescu (for purposes of this section, the "Maine Plaintiff") brings this claim individually and on behalf of the proposed Maine Subclass.

432. The Maine Plaintiff, the Maine Subclass members, and Volkswagen are

162

"persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(2).

433. Volkswagen is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(3).

434. The Maine Unfair Trade Practices Act ("MUTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Me. Rev. Stat. Ann. Tit. 5 § 207.

435. In the course of its business, through its agents, employees, and/or subsidiaries, Volkswagen violated the MUTPA as detailed above. Specifically, in marketing, offering for sale or lease, and selling and/or leasing the defective Class Vehicles, Volkswagen engaged in unfair or deceptive acts or practices as defined in Me. Rev. Stat. Ann. Tit. 5 § 207 including:

     i. Failing to disclose the Defect prior to the Maine Plaintiff's and the Maine Subclass members purchase of their Class Vehicles;

     ii. Actively concealing its knowledge regarding the inherent safety defect of the Class Vehicles' ACC and IQ.Drive Systems and the resulting catastrophic accidents and damage that result;

     iii. Advertising and representing the Class Vehicles are safe and reliable vehicles when they are not; and

     iv. Failing to act in the face of prior notice regarding the Defect associated with the Class Vehicles, thereby rendering its conduct

163

unconscionable under the circumstances.

436. Volkswagen intended that the Maine Plaintiff and the Maine Subclass members would rely on its omissions, which occurred in the course of conduct involving trade and commerce.

437. Volkswagen's concealment of the Defect in the Class Vehicles was material to the Main Plaintiff and members of the Maine Subclass. Had they known of the Defect, the Maine Plaintiff and the Maine Subclass members would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, they would have paid significantly less for them.

438. The omissions by Volkswagen were likely to deceive reasonable consumers, and a reasonable consumer would have relied on these omissions.

439. Volkswagen had an ongoing duty to the Maine Plaintiff and the Maine Subclass members to refrain from unfair and deceptive practices under the Maine UTPA in the course of their business. Specifically, Volkswagen owed the Maine Plaintiff and the Maine Subclass members a duty to disclose all the material facts concerning the Defect because they possessed exclusive knowledge, they intentionally concealed it from the Maine Plaintiff and the members of the Maine Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

440. Plaintiff Popescu made a demand for relief, in writing, to Defendant

164

prior to filing this complaint, sent on October 30, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in violation of the MUTPA and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all others similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Maine Subclass.

441.   Moreover, Requisite notice to Volkswagen of its violations required under the MUTPA has been satisfied here as Volkswagen's violations constitute acts and practices that have been declared to be deceptive or unconscionable by rules adopted under the MUTPA. Additionally, notice to VW has likewise been satisfied due to deceptive and unconscionable acts and practices similar to those alleged herein having already been determined by courts of the State of Maine to be in violation of the MUTPA.

442.   The Maine Plaintiff and the Maine Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagens' concealment, omissions and/or misrepresentations, and/or failure to

165

disclose material information.

443.    Volkswagen's violations present a continuing risk to the Maine Plaintiff, the Maine Subclass members, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

444.    Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, the Maine Plaintiff and the Maine Subclass members seek an order awarding damages, punitive damages, and any other just and proper relief available under the MUTPA.

**COUNT XXII**
**Breach of Implied Warranty of Merchantability**
**(Me. Rev. State Tit. 11 §§ 2-314 and 2-1212)**
**(On Behalf of the Maine Subclass)**

445.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

446.    Plaintiff Popescu (for purposes of this section, the "Maine Plaintiff") brings this claim individually and on behalf of the proposed Maine Subclass.

447.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

448.    Volkswagen was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

166

449. With respect to leases, Volkswagen was all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

450. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

451. The Class Vehicles, when sold or leased, and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that their ACC controls components are defective and incapable of providing safe and reliable transportation as described herein.

452. The Class Vehicles were not fit for their ordinary purpose of providing safe and reliable transportation.

453. On October 30, 2025, the Maine Plaintiff notified Volkswagen of the breach within a reasonable time of its breach, and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure their breaches would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

454. Volkswagen's breaches of the implied warranty of merchantability caused damage to the Maine Plaintiff and the members of the Maine Subclass in an

amount of damages to be proven at trial.

## COUNT XXIII
### Breach of Express Warranty
### (Me. Rev. Stat. Tit. §§ 2-313 and 2-1210)
### (On Behalf of the Maine Subclass)

455.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

456.   Plaintiff Popescu (for purposes of this section, the "Maine Plaintiff") brings this claim individually and on behalf of the proposed Maine Subclass.

457.   Volkswagen was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

458.   With respect to leases, Volkswagen was all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

459.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

460.   In connection with the sale or lease of the Class Vehicles, Volkswagen provided purchasers or lessees of the Class Vehicles with its 4-year/50,000-mile NVLW, which was an express warranty and became part of the basis of the parties' bargain.

461.   Volkswagen's warranties formed a basis of the bargain that were reached when the Maine Plaintiff and the Maine Subclass members purchased or

168

leased their Class Vehicles.

462.   Plaintiff and the Maine Class members experienced the Defect within the warranty period. Despite the existence of warranties, Volkswagen failed to inform Plaintiff and Maine Class members that the Class Vehicles contained the Defect which would cause the Class Vehicles to uncontrollably accelerate, and the redundant safety systems fail to engage, resulting in damage to person and property, and failed to fix the defective ACC components free of charge.

463.   On October 30, 2025, the Maine Plaintiff notified Volkswagen of the breach within a reasonable time of its breach, and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure their breaches would have been futile. Volkswagen was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

464.   Volkswagen breached the express warranty by failing to provide the Maine Plaintiff and the Maine Subclass members with a remedy to the Defect.

465.   Finally, because of Volkswagen's breach of warranty as set forth herein, the Maine Plaintiff and the  Maine Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to the Maine Plaintiff and the Maine Subclass members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and

169

consequential damages allowed by law.

**COUNT XXIII**
**Violation of the Minnesota Prevention of Consumer Fraud Act ("MPCFA")**
**Minn. Stat. § 325F.68, et seq.**
**(On Behalf of the Minnesota Subclass)**

466.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

467.   Plaintiff Gates (for purposes of this section, the "Minnesota Plaintiff") brings this claim individually and on behalf of the proposed Minnesota Subclass.

468.   The MPCFA prohibits:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. Minn. Stat. § 325F.69, subd. 1.

469.   Volkswagen's practices described herein constitute false, misleading, and deceptive practices under the MPCFA.

470.   Defendant's practices, acts, policies, and course of conduct described herein were intended to and did in fact induce Plaintiff and members of the Minnesota Subclass to purchase Class Vehicles containing the Defect.

170

471.   Defendant sold the Class Vehicles, directly or through its authorized resellers, while knowingly concealing or recklessly ignoring that they contained the Defect.

472.   Defendant's practices, acts, policies, and course of conduct are actionable in that: Defendant actively and knowingly misrepresented to Plaintiff and the members of the Minnesota Subclass at the time of their purchase that the manufacturing, materials, and/or workmanship of the Class Vehicles did not contain any material defects, and were in good working order and merchantable.

473.   Plaintiff and members of the Minnesota Subclass were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose, including but not limited to, the representations about the Class Vehicles' quality, design, and safety technology.

474.   Defendant failed to give adequate warnings and notices regarding the Defect and the related problems with the Defect of the Class Vehicles to, and/or actively concealed the fact that the Defect existed from, members of the Minnesota Subclass, despite the fact that Defendant knew of the Defect. Defendant's omissions complained of herein were of material facts to Class members.

475.   Defendant's actions and/or material omissions detailed herein caused Plaintiff and the members of the Minnesota Subclass to expend sums of money at repair centers and elsewhere to repair and/or replace the Defect and/or entire Class

Vehicle, despite the fact that Defendant had prior knowledge of the Defect at the time of placing the Class Vehicles into the stream of commerce. Moreover, Defendant's post-sale failure to repair or replace Plaintiff's and Minnesota Subclass members' Class Vehicles amounted to deceptive conduct under the MPCFA.

476. Defendant's marketing, advertising and promoting of the Class Vehicles was deceptive because it concealed and failed to reveal the Defect.

477. Each and all of the aforementioned conduct is and was deceptive, false, fraudulent and constitutes an unconscionable commercial practice in that Defendant has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the true defective nature of the Class Vehicles.

478. Pursuant to Minn. Stat. § 8.31, subd. 3a, Plaintiff and the Minnesota Subclass members are entitled to relief for Volkswagen's violations of the MPCFA, including: (1) an order enjoining Volkswagen from continuing to engage in the scheme described herein; (2) damages; (3) restitution and other equitable remedies; and (4) recovery of their costs and reasonable attorneys' fees.

479. There was a causal nexus between Defendant's deceptive and unconscionable commercial practices and the damage to Plaintiff and the members of the Minnesota Subclass as alleged herein. Therefore, Plaintiff and the members of the Minnesota Subclass are entitled to recover actual and/or statutory damages

172

and/or trebled damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

480. Volkswagen had a duty to disclose the material facts complained of herein because it made material representations and omissions as detailed herein yet failed to prevent its representations and omissions from misleading Plaintiff and Class members. Moreover, Volkswagen had special knowledge of the material facts herein regarding the Defect to which the Plaintiff and Class members did not have access to. As such, Volkswagen had a duty to disclose these facts to Plaintiff and Class members.

481. The Minnesota Plaintiff made a demand for relief, in writing, to Defendant prior to filing this complaint, sent on November 18, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in violation of the MPCFA and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all others similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Minnesota Subclass.

482. Plaintiff and the members of the Minnesota Subclass seek restitution of all monies that Volkswagen received as a result of selling the defective Class Vehicles to Plaintiff and the members of the Minnesota Subclass. As a result of this deception, Plaintiff and the members of the Minnesota Subclass expended substantial sums of money and time for the repair and/or replacement of their Class Vehicles. Plaintiff is informed and believes that the amount of said restitution is unknown at this time, but will seek relief to amend this complaint at the time of trial, when the same has been ascertained.

483. In addition, Plaintiff and the members of the Minnesota Subclass seek reasonable attorneys' fees. Plaintiff also seek a declaratory judgment that the Defect must be repaired at Defendant's expense.

**COUNT XXIV**
**Violation of the Minnesota Deceptive Trade Practices Act, ("MDTPA")**
**Minn. Stat. § 325D.43 *et seq***
**(On Behalf of the Minnesota Subclass)**

484. Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

485. Plaintiff Gates (for purposes of this section, the "Minnesota Plaintiff") brings this claim individually and on behalf of the proposed Minnesota Subclass.

486. The MDTPA prohibits deceptive trade practices in the course of business, specifically:

(5) represent[ing] that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not                have                .          .          .
(7) represent[ing] that goods or services are of a particular standard, quality, or grade . . . if they are of another . . .
(13) engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
Minn. Stat. § 325D.44(1)

487.  Volkswagen's practices described herein constitute deceptive trade practices under these provisions of the MDTPA, and Volkswagen has violated the MDTPA by engaging in the practices described herein.

488.  Defendant misrepresented and/or knowingly and intentionally concealed material facts concerning the characteristics, uses, and quality of the Class Vehicles, and thereby created confusion among purchasers of the Class Vehicles.

489.  Contrary to Defendant's representations, the Class Vehicles were not safe and reliable modes of transportation, and they could not be used in the manner shown in Defendant's marketing material—*i.e.*, as an all-electric SUV with safe technology that provides safe transportation —without triggering the Defect and becoming largely or wholly unusable.

490.  These misrepresentations and/or omissions led the Minnesota Plaintiff and Minnesota Subclass members to believe that they were purchasing a fully functional, all-electric SUV with safe technology that provides safe transportation, when in fact they purchased Class Vehicles that would cease to function properly if used as advertised.

491. The Minnesota Plaintiff made a demand for relief, in writing, to Defendant prior to filing this complaint, sent on November 18, 2025, via email to counsel and certified mail, return receipt requested, advising Defendant that it was in violation of the MDTPA and demanding that it make full restitution by refunding the monies received in purchasing the Vehicles and that Defendant immediately notify all Vehicle purchasers and owners that the Vehicles are defective and are not as advertised. The letter expressly stated that it was sent on behalf of Plaintiffs and "all others similarly situated." Defendant did not provide the requested class-wide relief and Plaintiff has not received a written tender of class-wide settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Minnesota Subclass.

492. Plaintiff and members of the Minnesota Subclass were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose, including but not limited to, the representations about the Class Vehicles' quality, design, and safety technology.

493. Plaintiff and the members of the Minnesota Subclass are entitled to recover actual, statutory, and all other damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

494.   Upon information and belief, Defendant continues to sell the Class Vehicles and continues to misrepresent and/or knowingly and intentionally conceal material facts concerning the characteristics, uses, and quality of the Class Vehicles.

495.   Plaintiff and the members of the Minnesota Subclass are entitled to injunctive relief because it is likely that many of the Class Vehicles will be used or purchased by unsuspecting members of the putative class, and injunctive relief could prevent harm to those who remain unaware of the Defect which can render the Class Vehicles useless.

496.   Plaintiff and the members of the Minnesota Subclass seek restitution of all monies that Volkswagen received as a result of selling the defective Class Vehicles to Plaintiff and the members of the Minnesota Subclass. As a result of this deception, Plaintiff and the members of the Minnesota Subclass expended substantial sums of money and time for the repair and/or replacement of their Class Vehicles. Plaintiff is informed and believes that the amount of said restitution is unknown at this time, but will seek relief to amend this complaint at the time of trial, when the same has been ascertained.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.      Appoint Plaintiffs as representatives of the Nationwide Class and the respective State Subclasses and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief against Defendant, including an order requiring Volkswagen to buy back or permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that Defendant is financially responsible for all Class notice and administration of Class Relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.


Dated: November 19, 2025

_____
Howard T. Longman
**LONGMAN LAW, P.C.**
354 Eisenhower Parkway, Suite 1800
Livingston, N.J. 07039

178

Telephone: (973) 994-2315
Hlongman@longman.law

Nicholas A. Migliaccio (P29077)
Jason S. Rathod (P18424)
**MIGLIACCIO & RATHOD LLP**
412 H St. NE, Suite 302
Washington D.C. 20002
Telephone: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Scott D. Hirsch (FL Bar No. 50833)
**SCOTT HIRSCH LAW GROUP, PLLC**
6810 N. St. Road 7
Coconut Creek, FL 33073
Telephone: (561) 569-6283
scott@scotthirschlawgroup.com

*Attorneys for Plaintiffs and the Proposed
Class and Subclasses*